IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANGELA CARLOS, as
ADMINISTRATRIX of the ESTATE OF
TIOMBE KIMANA CARLOS,

                Plaintiff,

        v.

YORK COUNTY; PRIMECARE
MEDICAL, INC.; PAMELA
ROLLINGS-MAZZA, MD; PATRICK
GALLAGHER, LPC; ROBERT DAVIS,
MD; HOLLY A. SNYDER, RN; AIMEE
LEIPHART, LPN; MEDICAL JOHN
DOES 1-10; DEPUTY WARDEN CLAIR
DOLL; CAPTAIN CARL NEEPER;
CORRECTIONAL OFFICER ERIKA
COLLINS; CORRECTIONAL
OFFICER GRISSELL SANTOS-
HEREDIA; CORRECTIONAL
COUNSELOR MCNICHOLAS;
CORRECTIONAL COUNSELOR
CRIST; CORRECTIONAL
COUNSELOR NADEAU;
CORRECTIONAL COUNSELOR J.
JACKSON; CORRECTIONAL
COUNSELOR TRIG;
CORRECTIONAL OFFICER JOHN
DOES 1-10,

                Defendants.

No. 1:15-CV-1994-WWC-JFS

JURY TRIAL DEMANDED

FILED
WILKES BARRE
APR 2 7 2016
Per MS

## AMENDED COMPLAINT

## I. PRELIMINARY STATEMENT

1.     This is a civil rights survival and wrongful death action brought under 42 U.S.C. § 1983 and raising supplemental state-law claims concerning the defendants' deliberate indifference and negligence in failing to treat the serious and chronic mental health needs of plaintiff's decedent, Tiombe Kimana Carlos, while she was held as an immigration detainee at the York County Prison, which led directly to Ms. Carlos's death by suicide.

2.     Defendants were aware from more than two years of encounters with Ms. Carlos that her psychiatric condition and the circumstances of her confinement made her a serious risk for suicidal actions.  Indeed, in August 2013, Ms. Carlos attempted to commit suicide by hanging herself with a bed sheet in her cell, but she was stopped by correctional officers.

3.     Notwithstanding this suicide attempt, just two months later, defendants allowed Ms. Carlos to be transferred into a non-suicide resistant cell in a segregated housing area called the Intensive Custody Unit.  They did so despite their knowledge that during the two months following her suicide attempt Ms. Carlos had not received the proper dosage of her prescribed anti-psychotic medication leaving her prone to impulsive actions, and, further, that she had expressed growing frustration and despondency with her prolonged detention and pending removal from the United States.

4. On October 23, 2013, shortly after 9:00 p.m., Ms. Carlos used the sheet which had been issued to her, affixed it to bars covering the window in her cell, and hung herself. By time she was seen by correctional officers, she had no pulse and was, after being rushed to a hospital, pronounced dead. She was 34 years old.

5. Plaintiff now seeks on behalf of Ms. Carlos's estate and heirs, including her teen-aged daughter, damages for the substantial pain and suffering and financial losses caused by the defendants' conduct.

## II. JURISDICTION

6. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III. PARTIES

7. Decedent Tiombe Kimana Carlos ("Ms. Carlos") was at all times relevant to this Complaint incarcerated as an immigration detainee at York County Prison in York, Pennsylvania. She died at the age of 34 on October 23, 2013.

8. Plaintiff Angela Carlos ("Plaintiff"), the mother of Ms. Carlos, was on December 9, 2013, appointed as the Administratrix of the Estate of Tiombe Kimana Carlos by the York County Register of Wills. She brings this action in her capacity as Administratrix of the Estate and for the benefit of Ms. Carlos's heirs.

3

9. Defendant York County is a municipal government entity in the Commonwealth of Pennsylvania, which manages and oversees the York County Prison ("YCP"), 3400 Concord Road, York, PA.

10. Defendant PrimeCare Medical, Inc. ("PrimeCare"), which has a principal place of business at 3940 Locust Lane, Harrisburg, PA 17109, was, at all times relevant to this Complaint, the holder of a contract to provide all medical and mental health services to inmates at YCP.

11. At all times relevant to this Complaint, defendant Pamela Rollings-Mazza, MD, was a physician employed by defendant PrimeCare and assigned to provide psychiatric services at YCP.

12. At all times relevant to this Complaint, defendant Patrick Gallagher, LPC, was a licensed professional counselor employed by defendant PrimeCare and assigned to provide mental health counseling services at YCP.

13. At all times relevant to this Complaint, defendant Robert Davis, MD, was a physician contracted by defendant PrimeCare and assigned to provide psychiatric services at YCP.

14. At all times relevant to this Complaint, defendant Holly A. Snyder, RN, was a registered nurse employed by defendant PrimeCare and assigned to provide mental health nursing services at YCP.

4

15.   At all times relevant to this Complaint, defendant Aimee Leiphart, LPN, was a licensed practical nurse employed by defendant PrimeCare and assigned to provide mental health nursing services at YCP.

16.   At all times relevant to this Complaint, defendant Medical John Does 1-10, were medical and/or mental health professionals employed by defendant PrimeCare assigned to provide medical and/or mental health services at YCP. Plaintiff does not presently know the names of these defendants but will seek leave to amend the Complaint so as to name each appropriate defendant after the completion of additional discovery.

17.   At all times relevant to this Complaint, defendant Deputy Warden Clair Doll was employed by defendant York County as a deputy warden at YCP.

18.   At all times relevant to this Complaint, defendant Captain Carl Neeper was employed by defendant York County as a captain at YCP.

19.   At all times relevant to this Complaint, defendant Correctional Officer Erika Collins was employed by defendant York County as a correctional officer at YCP.

20.   At all times relevant to this Complaint, defendant Correctional Officer Grissell Santos-Heredia was employed by defendant York County as a correctional officer at YCP.

21.   At all times relevant to this Complaint, defendant Correctional Counselor McNicholas was employed by defendant York County as a correctional counselor at YCP.

22.   At all times relevant to this Complaint, defendant Correctional Counselor Crist was employed by defendant York County as a correctional counselor at YCP.

23.   At all times relevant to this Complaint, defendant Correctional Counselor Nadeau was employed by defendant York County as a correctional counselor at YCP.

24.   At all times relevant to this Complaint, defendant Correctional Counselor J. Jackson was employed by defendant York County as a correctional counselor at YCP.

25.   At all times relevant to this Complaint, defendant Correctional Counselor Trig was employed by defendant York County as a correctional counselor at YCP.

26.   At all times relevant to this Complaint, defendant Correctional Officer John Does 1-10, were correctional officers or supervisors employed by defendant York County to work at YCP.  Plaintiff does not presently know the names of these defendants but will seek leave to amend the Complaint so as to name each appropriate defendant after the completion of additional discovery.

27.   At all times relevant to this Complaint, all defendants acted under color of state law.

28.   At all times relevant to this Complaint, defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart and Medical John Does 1-10 were acting as agents, servants, and/or employees of defendant PrimeCare, were acting within the scope and course of their employment, and were acting under the direct control and supervision of defendant PrimeCare.

29.   At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Ms. Carlos.

## IV. FACTUAL ALLEGATIONS

### A. Suicide Risk Factors in the Correctional Environment

30.   It is well recognized by professionals working in the correctional environment, including all defendants in this matter, that inmate populations include many persons with serious mental illness and specialized mental health needs.

31.   It is additionally well recognized by professionals working in the correctional environment, including all defendants in this matter, that inmates with mental health needs are at substantial risk for attempting to commit suicide while incarcerated.

32.   Professionals working in the correctional environment, including all defendants in this matter, are aware of the specific factors that make an inmate a risk to attempt suicide, including, but not limited to:

    a.  A history of mental illness;

    b.  A history of extreme psychiatric symptoms upon changes in medication delivery;

    c.  A history of violence toward others;

    d.  A history of victimization by others;

    e.  A history of prior suicide attempts;

    f.  Significant stressors including expectation of a prolonged period of incarceration or deportation; and

    g.  Placement in "special management" segregated housing units for punitive purposes.

33.   Professionals working in the correctional environment, including all defendants in this matter, are aware of several recognized methods to mitigate and prevent the risks of suicide for an inmate who presents with such risk factors, including, but not limited to:

    a.  The development of a comprehensive treatment plan;

    b.  Placement of the inmate in a treatment-focused housing area;

    c.  Conducting periodic suicide risk evaluations;

    d.  Close management of medication delivery;

    e.  Ensuring alerts to mental health professionals upon any change in the housing location for the inmate; and

    f.  If necessary, placement in a suicide resistant cell without access to linens and clothing which could be used in a suicide attempt.

## B. Ms. Carlos's Chronic Mental Illness And Her Incarceration At YCP

34.  Ms. Carlos was born in Antigua and Barbuda and immigrated to the United States with her family when she was a child.  She obtained lawful permanent resident—i.e. "green card"—status, but had never become a citizen.

35.  In her early teen years, Ms. Carlos suffered from serious mental health symptoms, with paranoid thought patterns and hallucinations.

36.  On at least two occasions in her teen-aged years, Ms. Carlos reported that she was the victim of rape.

37.  Ms. Carlos was prescribed various medications for the treatment of her mental health condition, but when she was not compliant with her medication schedule, she experienced severe psychiatric conditions.

38.  Throughout her teen years and early adulthood, Ms. Carlos was hospitalized for the treatment of her mental health conditions on numerous occasions.

39. Ms. Carlos's paranoia was focused on authority figures; when experiencing severe psychiatric conditions, she believed that law enforcement officers were out to get her.

40. As a likely result of these psychiatric symptoms, Ms. Carlos was arrested due to a physical altercation with a police officer. While incarcerated after a conviction for that physical altercation, Ms. Carlos was accused of assaulting a correctional officer. That assault resulted in additional imprisonment for Ms. Carlos.

41. Because Ms. Carlos was a lawful permanent resident and not a citizen, those convictions rendered Ms. Carlos subject to removal from the United States.

42. At the conclusion of her criminal sentence and upon the initiation of removal proceedings, Ms. Carlos was taken into custody by U.S. Immigration and Customs Enforcement and transferred to YCP, which, by virtue of a contract between defendant York County and the federal government, houses immigration detainees.

43. Ms. Carlos was admitted to YCP on April 18, 2011.

44. Immediately upon her admission, correctional and medical/mental health staff at YCP were aware of Ms. Carlos's serious mental health needs.

45.   Because she was found to have "impulse control issues" and acted out in interactions with staff, Ms. Carlos was placed in a "Behavioral Adjustment Unit," a special housing area intended to enforce discipline.

46.   Ms. Carlos was, shortly after her admission, seen by mental health staff, including defendants Dr. Rollings-Mazza, a psychiatrist, and Mr. Gallagher, a mental health counselor.

47.   Dr. Rollings-Mazza and Mr. Gallagher were charged with supervising Ms. Carlos's mental health care throughout her incarceration at YCP.

48.   Defendants Davis, Snyder and Leiphart were, likewise, regularly involved in the provision of mental health care to Ms. Carlos throughout her incarceration at YCP.

49.   Dr. Rollings-Mazza, upon noting that Ms. Carlos appeared to be suffering from a psychotic condition, ordered that Ms. Carlos receive Haldol, a powerful anti-psychotic medication.

50.   Dr. Rollings-Mazza ordered that Ms. Carlos receive this medication via injections every two weeks.

51.   Injectable psychiatric medications are provided to patients who, due to their illness, cannot be expected to ingest medications on a more regular basis.

52.   When psychiatric medications are provided by injection, regular compliance with the scheduled injections is critical for the medications to have

their desired effect; any delays in the provision of medications could result in an increase in psychiatric symptoms.

53.    Throughout Ms. Carlos's incarceration at YCP, Ms. Carlos's Haldol injections were periodically delayed.

54.    Mental health practitioners, including Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder and Nurse Leiphart were aware that when Ms. Carlos's medications were not provided on a regular schedule, she experienced severe psychiatric symptoms and a marked increase in impulsive behavior.

55.    Beyond prescribing the administration of Haldol injections for Ms. Carlos, at no time during Ms. Carlos's incarceration at YCP did Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder or Nurse Leiphart arrange for the development of a treatment plan to fully address Ms. Carlos's chronic mental health condition.

56.    Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder and Nurse Leiphart failed to initiate the development of a treatment plan at any time in the more than two years that Ms. Carlos was incarcerated at YCP notwithstanding their knowledge that the development of a treatment plan was critical to treating Ms. Carlos's serious mental health needs.

57.    In the early part of her incarceration at YCP, an immigration lawyer retained by Ms. Carlos's family undertook extensive efforts to persuade U.S.

Immigration and Customs Enforcement to exercise its discretion to terminate its attempt to remove Ms. Carlos from the country and allow for her to be released to a community based mental health housing arrangement which would allow for close monitoring of her symptoms and medication compliance and provide a structured living environment.

58.   As part of those efforts, Ms. Carlos's immigration lawyer secured an expert evaluation from a psychologist who, in September 2011, completed a comprehensive evaluation of Ms. Carlos.

59.   The psychologist issued a report with several recommendations, including that Ms. Carlos be under the close supervision of psychiatrists, that she be provided a supporting and structured living environment, that her stress levels be minimized and that her medication compliance be closely monitored.

60.   Upon information and belief, the psychologist's report was provided to correctional and mental health staff at YCP, including the defendants in this matter. At no time, however, did any defendant implement any of the recommendations offered by the psychologist.

61.   Instead, Ms. Carlos continued to experience difficulties with medication management and conflicts with staff related to her law-enforcement based paranoia.

62.     As a result of such conflicts, in the summer of 2013, Ms. Carlos was housed in the "Behavioral Adjustment Unit" of YCP, where she remained until she was transferred to general population on August 12, 2013.

## C. Ms. Carlos's Suicide Attempt Followed By Her Completed Suicide

63.     On August 13, 2013, just one day after she had been permitted to reside in general population, Ms. Carlos attempted suicide.

64.     Ms. Carlos took the sheet which had been issued to her, wrapped it around her neck as a noose and affixed it to bars in her cell and sat down in such a way as to place tension on the sheet.

65.     Correctional officers observed Ms. Carlos and were able to intervene and cut the sheet from Ms. Carlos's neck.

66.     Ms. Carlos was taken to an outside hospital for assessment of her condition and was released back to YCP.

67.     Prior to Ms. Carlos's suicide attempt, she had not received her biweekly prescribed Haldol injections and, therefore, was at increased risk for severe mental health reactions.

68.     Notwithstanding Ms. Carlos's suicide attempt, the mental health practitioners responsible for her care, including Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder, Nurse Leiphart and Medical John Does 1-10,

made no effort to develop a treatment plan to address Ms. Carlos's obvious risks for suicide.

69.   Instead, Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder, Nurse Leiphart and Medical John Does 1-10 persisted in intervening only with Haldol injections.

70.   However, between the August 13, 2013 suicide attempt and mid-October, Ms. Carlos missed at least two Haldol injections, leaving her with inadequate medication in her system to address her psychiatric symptoms.

71.   Additionally, after her August 13, 2013 suicide attempt, Ms. Carlos was placed in a special management housing area, the Intensive Custody Unit ("ICU").

72.   The ICU is a punitive segregation area where inmates are held in harsh conditions with little access to recreation or time out of the cell.

73.   The decision to house Ms. Carlos in the ICU was made by correctional staff including Deputy Warden Doll, Captain Neeper and defendant Correctional Officer John Does 1-10.

74.   Throughout Ms. Carlos's time in the ICU, correctional counselors employed by YCP, including defendant Correctional Counselors McNicholas, Crist, Nadeau, J. Jackson and Trig, had regular encounters with Ms. Carlos.

75.    Defendants Doll, Neeper, McNicholas, Crist, Nadeau, J. Jackson and Trig were aware of Ms. Carlos's chronic mental health history and her suicide attempt; they were, likewise, aware of the fact that placement of an inmate in a punitive segregation housing area is a recognized high risk factor for suicide.

76.    These defendants were additionally aware that Ms. Carlos was despondent over her placement in the ICU and that this placement had serious effects on her mental health.

77.    Defendants Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder, Nurse Leiphart and Medical John Does 1-10, despite their knowledge that the placement of a Ms. Carlos in a punitive segregation housing area presented serious risks to Ms. Carlos, made no effort to intervene with the decision to place Ms. Carlos in the ICU.

78.    On or about October 21, 2013, after Ms. Carlos had been housed in the "B Pod" of the ICU for several weeks, she was moved to a different cell within the "A Pod" of the ICU.

79.    At the time she was moved to the different cell on a different pod, there were numerous factors that made Ms. Carlos an obvious risk for suicide, including the following:

a. She had attempted suicide just over two months earlier;

b. That prior suicide attempt occurred just one day after her move to a new location at YCP;

c. She had not received appropriate dosage of her Haldol injections in the two months since that suicide attempt;

d. Prior experience with Ms. Carlos showed that improper dosing of her Haldol had a serious impact on her psychiatric functioning and rendered her impulsive;

e. Ms. Carlos was known to be despondent over her prolonged immigration detention—more than two-and-a-half years—and her impending removal from the United States; and

f. Ms. Carlos had spent weeks in a punitive segregation environment.

80. The above-listed risk factors were in addition to risk factors that were known to be present for Ms. Carlos since the beginning of her incarceration at YCP, including the fact that she had a chronic mental illness, she had reportedly been victimized by sexual assaults, and she had acted with violence toward others.

81. At the time Ms. Carlos was moved to a different cell in the ICU, all of the above-referenced individual defendants were aware of each of these factors and aware that these factors made Ms. Carlos a substantial risk for suicide.

82. Notwithstanding their knowledge of these risks, Ms. Carlos was placed in a cell of the "A Pod" of the ICU that was not suicide resistant.

83.   The "A Pod" had at least three cells that were classified as suicide resistant.

84.   In Ms. Carlos's non-suicide-resistant cell, there were exposed bars, which allowed for the attachment of a noose.

85.   Ms. Carlos was issued a bed sheet and other clothing that could be used for a noose.

86.   The correctional officers assigned to supervise Ms. Carlos on the "A Pod" included defendant Correctional Officers Collins and Santos-Heredia.

87.   Defendants Collins and Santos-Heredia were, as with the individual defendants referenced above, aware that the above-described factors made Ms. Carlos a substantial risk for suicide

88.   At approximately 9:00 p.m., on October 23, 2013, two days after Ms. Carlos was placed in the non-suicide resistant cell on "A Pod" in the ICU, defendant Collins, while walking in "A Pod," heard a verbal dispute between Ms. Carlos and another inmate.

89.   Defendants Collins and Santos-Heredia were both aware of the dispute and were specifically aware that, as a result of the dispute, another inmate in the "A Pod" had told Ms. Carlos: "go kill yourself."

90.   Defendants Collins and Santos-Heredia knew that the dispute with the other inmate left Ms. Carlos in a highly agitated state.

91.  Despite their knowledge of Ms. Carlos's agitation and despite their knowledge that Ms. Carlos presented a substantial risk to commit suicide as described above, neither defendant Collins nor defendant Santos-Heredia took any action to seek mental health treatment for Ms. Carlos or to otherwise minimize the risk that she would attempt to harm herself.

92.  When a correctional officer next returned to "A Pod," she observed Ms. Carlos hanging from a bed sheet tied around her neck and affixed to the bars covering a window in the cell.

93.  An emergency alert was issued and correctional and medical staff were summoned to Ms. Carlos's cell.

94.  Ms. Carlos could not be revived and was pronounced dead.

### D.  Defendants' Violation Of Ms. Carlos's Constitutional Rights And Defendants' Violation Of Their Duty Of Care To Ms. Carlos

95.  Defendants Dr. Rollings-Mazza, Mr. Gallagher, Dr. Davis, Nurse Snyder, Nurse Leiphart, Deputy Warden Doll, Captain Neeper, Correctional Officer Collins, Correctional Officer Santos-Heredia, Correctional Counselor McNicholas, Correctional Counselor Crist, Correctional Counselor Nadeau, Correctional Counselor J. Jackson, Correctional Counselor Trig, Correctional Officer John Does 1-10 and Medical John Does 1-10 (collectively "individual defendants") were aware of Ms. Carlos's serious and chronic mental health needs.

96.    Notwithstanding the individual defendants' knowledge of Ms. Carlos's serious and chronic health needs and notwithstanding their knowledge of numerous risk factors present in the days before Ms. Carlos's suicide, defendants failed to take reasonable actions to mitigate the risks and to prevent a suicide.

97.    Instead, the individual defendants allowed Ms. Carlos to be placed in a non-suicide resistant cell with access to items and materials that would allow for her to affix a noose to her neck just as she had done two-and-a-half months earlier.

98.    Ms. Carlos's suicide was the direct and proximate result of the defendants' failures as outlined above.

99.    At all relevant times, the individual defendants were aware of Ms. Carlos's serious mental health needs and failed, with deliberate indifference, to ensure that Ms. Carlos would receive treatment that would mitigate the risk that she would attempt suicide.

100.    At all times relevant to this Complaint, as evidenced by the lack of appropriate care provided to Ms. Carlos in this case, defendants York County and PrimeCare, with deliberate indifference, failed to develop and implement policies, practices, and procedures to ensure that inmates in the position of Ms. Carlos would be treated in a way that would mitigate significant risks of suicide.

101.    At all times relevant to this Complaint, as evidenced by the lack of appropriate care provided to Ms. Carlos in this case, defendants York County and

PrimeCare, with deliberate indifference, failed to properly train, supervise and discipline medical/mental health and correctional personnel at YCP so as to ensure that inmates in the position of Ms. Carlos would be treated in a way that would mitigate significant risks of suicide.

102.   At all times relevant to this Complaint, the conduct of all defendants was in willful, reckless, and callous disregard of Ms. Carlos's rights under federal and state law.

103.   As a direct and proximate result of the conduct of all defendants, Ms. Carlos experienced enormous physical and emotional pain and suffering.

104.   As a direct and proximate result of the conduct of all defendants, Ms. Carlos was caused to lose her life and thereby caused to suffer complete loss of earnings and earnings capacity.

## V. WRONGFUL DEATH AND SURVIVAL ACTIONS

105.   Plaintiff, as Administratrix of the Estate of Tiombe Kimana Carlos, brings this action on behalf of Ms. Carlos's heirs under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

106.   Ms. Carlos's heirs under the Wrongful Death Act are:

   a. Her father, Hueth Carlos, 2500 Knights Road, Bldg. 38, Apt. 2, Bensalem, PA 19020;

   b. Her mother, Angela Carlos, the plaintiff in this action; and

c. Her daughter, Natalla Carlos, 2500 Knights Road, Bldg. 38, Apt. 2,

Bensalem, PA 19020.

107. Ms. Carlos did not bring an action against defendants for damages for the injuries causing her death during her lifetime.

108. Ms. Carlos's heirs have, by reason of Ms. Carlos's death, suffered pecuniary loss, and have or will incur expenses for the costs of Ms. Carlos's funeral, the costs of Ms. Carlos's headstone, and the costs of administering Ms. Carlos's estate.

109. Ms. Carlos's heirs have, by reason of Ms. Carlos's death, suffered further pecuniary loss including expected contributions and financial support from Ms. Carlos for food, clothing, shelter, medical care, education, entertainment, recreation and gifts as well as, for her daughter, the loss of moral guidance, support and tutelage.

110. Plaintiff also brings this action on behalf of the Estate of Tiombe Kimana Carlos under the Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, under which all claims Ms. Carlos would have been able to bring had she survived, may be brought by Ms. Carlos's estate.

111. Ms. Carlos's estate has, by reason of Ms. Carlos's death, suffered pecuniary loss, and has or will incur expenses for the costs of Ms. Carlos's funeral,

the costs of Ms. Carlos's headstone, and the costs of administering Ms. Carlos's estate.

112.   As a direct and proximate result of the conduct of all defendants, Ms. Carlos experienced extraordinary physical and emotional pain and suffering before her death, and, as a result of her death, suffered complete loss of earnings and earnings capacity.

113.   Plaintiff, via this survival action, seeks damages for these harms caused to Ms. Carlos.

## VI.  CLAIMS FOR RELIEF

### COUNT I
**Plaintiff v. Defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart, Doll, Neeper, Collins, Santos-Heredia, McNicholas, Crist, Nadeau, J. Jackson, Trig, Medical John Does 1-10, Correctional Officer John Does 1-10 Federal Constitutional Claims**

114.   Defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart, Doll, Neeper, Collins, Santos-Heredia, McNicholas, Crist, Nadeau, J. Jackson, Trig, Medical John Does 1-10, and Correctional Officer John Does 1-10 were deliberately indifferent to Ms. Carlos's serious medical needs and thereby violated Ms. Carlos's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and/or Ms. Carlos's right to due process of law under the Fourteenth Amendment to the United States Constitution.

## COUNT II
### Plaintiff v. Defendants York County and PrimeCare
### Federal Constitutional Claims

115.  The violations of Ms. Carlos's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, plaintiff's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and/or inactions of defendants York County and PrimeCare, which have, with deliberate indifference, failed to establish policies, practices, and procedures and/or have failed to properly train, supervise and discipline their employees regarding the treatment of inmates with serious and chronic mental health needs who present with significant risk factors for suicide.

## COUNT III

### Plaintiff v. Defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart, Medical John Does 1-10 and PrimeCare
### State Law Negligence Claims

116.  Defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart and Medical John Does 1-10 had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Ms. Carlos.

117.  Defendants Rollings-Mazza, Gallagher Davis, Snyder, Leiphart and Medical John Does 1-10 violated their duty of care to Ms. Carlos.

118.   The defendants' violation of their duty of care to Ms. Carlos was a direct and proximate cause and a substantial factor in bringing about Ms. Carlos's damages as outlined above, and, as a result, defendants are liable to plaintiff.

119.   Because the individual defendants were acting as agents, servants, and/or employees of defendant PrimeCare, and because the individual defendants were acting within the scope and course of their employment, and under the direct control and supervision of defendant PrimeCare, defendant PrimeCare is liable to plaintiff on the basis of *respondeat superior* liability.

## VI.  REQUESTED RELIEF

**Wherefore**, plaintiff respectfully requests:

A.  Compensatory damages as to all defendants;

B.  Punitive damages as to defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart, Doll, Neeper, Collins, Santos-Heredia, McNicholas, Crist, Nadeau, J. Jackson, Trig Medical John Does 1-10, and Correctional Officer John Does 1-10;

C.  Reasonable attorneys' fees and costs;

D.  Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ Susan M. Lin
Susan M. Lin
slin@krlawphila.com

/s/ David Rudovsky
David Rudovsky
drudovsky@krlawphila.com

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
jfeinberg@krlawphila.com

KAIRYS, RUDOVSKY, MESSING & FEINBERG LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)
*Counsel for Plaintiff*