**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA CARLOS, as ADMINISTRATRIX OF THE ESTATE OF TIOMBE KIMANA CARLOS, | : | CIVIL ACTION  No. 1:15-cv-01994-WWC |
| | : | |
| Plaintiff | : | |
| | : | [ELECTRONICALLY FILED] |
| v. | : | |
| | : | |
| YORK COUNTY, et al., | : | District Judge William W. Caldwell |
| Defendants | : | Magistrate Judge Joseph F. Saporito |

**BRIEF IN SUPPORT OF DEFENDANT PATRICK GALLAGHER'S MOTION FOR SUMMARY JUDGMENT**

**SAXTON & STUMP**

Date:   February 7, 2017

By:   */s/ Brandon R. Conrad* _____
Brandon R. Conrad, Esquire
Harlan W. Glasser, Esquire
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: (717) 556-1000
Email: brc@saxtonstump.com
        hwg@saxtonstump.com
*For Defendant Patrick Gallagher, LPC*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

I.   INTRODUCTION ..................................................................................................1

II.  PERTINENT PROCEDURAL HISTORY ...........................................................2

III. STATEMENT OF FACTS .....................................................................................2

    A.   COUNSELOR GALLAGHER ..........................................................................2

    B.   TIOMBE CARLOS ..........................................................................................3

    C.   YORK COUNTY PRISON ...............................................................................3

        1.   HOUSING CLASSIFICATION AND LAYOUT .......................................3

        2.   SEGREGATED STATUSES ....................................................................4

        3.   MS. CARLOS' INCARCERATION AT YORK COUNTY PRISON ..........5

IV.  STATEMENT OF QUESTIONS INVOLVED ...................................................14

V.   LEGAL STANDARD ...........................................................................................14

VI.  ARGUMENT .......................................................................................................15

    A.   PLAINTIFF CANNOT ESTABLISH THAT COUNSELOR GALLAGHER WAS
        DELIBERATELY INDIFFERENT TO MS. CARLOS' PARTICULAR
        VULNERABILITY TO COMMIT SUICIDE. ...................................................15

        1.   PLAINTIFF CANNOT ESTABLISH MS. CARLOS HAD A SERIOUS
            MEDICAL NEED. .............................................................................16

        2.   PLAINTIFF CANNOT ESTABLISH COUNSELOR GALLAGHER WAS
            DELIBERATELY INDIFFERENT .........................................................20

    B.   COUNSELOR GALLAGHER IS ENTITLED TO SUMMARY JUDGMENT
        ON PLAINTIFF'S STATE LAW CLAIMS BECAUSE SUCH CLAIMS
        CANNOT BE MAINTAINED AS A MATTER OF LAW .....................................23

          1.        COUNSELOR GALLAGHER IS NOT A PROFESSIONAL AGAINST WHOM A PROFESSIONAL NEGLIGENCE CLAIM CAN BE ASSERTED UNDER PENNSYLVANIA LAW ..................................................................................23

          2.        PLAINTIFF CANNOT ESTABLISH COUNSELOR GALLAGHER WAS NEGLIGENT ....................................................................................24

    C.      COUNSELOR GALLAGHER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES ........................................28

VII.    CONCLUSION ................................................................................................29

CERTIFICATION OF COMPLIANCE ...................................................................... vi

CERTIFICATION OF SERVICE ............................................................................. vii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986) ...........................................................................................15

*Beers-Capitol v. Whetzel,*
    256 F.3d 120 (3d Cir. 2001) .............................................................................21

*Brown v. Borough of Chambersburg,*
    903 F.2d 274 (3d Cir. 1990) .............................................................................21

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...........................................................................................15

*Colburn v. Upper Darby Twp.,*
    946 F.2d 1017 (3d Cir. 1991) .............................................................16, 17, 20

*Deitzel v. Gurman,*
    806 A.2d 1264 (Pa. Super. 2002) .....................................................................24

*Dimitris v. Lancaster Cnty. Prison Bd.,*
    No. 00-cv-3739, 2002 U.S. Dist. LEXIS 11280 (E.D. Pa. 2002) ....................21

*Estate of Puza v. Carbon Cnty.,*
    586 F. Supp. 2d 271 (M.D. Pa. 2007), *aff'd sub nom.*
    *Barker-Puza v. Carbon Cnty.,*
    2008 U.S. App. LEXIS 25613 (3d Cir. 2008) ...................................16, 17, 28

*Estate of Thomas v. Fayette Cnty.,*
    2016 U.S. Dist. LEXIS 88647 (W.D. Pa. 2016) ......................................16, n.3

*Estelle v. Gamble,*
    429 U.S. 97 (1976) .............................................................................................15

*Farmer v. Brennan,*
    511 U.S. 825 (1994) .....................................................................................15, 21

*First v. Zem Zem Temple,*
    686 A.2d 18 (Pa. Super. 1986) .........................................................................27

*Geter v. Owens Corning Fiberglass Corp.,*
    716 A.2d 633 (Pa. Super. 1998) .......................................................................27

Page(s)

*Gilmour v. Bohmueller*,
No. 04-cv-2535, 2005 U.S. Dist. LEXIS 1611 (E.D. Pa. 2005) ......................................24

*Herman v. Cnty. of York*,
482 F. Supp. 2d 554 (M.D. Pa. 2007) ...........................................................................20

*Hower v. Rogers*,
53 Pa. D. & C. 4th 353 (Pa. Com. Pl. Berks Cnty. 2001),
*aff'd in part, rev. in part on other grounds*
2002 Pa. Super. LEXIS 3103 (Pa. Super. 2002) ...........................................................25

*Hutchison v. Luddy*,
870 A.2d 766 (Pa. 2005) ...............................................................................................28

*Inmates of Allegheny Cnty. Jail v. Pierce*,
612 F.2d 754 (3d Cir. 1979) ..........................................................................................21

*Innis v. Wilson*,
334 F. App'x 454 (3d Cir. 2009) .............................................................................. 20-21

*Joines v. Twp. of Ridley*,
229 F. App'x 161 (3d Cir. 2007) ...................................................................................16

*Jones v. U.P.S.*,
214 F.3d 402, 407 (3d Cir. 2000) ..................................................................................15

*Keohane v. Lancaster Cnty.*,
No. 07-cv-3175, 2010 U.S. Dist. LEXIS 85714 (E.D. Pa. 2010) ...................................n.8

*Liggon-Redding v. Estate of Sugarman*,
659 F.3d 258 (3d Cir. 2011) ..........................................................................................n.9

*Mitzelfelt v. Kamrin*,
584 A.2d 888, 892 (Pa. 1990) ................................................................................. 26-27

*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*,
834 F.2d 336 (3d Cir. 1987) ..........................................................................................15

*Palakovic v. Wetzel*,
No. 3:14-cv-145, 2015 U.S. Dist. LEXIS 83286 (W.D. Pa. 2015) ...........................19, 21

*Powell v. Risser*,
99 A.2d 454, 456 (Pa. 1953) (3d Cir. 1991) .................................................................25

Page(s)

*Reilly v. Tiergarten*,
    633 A.2d 208 (Pa. Super. 1993) ......................................................................27

*Rouse v. Plantier*,
    182 F.3d 192 (3d Cir. 1999) ..........................................................................21

*Schuenemann v. United States*,
    No. 05-2565, 2006 U.S. App LEXIS 4350 (3d Cir. 2006) ...............................20

*Smith v. Wade*,
    461 U.S. 30 (1983) ........................................................................................28

*Titchnell v. United States*,
    681 F.2d 165 (3d Cir. 1982) ..........................................................................25

*Wargo v. Schuykill Cnty.*,
    No. 3:06-cv-2156, 2008 U.S. Dist. LEXIS 92866 (M.D. Pa. 2008),
    *aff'd* 2009 U.S. App. LEXIS 22279 (3d Cir. 2009) .......................................20

*Woloszyn v. Cnty. of Lawrence*,
    396 F.3d 314 (3d Cir. 2005) ...................................................................16, 20

**Court Rules and Statutes**

Fed. R. Civ. P. 56.............................................................................................15
Pa. R.C.P. 1042.1 ................................................................................ 23-24, n.10
40 P.S. §1303.503 ............................................................................... 23-24, n.10

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA CARLOS, as ADMINISTRATRIX OF THE ESTATE OF TIOMBE KIMANA CARLOS, | : : : | CIVIL ACTION  No. 1:15-cv-01994-WWC |
| Plaintiff | : : | [ELECTRONICALLY FILED] |
| v. | : : | |
| YORK COUNTY, et al., | : : | |
| Defendants | : | The Honorable William W. Caldwell |

**BRIEF IN SUPPORT OF DEFENDANT PATRICK GALLAGHER'S MOTION FOR
SUMMARY JUDGMENT**

I.    **INTRODUCTION**

Not a single individual who encountered Tiombe Carlos ("Ms. Carlos") throughout her 2 ½ year incarceration at York County Prison believed she would commit suicide.  Indeed, even Ms. Carlos' own family described her as happy, future oriented, and behaving normally just days before her death.  The undisputed facts of record are clear: no one, including Licensed Professional Counselor Patrick Gallagher, believed that Ms. Carlos had a particular vulnerability to suicide on October 23, 2013, or at any time during the prior 65 days.

It is undisputed that Ms. Carlos was objectively and subjectively stable on Haldol, which the records and testimony confirm she received every two weeks in the months preceding her death.  Plaintiff has not submitted that continuing Ms. Carlos' treatment plan with Haldol was negligent or improper.  Even if she did, medication management is beyond the scope of a mental health counselor's responsibility.

The record established through discovery does not and cannot support a claim that Counselor Gallagher was negligent in treating Ms. Carlos – let alone that he was deliberately indifferent to her serious medical needs – or behaved in a manner that can justify a claim for punitive damages.  Accordingly, Counselor Gallagher is entitled to judgment as a matter of law.

1

## II.     PERTINENT PROCEDURAL HISTORY

Plaintiff, Angela Carlos, in her capacity as Administratix of the Estate of Ms. Carlos, brought this action against York County, PrimeCare Medical, Patrick Gallagher, LPC ("Counselor Gallagher"), Psychiatrists Pamela Rollings-Mazza, M.D., and Robert Davis, M.D., two Mental Health Nurses, ten members of York County Prison's correctional staff, and twenty medical and correctional "John Doe" defendants, alleging that they each were recklessly indifferent to Ms. Carlos' serious medical needs and violated her constitutional rights, asserting pendent state law professional negligence claims, and requesting punitive damages.   (Doc. 1; Doc. 36.)   The pleadings closed on August 30, 2016.[1]   (Doc. 63.)

Discovery closed on September 15, 2016, and the Parties timely produced expert reports. (See Doc. 58.)   Plaintiff's single expert, Raymond Patterson, M.D., a psychiatrist, mentions Counselor Gallagher's name only once and criticizes him for "not following the applicable policies for suicide prevention and management including follow-up with inmates released from suicide watch."   Counselor Gallagher now timely moves for Summary Judgment.

## III.     STATEMENT OF FACTS

### A.  Counselor Gallagher

Counselor Gallagher has been employed at York County Prison for 31 years.  (SMF 1.)  As a Licensed Professional Counselor, he provides direct therapeutic services to inmates, conducts intake assessments, performs crisis intervention, and manages inmates on mental health status to step them down when they are no longer acutely suicidal.  Counselor Gallagher cannot modify an inmate's psychiatric medication regimen and did not administer the medication that had been prescribed by the psychiatrist.  (SMF 4.)

---

[1] On August 19, 2016, The Court denied Counselor Gallagher's motion to dismiss and permitted this matter to proceed to discovery.  (Doc. 62.)

2

B. <u>Tiombe Carlos</u>

Ms. Carlos was a citizen and national of Antigua and Barbuda. (SMF 14.) Ms. Carlos was consistently in the custody of state and federal authorities from 2003 until her death on October 23, 2013.[2] (<u>SMF</u> 15.) On February 3, 2011, Ms. Carlos was transferred into the custody of U.S. Immigration and Customs Enforcement ("ICE"), and was briefly committed to the Bristol County correctional system as a detainee. (<u>Ex. K</u> at PCM 2558). Upon commitment, Ms. Carlos self-reported that she had schizophrenia and bipolar disorder and was being treated with Haldol injections. (<u>Id.</u> at PCM 2561.) Ms. Carlos denied she had ever been sexually abused and reported that she had previously attempted suicide by hanging. (<u>SMF</u> 17; <u>Ex. K</u> at PCM 2550-51, 2561.) Bristol County accepted Ms. Carlos' self-reported diagnoses and continued her course of treatment with Haldol. (<u>Ex. K</u> at PCM 2559.) On April 14, 2011, Ms. Carlos was transferred to York County Prison as an ICE detainee. (<u>SMF</u> 18.)

C. <u>York County Prison</u>

Plaintiff's allegations–and much of Patterson's report–are based upon a misunderstanding of York County Prison and differences between housing units and segregated statuses.

1. <u>Housing Classification and Layout</u>

York County Prison requires inmates to be confined in the least restrictive housing accommodations consistent with safety and security. (<u>SMF</u> 22.) Specific cell assignments are the sole province of correctional staff, and are carried out by correctional officers.

The Female Maximum Security portion is comprised of five "Pods." (<u>SMF</u> 23.) "A Pod" and "D Pod" are identical segregated housing pods, each containing six double occupancy cells.

---

[2] Ms. Carlos' initial incarceration stemmed from a conviction of felony assault, for which she was sentenced to an 8-year term of imprisonment. (<u>Ex. I</u> at Carlos 914.) As a result of her conviction and considering her immigration status, she was ordered to be removed, which became final on July 24, 2012. (<u>Ex. L</u> at YC 764.)

(SMF 24.)  The "BAU Pod" is also for inmates on segregated statuses and contains two suicide resistant cells.  (SMF 26.)  Inmates on medical statuses, such as Psychiatric Observation and Suicide Precaution, and segregated disciplinary statuses, such as Intensive Custody Unit ("ICU") Status and Behavioral Adjustment Unit ("BAU") Status, can be housed only in the A Pod, D Pod, or BAU Pod.  (SMF 27.)  Corrections Officers perform rounds of these three Pods on staggered 15-minute intervals.  (Ex. F, 36:14-20.)

2.  Segregated Statuses

York County policies also outline various status applicable to inmates.  An inmate may be on multiple status simultaneously.  The Program Review Committee ("PRC") conducts weekly reviews of all inmates on segregated statuses.  (SMF 31.)  BAU Status is a segregated security status used for inmates that have received disciplinary sanctions.  (Ex. D, 67:3-7.)  Inmates on BAU Status are entitled to 1 hour outside their cell five times per week and have access to limited property. (Id. at 67:10-24). Ms. Carlos spent a total of 163 days on BAU Status.  (SMF 29.)  ICU Status is a segregated security status for the detention of inmates who have established a pattern of violence and for those who are mentally disturbed or are unable to live in the general population. (Ex. D, 68:3-18.)  ICU Status is considered by correctional staff as a "stable status" for inmates who "don't follow the rules, get write ups, and have no other housing options." (Ex. C, 60:22-24.) Inmates on ICU Status are entitled to 2 hours outside their cell seven days per week and have access to all property.  (Ex. D, 67:14-19.) Ms. Carlos spent a total of 198 days on ICU Status. (SMF 28.)

The Suicide Precaution Status is a segregated medical status for inmates who are: (1) acutely suicidal and express suicidal ideation; or (2) have a mental illness and are engaged in physical altercations.  Inmates on Suicide Precaution are placed on constant watch within the view

4

of a dedicated officer and are provided with only a suicide resistant gown, blanket, and mattress in their cell.  (Ex. D, 60:2-6.)  All correctional staff are familiar with the risk factors of suicide, (SMF 8-10; Ex. D, 40:17-21), have a duty to recognize a patient may be acutely suicidal, (SMF 13), and have the ability to place any inmate they believe is acutely suicidal on Suicide Precaution, (SMF 13).

The Psychiatric Observation Status is a segregated medical status, which is "a step down level from suicide precaution," and is designed to observe, evaluate, and determine appropriate treatment and housing.  A corrections officer conducts staggered 15-minute rounds of any Pod that houses an inmate on Psychiatric Observation Status.  (SMF 30.)

### 3.  Ms. Carlos' Incarceration at York County Prison

Counselor Gallagher first evaluated Ms. Carlos when she was committed to York County Prison.  Ms. Carlos reported she had a history of schizophrenia and reported that Haldol was effective medication.  (SMF 19.)  Dr. Rollings-Mazza continued Ms. Carlos on biweekly Haldol injections.  (SMF 21.)

Counselor Gallagher regularly evaluated Ms. Carlos over the course of her 923-day detention pending removal.  Counselor Gallagher believed that she neither needed to be specially referred to a psychiatrist nor required additional treatment.  Ms. Carlos' Correctional Counselor, Janet Jackson, who was trained in identifying risks of suicide, (SMF 8), did not consider Ms. Carlos' behavior abnormal compared to other inmates.  (Ex. C, 22:7-10.)  Dr. Rollings-Mazza did not believe Ms. Carlos' behavior was caused by her mental illness.  (SMF 32.)

As part of her treatment plan, Counselor Gallagher provided supportive counseling to Ms. Carlos to supplement her Haldol medication regimen.  (Ex. A, 46:24-48:7.)  Ms. Carlos was generally compliant with her medication, (Ex. K at PCM 196-206, 258-59, 761), and Counselor

Gallagher did not notice a change in her behavior if and when injections were delayed.  (Ex A, 49:7-12).  Ms. Carlos was objectively and subjectively stable on Haldol.  (SMF 21.)  There was no medical indications that Ms. Carlos was under medicated.  (SMF 34.)

Ms. Carlos had a history of violence, for which she was placed on BAU Status as a sanction.  For example, on July 16, 2013, Ms. Carlos was sanctioned with 30-days of BAU Status segregation on the BAU Pod for assaulting an inmate on July 11, 2013.  (SMF 39.)  The day of the assault was one day after she received a Haldol injection on July 10, 2013.  (SMF 37.)

a.  Ms. Carlos' condition before August 2013 suicide attempt (4/14/11-8/13/13)

Ms. Carlos neither exhibited nor expressed any suicidal ideation at any time between her commitment to York County prison and August 2013. (SMF 33.)  From May to August 2013, Ms. Carlos timely received biweekly Haldol injections, including one on August 7, 2013.  (SMF 35-38, 40, 41.)  On August 7, 2013, Ms. Carlos was relaxed, calm, appropriate, and cooperative, had intact judgment, and was not acutely suicidal.  (SMF 42.)  On August 8, 2013, Holly Snyder, LPN, a mental health nurse trained to recognize suicide risks, (SMF 12), noted that Ms. Carlos was calm, alert, and not acutely suicidal, (SMF 43).  Ms. Carlos' sanction expired on August 10, 2013, and she was transferred from BAU Pod on BAU Status to A Pod on ICU Status and Psychiatric Observation.  (SMF 44.)

Ms. Carlos was oriented, appropriate, and cooperative, had intact judgment, and was not a risk for suicide on August 12, 2013.  (SMF 45.)  Accordingly, Counselor Gallagher discontinued Psychiatric Observation.  (Ex. K at PCM 613.)  Ms. Carlos' housing status did not change, and she remained on ICU status in the A Pod, (Id. at PCM 1760).

Plaintiff Angela Carlos, Ms. Carlos' mother, testified that she saw her daughter around July/August 2013.  (Ex. J, 50:22-51:4.)  According to Plaintiff, Ms. Carlos was happy and future oriented during that encounter:

Q:      When you visited with her, at that time, **was there anything about her that you were concerned that she might hurt herself or harm herself**?

A:      **No**.  She was – she was happy to see me.  She asked for the others.  Asked for Natalla.  I tell her that Natalla couldn't visit.  They say she can't visit because she was too young.  And she asked for everybody else at home, the family.  **I didn't see no sign of – you know, she said she can't wait to come home**, so we can go clothes shopping.

(Id. at 51:5-15.)

In the afternoon of August 13, 2013, Officer Wendy Harris was on constant watch on the A Pod for another inmate.  (SMF 46.)  She noticed Ms. Carlos standing on the desk stool and "doing something" with a sheet.  (SMF 47.)  Ms. Carlos did not comply with directions to stop, and Officer Harris called for assistance.  (Ex. L at YC 523.)  After four security officers entered her cell, Ms. Carlos put the sheet around her neck and moved from the stool.  (SMF 48.)  Ms. Carlos was caught in the air by an officer and never hanged by her full weight and did not lose consciousness.  (SMF 49.)  Every witness who knew Ms. Carlos was surprised of this attempt, because he or she did not believe Ms. Carlos was suicidal.  (Ex. G, 37:20-24; Ex. E, 36:8-23; Ex. B, 75:5-14, Ex. A, 55:23-11.)

b.   Ms. Carlos' condition after August 2013 suicide attempt (8/13/13-10/23/13).

Upon her return from an outside hospital, Ms. Carlos was housed on the BAU Pod and placed on Suicide Precautions Status with constant watch.  (SMF 50.)  Ms. Carlos refused to participate during a Mental Health Evaluation with Counselor Gallagher on August 14, and was treated as a continued risk for suicide and remained on Constant Watch.  (SMF 51.)  Dr. Rollings-Mazza evaluated Ms. Carlos on August 15, 2013, and did not change her treatment plan.  (SMF 52.)  Ms. Carlos refused to participate during a Mental Health Evaluation with Counselor Gallagher and Mental Health Nurse Leiphart on August 15, 2013, and was treated as a continued risk for suicide and remained on Constant Watch.  (SMF 53.)  She again refused to participate

7

during a Mental health Evaluation with Counselor Gallagher on August 16, 2013, and was treated as a continued risk for suicide and remained on Constant Watch.  (SMF 54.)

        i.   Ms. Carlos' condition prompting discontinuation of Suicide Precaution and resulting stability (8/19/13-10/2/13).

Ms. Carlos was calm, appropriate, and cooperative, denied suicidal ideations, "contracted for safety," and agreed to participate with her treatment plan when Counselor Gallagher evaluated her on August 19, 2013.  (SMF 55.)   Counselor Gallagher explained his use of the term "contract[ing] for safety" as follows:

> To me it means that we can sit down and discuss how we're going to move forward, use shorthand contract with safety, that, you know, we're having a discussion on how this is going to go.  What can you – can you agree that you're not going to harm yourself, if you do have feelings like this, how are we going to manage those, how can we move forward to make sure there's no more incidents like this, what can I – what do you need from me to continue on.

(Ex. A, Gallagher, 74:9-17.)   Because he no longer considered Ms. Carlos acutely suicidal, Counselor Gallagher discontinued Constant Watch and implemented 15-minute checks, a step-down level of Suicide Precaution. (SMF 55.)

Dr. Davis evaluated Ms. Carlos on August 20, 2013.  (SMF 57.) Ms. Carlos was animated, maintained good eye contact, and was goal oriented.  (Id.)  He did not change her treatment plan, and scheduled her to return to the clinic in eight weeks.  (Id.)   Ms. Carlos remained calm, appropriate, and cooperative and denied suicidal ideations during a Mental Health Evaluation with Counselor Gallagher later that day. (SMF 58.)  Because Ms. Carlos was not acutely suicidal or violent, Counselor Gallagher discontinued Suicide Precautions and implemented Psychiatric Observations with 15-minute checks.  (Id.).   Correctional staff transferred her cell from the BAU Pod to D Pod.  (SMF 60.)

Ms. Carlos received Haldol injections on August 21, 2013, September 4, 2013, and September 18, 2013.  (SMF 61, 67, 70.)  Ms. Carlos was cooperative, appropriate, calm, and relaxed and had a normal affect and intact judgment during Mental Health evaluations on August 22, 2013, August 26, 2013, August 30, 2013, September 4, 2013, September 5, 2013, September 12, 2013, September 19, 2013, and September 26, 2013.  (SMF 62, 63, 65, 66, 68, 69, 71, 72, 73, 74.)  Each Mental Health evaluator documented that Ms. Carlos was not a risk for suicide.  (SMF 62, 63, 65, 66, 68, 69, 71, 72, 73, 74.)  Dr. Rollings-Mazza evaluated Ms. Carlos on September 30, 2013.  (SMF 75.)  Ms. Carlos was "very cooperative," displayed no evidence of psychosis, denied suicidal ideations, and appeared to be stable.  (Id.)  Dr. Rollings-Mazza continued the current treatment plan.  (Id.)

ii.  Ms. Carlos is removed from psychiatric observation (10/2/13)

During a Mental Health Examination by Counselor Gallagher on October 2, 2013, Ms. Carlos was calm and cooperative, had an intact thought process, affect, and mood, and denied suicidal ideations.  (SMF 76.)  Counselor Gallagher documented she was not a risk for suicide. (Id.)  Ms. Carlos requested that Counselor Gallagher step her down from Psychiatric Observation considering she had a sustained period of time without negative incidents.  (SMF 77.)  Counselor Gallagher discontinued Psychiatric Observation after Ms. Carlos committed to continued participation in her treatment plan. (SMF 78.)  Counselor Gallagher explained his rationale:

> We discussed her situation.  She said, I want this paper sign [noting psychiatric observation] off my door because it makes people think I'm crazy.  I said, okay, look, I can do that.  I can go to bat for you on that part.  I can't get you off ICU because that's a Security check.  I can do this for you, **but you got to be working with me to continue to maintain and move forward on this, which she said she could**.  So I followed through and made the recommendation to take her off psychiatric observation.

* * *

9

> . . . I discussed this with Deputy Warden Doll and PRC because of the nature of the
> case, if you will, the long-term on ICU and, you know – you know, this is something
> I think we can help her to move forward with.  If I give her this, we have more room
> to work.  **She feels I'm being supportive.  I'm trying to work with her, make
> her part of the team**, so, you know, I'm recommending we take her off [psychiatric
> observation].  She understands she'll still have to stay on ICU, which she's not
> happy with, but she said she can work with that.

(Ex. A, 78:21-79:16.)   Counselor Gallagher had no concerns about taking Ms. Carlos off

psychiatric observations, and knew he would continue to monitor her progress during PRC rounds

due to her ICU status and that she would continue to be monitored every 15-minutes.  (SMF 80.)

Ms. Carlos remained housed on the D Pod on ICU status.  (Ex. K at PCM 1774.)  She received her

scheduled Haldol injection that day.  (SMF 81.)

### iii.   Ms. Carlos was stable following removal from psychiatric observation (10/2/13-10/23/13).

Ms. Carlos was stable, reported no problems, and denied suicidal ideations during Mental

Health Segregation Checks by Mental Health Nurses on October 3, 2013, October 10, 2013, and

October 17, 2013.   (SMF 82, 83, 87.)  Ms. Carlos was stable and was not a risk for suicide on

October 16, 2013, during a PRC review with Counselor Gallagher, (SMF 84), and received a

Haldol injection that day, (SMF 86.)  October 16, 2013 was Counselor Gallagher's last clinical

encounter with Ms. Carlos.  (SMF 85.)  She was not acutely suicidal that day.  (Ex. A, 103:13-20;

Ex. D, 137:18-22; SMF 84.)

On Saturday, October 19, 2013, Ms. Carlos' father, Hueth Carlos, spoke with Ms. Carlos

on the phone.  (SMF 88.)  Ms. Carlos did not indicate she was acutely suicidal during the phone

conversation:

> Q:    Can you remember anything about that last phone conversation that you had
>        with [Ms. Carlos on October 19, 2013]?

> A:    The last phone conversation we had, she told me, Dad, I can't wait to come home so we can make music. She liked to sing. I bought an instrument for us to make music. She told me she can't wait to come home. I tell her, I can't wait for you to come home too so we can have fun and do this. **She didn't show me no kind of indication that she was going to do this**.

(Ex. O, 12:6-15; SMF 88.)  Plaintiff's impression of her daughter was consistent with that offered

by Mr. Carlos:

> Q:    When was the last time you would have spoken to [Ms. Carlos] on the phone before October 23rd of 2013?
>
> A:    The week before.
>
> Q:    **Was there anything about that phone conversation that you were concerned that she might harm herself**?
>
> A:    **No**. We were just talking about things she was going to do when she get [sic] out.

(Ex. J, 51:16-52:1; SMF 89.)  Plaintiff explicitly confirmed that Ms. Carlos was future oriented:

> Q:    **So she was thinking about future things**?
>
> A:    **Yes**.
>
> Q:    **And plans that she had in the future**?
>
> A:    **Yes**.
>
> Q:    Or would like to have in the future?
>
> A:    Yes.
>
> Q:    What types of plans was she sharing with you then, ma'am?
>
> A:    She said she can't wait to come out to be with Natalla. She said she can't wait to come out so we can go clothes shopping. And she was asking me what the latest thing, wearing, you know, and thing[s] like that.
>
> Q:    Okay.
>
> A:    And I tell her that as soon as she come[s] out, we're going to go shopping for clothes.

(Ex. J, 52:2-17; SMF 90.)  Not only was Ms. Carlos future oriented, she was coherent and happy:

> Q:    Did she sound – I mean, were you able to speak with her? Did she seem to understand what was going on?

11

A:      Yes.

Q:      **She seemed coherent**?

A:      **Yes**.

Q:      Do you know what I mean by that?

A:      Yes. Yes.  **And happy**.

Q:      Happy?  The conversation made sense?

A:      Yes.

Q:      So it was a happy conversation?

A:      Yes.  Because she's coming out now, so she [was] happy she got to come
        out, get out.

(Ex. J, 51:18-53:5; SMF 91.)  In fact, Ms. Carlos' family led her to believe that she was going to

be released from prison soon:

Q:      Did she believe she was getting out soon?

A:      Yes.

Q:      Upon what did she believe that?

A:      Because that's what we [were] trying to tell her.  And the last words she
        get from the Freedom Fighter guy, that sen[t] a letter to Washington to ask
        to let them out. . . .

(Ex. J, 53:6-23; SMF 92.)

        The impression offered by both of her parents was consistent with that offered by Ms.

Carlos' daughter, Natalla Carlos, who spoke to Ms. Carlos on or about October 20, 2013:

Q:      . . . .  Do you remember anything about that conversation?

A:      . . . .  **[Ms. Carlos] didn't sound like she was upset, like she was down or
        anything**.  I can tell because, like, by now, I got common sense and I could
        think about how she sounds.  **She sounded happy**, like she just wanted to
        come out.

        Basically, what my grand mom said, [Ms. Carlos] wanted to come out and
        do stuff with me and go shopping and go to the park or something, have fun,
        build a relationship.

Q:      **Nothing about that phone call that you thought that she might hurt
        herself or anything?**

12

A:      **No.**

Q:      She didn't say goodbye to you or anything like that?

A:      No.

Q:      I mean, like a permanent goodbye, not, talk to you later type of thing?

A:      She, basically, **the vibe that we had was like I was going to talk to her again in two weeks**.

(Ex. P, 15:5-16:1; SMF 93, 94.)

On October 21, 2013, Corrections Counselor Jackson, who is trained to recognize the signs of suicide, (SMF 8), transferred Ms. Carlos from a cell on the D Pod to a cell on the A Pod, (SMF 95). Counselor Jackson did not believe "personally or professionally" that Ms. Carlos was suicidal. (SMF 96.) The two cells were of the exact same type, and Ms. Carlos' access to property and level of monitoring were exactly the same because she remained on ICU status. (SMF 97.) Ms. Carlos did not complain about the move, (SMF 98), and Counselor Gallagher was not informed of this cell transfer. (SMF 99.)

### 4.   The October 23, 2013 suicide

On October 23, 2013, Corrections Officers performed 15 minute rounds of the A Pod where Ms. Carlos was housed. (SMF 101.) Corrections Officer Curry rounded the A Pod at 8:05 pm. (SMF 102.) Corrections Officer Grissell Santos, who is trained to detect suicidal behaviors, (SMF 9), performed rounds of the A Pod at approximately 8:13 pm and 8:29 pm. (SMF 103, 104.) "[E]very time [Officer Santos] looked at [Ms. Carlos], [Ms. Carlos] was fine." (Ex. E, 49:19-20.)

At 8:30 p.m., Ms. Carlos had a verbal argument with another inmate, which prompted Corrections Officer Erika Collins, who is trained to recognize risks for suicide, (SMF 10), to enter the A Pod and diffuse the situation. (SMF 105.) After the incident, Ms. Carlos was talking, joking, and laughing, and was not visibly upset. (SMF 106.) No one reported this argument to Counselor Gallagher, including the Corrections Officers who were witnesses to the argument, knew Ms.

13

Carlos, and observed her reaction.  (SMF 107.)  In fact, Counselor Gallagher was not present at the prison on October 23, 2013.  (SMF 100.)

Officer Santos conducted her next round of the A Pod at 8:49 pm.  (SMF 108.)  Ms. Carlos still looked fine.  (Id.)  At the time of her last round, which was completed at approximately 9:00 pm, Ms. Carlos appeared as if she was going to bed and did not appear distressed.  (SMF 109.) Officer Collins performed the next round at 9:17 pm.  (SMF 110.)  During that round, Officer Collins discovered that Ms. Carlos had hanged herself.  (SMF 111.)  At autopsy, Ms. Carlos had 34 ng/mL of Haldol in her system, which is a therapeutic level.  (SMF 116, 117.)

## IV.    STATEMENT OF QUESTIONS INVOLVED

A. Whether Counselor Gallagher is entitled to summary judgment on Plaintiff's Constitutional Claims because the undisputed facts establish that Counselor Gallagher was not deliberately indifferent to the risk that Ms. Carlos would commit suicide?

[*Suggested answer in the affirmative.*]

B. Whether Counselor Gallagher is entitled to summary judgment on Plaintiff's state law claims because Plaintiff cannot establish the elements of a professional liability claim against Counselor Gallagher as a matter of Pennsylvania law?

[*Suggested answer in the affirmative.*]

C. Whether Counselor Gallagher is entitled to summary judgment on Plaintiff's claim for punitive damages because the undisputed facts cannot establish that Counselor Gallagher acted with evil motive or callous indifference?

[*Suggested answer in the affirmative.*]

## V.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Although the initial burden is on the movant to show the absence of a genuine issue of material fact, "the burden on the moving party may be discharged by 'showing' that

14

there is an absence of evidence to support the nonmoving party's case" when the nonmoving party bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its initial burden, the nonmoving party must show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The nonmoving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show there exists a genuine issue for trial. *Jones v. U.P.S.*, 214 F.3d 402, 407 (3d Cir. 2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a genuine issue of material fact to preclude summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the nonmoving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Id.* at 247.

## VI.   ARGUMENT

### A.   PLAINTIFF CANNOT ESTABLISH THAT COUNSELOR GALLAGHER WAS DELIBERATELY INDIFFERENT TO MS. CARLOS' PARTICULAR VULNERABILITY TO COMMIT SUICIDE.

To sustain her Constitutional Claims, Plaintiff must establish that Counselor Gallagher was deliberately indifferent to Ms. Carlos' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In the context of a prison suicide case, the plaintiff must establish that: (1) the detainee had a "particular vulnerability to suicide," and (2) the defendant was deliberately indifferent to it. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An inadvertent failure to provide adequate medical care does not establish the requisite state of mind. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 336, 346-47 (3d Cir. 1987).

1.   PLAINTIFF CANNOT ESTABLISH MS. CARLOS HAD A SERIOUS MEDICAL NEED.

A particular vulnerability to suicide may qualify as a serious medical need. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). "The requirement of a "particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition." *Id.* at 1024. In the Third Circuit, a particular vulnerability to suicide means that "there must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005); *see also Estate of Puza v. Carbon Cnty.*, 586 F. Supp. 2d 271, 277 (M.D. Pa. 2007), *aff'd sub nom. Barker-Puza v. Carbon Cnty.*, 2008 U.S. App. LEXIS 25613 (3d Cir. 2008). To establish this element, the plaintiff must submit evidence to establish that the particular inmate, not those with similar "risk factors," exhibited a particular vulnerability to suicide. *See Joines v. Twp. of Ridley*, 229 F. App'x 161, 164 (3d Cir. 2007).

Not even Plaintiff's own expert opines that Ms. Carlos had a particular vulnerability to suicide on October 23, 2013. Instead, Dr. Patterson opines that Ms. Carlos had several "increased risk factors for suicide" which included: (1) a history of "severe and persistent mental illness"; (2) a history of decompensation when her medications were not properly managed; (3) a history of rape trauma; (4) a history of violence towards others; (5) her placement in a punitive and restrictive environment; (6) an additional stressor of pending deportation; and (7) a prior suicide attempt. (Ex. R, p. 13-14.) Listing "risk factors" is insufficient to establish that Ms. Carlos had a particular vulnerability to suicide. *See Joines*, 229 F. App'x at 164 (finding that an inmate did not have a particular vulnerability to suicide, even though an expert opined he possessed risk factors for suicide, reasoning that the inmate's "behavior in no way demonstrated that he was inclined toward

self-inflicted harm"); *Estate of Thomas v. Fayette Cnty.*, 2016 U.S. Dist. LEXIS 88647 (W.D. Pa. 2016)[3]; *Puza*, 586 F. Supp. 2d 271 (Pa. M.D. 2007).

In *Puza*, the defendants recognized the inmate from a prior incarceration, during which he had been placed on suicide watch after admitting he would "consider suicide if he 'could find a nice way to do it.'"  586 F. Supp. 2d at 273.  The inmate was not placed on suicide watch during the most recent incarceration, and committed suicide by strangulation.  *Id.*  In support of their deliberate indifference claim, the plaintiff submitted an expert report who opined the inmate had several risk factors for suicide, including a history of impulsivity, anger, disruptiveness, aggression, and prior suicide attempt.  *Id.* at 277.  The court granted summary judgment and held the mere presence of risk factors was insufficient to establish a particular vulnerability to suicide.[4]

Further, the undisputed facts of record do not support the majority of "risk factors" Dr. Patterson identifies.  First, the **record is devoid of any treating psychiatrist who diagnosed Ms. Carlos with any** "**severe and persistent mental illness**." Rather, Ms. Carlos herself reported a history of schizophrenia.  Importantly, the only treating psychiatrist during her detention, Dr. Rollings-Mazza, explicitly testified that Ms. Carlos was stable and was not acutely psychotic, and that Ms. Carlos' mental illness, whatever it may have been, was not the cause of her "disruptive behavior."  (SMF 6, 32.)  *See Colburn*, 946 F.2d at 1023 ("[T]he condition must be one that has been diagnosed by a physician as requiring treatment.").

Second, there is no factual basis to conclude that Ms. Carlos' medications were not properly managed, let alone that she decompensated as a result of mismanagement.  According to

---

[3] The *Thomas* Court articulated the "sound, pragmatic reason" to not impose liability based upon presumed suicidal correlational risk factors because doing so would require inmates possessing such characteristics to be placed in more restrictive conditions than necessary without an acute risk for self-harm.  2016 U.S. Dist. LEXIS 88647 at *47 n. 18.

[4] The court addressed the risk factors in the context of rejecting the claim that the defendants knew of the inmates' particular vulnerability to suicide.

Dr. Patterson himself, at the time Ms. Carlos committed suicide, she had received a Haldol injection less than two weeks earlier.  Indeed, **the undisputed medical evidence documents that Ms. Carlos timely received her scheduled biweekly Haldol injections at all times between May 29, 2013 and the time of her death**.[5]  Further, the undisputed record confirms that, when Ms. Carlos did not receive her Haldol injection as scheduled, such as between April 17, 2013 and May 15, 2013 (when Haldol was unavailable at the prison), she remained stable, was housed on the A Pod, was not subject to Psychiatric Observation or any other segregated status, and did not attempt self-harm or engage in violence.  Lastly, **Ms. Carlos had therapeutic levels of Haldol in her system at the time of autopsy**.  (SMF 116-117.)

Third, there is no admissible evidence of "rape trauma."  **Ms. Carlos herself reported on her intake form from Bristol County that she had never been sexually abused**.  (SMF 17.)

Fourth, Ms. Carlos was not under "stress of pending deportation." To the contrary, **she subjectively believed she was going to be released**.  (SMF 92.)  Indeed, her own mother characterized her as future oriented shortly before her death.  (SMF 90.)

Fifth, Decedent was **not** placed in "a punitive housing environment" at the time of her death.  **ICU is a status – not a separate housing environment**.  Indeed, Ms. Carlos was on the same type of Pod that she had been throughout the majority of her incarceration, and had spent 361 days on a segregated disciplinary status without attempting suicide.  (SMF 28, 29.)  In fact, in the year preceding her death, she spent 157 days on the same Pod in which she died.  (SMF 25.)

---

[5] It is undisputed that she timely received Haldol injections on May 29, 2013, June 12, 2013, June 26, 2013, July 10, 2013, July 24, 2013, August 7, 2013, August 21, 2013, September 4, 2013, September 18, 2013, October 2, 2013, and October 16, 2013.  (SMF 35-38, 40, 41, 61, 67, 70, 81, 86.)  Dr. Patterson's opinion that "the consistent receipt of the prescribed injectable medication did not occur with Ms. Carlos and it appears from the record that she had missed several medication administrations" lacks any factual basis.

The only "risk factors" that Dr. Patterson references supported by the record were a history of violence toward others and a prior suicide attempt.[6]  However, Dr. Patterson does not – and cannot – even suggest that Ms. Carlos was acutely suicidal on October 2, 2013, or at any point leading up to October 23, 2013.  Although Ms. Carlos had a history of violence toward others, she did not display any violence after the BAU status "sanction" was imposed three months earlier and explicitly denied homicidal ideations.  Similarly, the prior suicide attempt occurred over two months earlier, and Ms. Carlos did not display any suggestion she would again attempt suicide and explicitly denied suicidal ideation.[7]

Case law makes clear that a prior suicide attempt, without significantly more, is insufficient to establish a particular vulnerability to suicide and is not even sufficient to survive a motion to dismiss.  In *Palakovic v. Wetzel*, 2015 U.S. Dist. LEXIS 83286 (W.D. Pa. 2015), the inmate, who had a long history of mental health issues and self-harm and suicide attempts, committed suicide after being "repeatedly subjected to solitary confinement," placed in restrictive housing units, subjected to abuse by staff, and receiving "inadequate to non-existent mental health care." *Id.* at *3. The Court held these allegations, even if true, were "insufficient to establish a strong likelihood that [he] would inflict self-harm," and dismissed the constitutional claims. *Id.* at *14.

Plaintiff cannot establish that Ms. Carlos was acutely psychotic, expressed an intention to inflict self-harm, or was psychologically unstable.  In fact, the undisputed record compels the opposite conclusion.  Each individual who encountered Ms. Carlos in the months preceding her

---

[6] There is a genuine dispute whether the August 2013 attempt was actually an attempt to kill herself, which Plaintiff advances, or an attempt to gain attention to her dislike with her housing status, as was believed by virtually all of the witnesses.  While this is a genuine dispute, it is not material to this motion.

[7] Using Plaintiff's rationale, Ms. Carlos should have always been placed on Suicide Precaution Constant Watch and restricted to only a suicide resistant smock and mattress considering she reported that she had attempted suicide by hanging a "long time ago" before incarceration in Bristol County.  This is absurd and precisely the result disfavored by the *Thomas* Court. *See supra*, Text Accompanying Note 4.

death – including her own family – characterized her as happy, behaving normally, and being future oriented.  Ms. Carlos did not request to speak to a mental health provider, requested to be taken off Psychiatric Observation Status, and denied being suicidal.  A psychiatrist concluded she was objectively and subjectively stable, appropriate, non-agitated, and non-suicidal just two days before the Psychiatric Observation was discontinued.  (SMF 75.)  This is dispositive to Plaintiff's Constitutional claims, as Courts have routinely found a lack of particular vulnerability to suicide in cases where, such as here, an inmate denies suicidal ideation and family members testified that even they did not suspect a suicide.  *See, e.g.*, *Schuenemann v. United States*, 2006 U.S. App. LEXIS 4350, *11 (3d Cir. 2006) (finding a lack of particular vulnerability to suicide when the "individuals who knew [the inmate] best have said that [the inmate] gave no indication that he wished to harm himself"); *Woloszyn*, 396 F.3d at 322 (finding a lack of particular vulnerability to suicide when the inmate appeared in good spirits, was talking and joking with counselors, and denied being suicidal); *Wargo v. Schuykill Cnty.*, 2008 U.S. Dist. LEXIS 92866, *18 (M.D. Pa. 2008) (finding a lack of particular vulnerability to suicide when the inmate did not indicate a desire to harm himself and when "none of [the inmate]'s family members or friends reported that they suspected he would harm himself"), *aff'd* 2009 U.S. App. LEXIS 22279 (3d Cir. 2009);  *Herman v. Cnty. of York*, 482 F. Supp. 2d 554, 565 (M.D. Pa. 2007) (finding a lack of particular vulnerability to suicide when the inmate repeatedly denied suicidal ideation and his own family testified they did not suspect he was suicidal.").

For these numerous reasons, Plaintiff cannot establish that Ms. Carlos had a particular vulnerability to suicide and, therefore, cannot establish her constitutional claims as a matter of law.

2.   Plaintiff cannot establish Counselor Gallagher was deliberately
     indifferent to a particular vulnerability to suicide.

Even if Plaintiff could establish Decedent had a particular vulnerability to suicide – which she cannot – she still cannot establish that Counselor Gallagher acted with deliberate indifference to her vulnerability.   "[A] level of culpability higher than a negligent failure to protect from self-inflicted harm is required" to find deliberate indifference to the risk of suicide.  *Colburn*, 946 F.2d at 1024; *see also Innis v. Wilson*, 334 F. App'x 454, 456 (3d Cir. 2009) ("Deliberate indifference requires that prison officials know of an excessive risk to an inmate's health or safety and affirmatively disregard that risk.").  This level requires a plaintiff to demonstrate "'an unnecessary and wanton infliction of pain' which is 'repugnant to the conscience of mankind' and 'offend[s] evolving standards of decency."  *Id.* at 106; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (holding that "deliberate indifference requires showing 'obduracy and wantonness.'").

Applying this high level of culpability, the Third Circuit has "found 'deliberate indifference' when the defendant: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  *Rouse*, 182 F.3d at 197.  "Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."  *Palakovic*, 2015 U.S. Dist. LEXIS 83286 at *23 (citing *Dimitris v. Lancaster Cnty. Prison Bd.*, 2002 U.S. Dist. LEXIS 11280, *17 (E.D. Pa. June 7, 2002)).  In evaluating a defendant's conduct, the court must remain mindful that "[t]he Eighth Amendment 'affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.'"  *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).  "The knowledge element of deliberate indifference is subjective not objective knowledge, meaning that the official must actually be

21

aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837-38).  An exercise of professional judgment "will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).

Guided by these standards, it is clear that Plaintiff cannot present sufficient evidence to a jury to support Counselor Gallagher was deliberately indifferent.  In fact, Plaintiff cannot even establish negligent conduct.

Plaintiff's primary claim against Counselor Gallagher is that he should not have removed Ms. Carlos from Psychiatric Observation Status on October 2, 2013.  Before discontinuing Psychiatric Observation, Ms. Carlos had been evaluated by a psychiatrist two days earlier, demonstrated lengthy compliance with and participation in her treatment plan, consistently received her biweekly Haldol injections for more than five months, reported no suicidal or homicidal ideations, and appeared stable.  Counselor Gallagher only discontinued Ms. Carlos' Psychiatric Observation Status after performing a full mental health examination, which led to his judgment that she was not acutely suicidal.

In fact, the undisputed record supports that Counselor Gallagher's conclusion was correct. Over the next three weeks, Ms. Carlos exhibited no behavior that would suggest that she was acutely suicidal.  To the contrary, the undisputed facts demonstrate that neither Counselor Gallagher nor anyone else who encountered Ms. Carlos between the discontinuation of Psychiatric Observation Status and her suicide believed she was at a risk for self-harm, including on October 3, 2013, October 10, 2013, October 16, 2013, and October 17, 2013.  Furthermore, she was seen on both October 21, 2013, the day of her cell transfer, and October 23, 2013, the day of her suicide, by corrections officers who were trained in recognizing risks for suicide.  They, too, did not believe

Ms. Carlos had a particular vulnerability for suicide.  Importantly, Ms. Carlos' own family, all of whom spoke with Ms. Carlos just days before her death, described her as happy, future oriented, and baseline.  They, too, did not believe Ms. Carlos had a particular vulnerability to suicide.  For these reasons, it is understandable that **every single person who encountered Ms. Carlos in the months preceding her death was surprised that she committed suicide**.  Plaintiff simply cannot establish that Counselor Gallagher intentionally refused to provide Ms. Carlos with necessary treatment or delayed or prevented Ms. Carlos from receiving treatment he knew she needed.[8]

The undisputed facts demonstrate that, even if Ms. Carlos was a threat to herself, of which there is no evidence from the frequent visits with mental health professionals throughout her lengthy incarceration, Counselor Gallagher was not deliberately indifferent to that threat.  Accordingly, Counselor Gallagher is entitled to judgment on Plaintiff's Constitutional claims.

**B.  COUNSELOR GALLAGHER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW PROFESSIONAL NEGLIGENCE CLAIMS BECAUSE SUCH CLAIMS CANNOT BE MAINTAINED AS A MATTER OF LAW**

1.  COUNSELOR GALLAGHER IS NOT A LICENSED PROFESSIONAL AGAINST WHOM A PROFESSIONAL NEGLIGENCE CLAIM CAN BE ASSERTED UNDER PENNSYLVANIA LAW.

It is undisputed that Counselor Gallagher is a licensed professional counselor and is not a psychiatrist or nurse.  (SMF 1, 2.)  Pennsylvania Rule of Civil Procedure 1042 is controlling state substantive law that applies to claims involving alleged negligence in the performance of

---

[8] To the extent Plaintiff claims that Counselor Gallagher was recklessly indifferent by not intervening in the decision to transfer Ms. Carlos from D Pod to A Pod, those claims are similarly meritless.  First, t**he D Pod and the A Pod were identical**.  (SMF 97.)  Having been stable on D Pod for more than two months, there was no reason to suspect Ms. Carlos would have become unstable being relocated to an identical cell on an identical Pod.  This is true especially considering that she spent 157 days on the A Pod in the year preceding her death.  (SMF 25.)  Moreover, it is undisputed that Counselor Gallagher was not informed of this cell transfer, (SMF 99), and he cannot be deliberately indifferent to something he was never told.  *See Keohane v. Lancaster Cnty.*, 2010 U.S. Dist. LEXIS 85714, *23 (E.D. Pa. 2010) (dismissing claims against mental health counselor where he was not working at the time relevant to the alleged "deprivation of plaintiff's rights").

professional duties.[9]   Professional negligence actions can be maintained only against persons licensed in Pennsylvania or another state as: (1) health care providers as defined in 40 P.S. § 1303.503; (2) accountants; (3) architects; (4) chiropractors; (5) dentists; (6) engineers or land surveyors; (7) nurses; (8) optometrists; (9) pharmacists; (10) physical therapists; (11) psychologists; (12) veterinarians; or (13) attorneys.  *Gilmour v. Bohmueller*, 2005 U.S. Dist. LEXIS 1611, *46-47 (E.D. Pa. 2005).  A licensed professional counselor is **omitted** from the list of twelve licensed professionals against whom a professional liability claim may be asserted in Pennsylvania.  Pa.R.C.P. 1042.1(c); *see also* 40 P.S. § 1303.503.  Accordingly, since Counselor Gallagher is not a "licensed professional" against whom a professional negligence claim can be asserted as a matter of Pennsylvania law, Counselor Gallagher is entitled to judgment in his favor on Plaintiff's professional negligence claim. *Gilmour*, 2005 U.S. Dist. LEXIS 1611 at *48 ("Under Pennsylvania law, however, professional negligence actions can be maintained only against defendants who are licensed professionals as defined in Pennsylvania Rule 1042.1.").

2. PLAINTIFF CANNOT ESTABLISH THAT COUNSELOR GALLAGHER WAS NEGLIGENT.

Even if Plaintiff could maintain a professional negligence claim against Counselor Gallagher – which she cannot – the record fails to establish Counselor Gallagher was negligent. In order to recover for professional negligence, the plaintiff must prove all of the following:

(1) DUTY.  The patient-plaintiff must show that the [defendant] owed her a particular duty or obligation.  This duty, recognized by law as created by the physician/patient relationship, requires the [defendant] to act in accordance with specific norms or stands established by the profession, commonly referred to as the standard of care.

---

[9] The Pennsylvania Rules of Civil Procedure applicable to professional negligence actions apply to federal courts sitting in diversity.  *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258 (3d Cir. 2011).

(2) BREACH OF DUTY.  The [plaintiff] must show that the [defendant] failed to act in accordance with those norms by any act or omission violating the standard of care….

(3) CAUSATION.  The [plaintiff] must show that a reasonable, close, causal connection exists between the acts of [defendant] and the resulting injury.

(4) DAMAGES.  The plaintiff must establish that because of the [defendant]'s acts or omissions, actual loss or damage has been incurred.

*Dietzel v. Gurman*, 806 A.2d 1264, 1268 (Pa. Super. 2002).  Expert testimony is required to establish the applicable standard of care, a deviation therefrom, and the causation elements. *Titchnell v. United States*, 681 F.2d 165, 170 (3d Cir. 1982) (quoting *Powell v. Risser*, 99 A.2d 454, 456 (Pa. 1953)) ("It has been uniformly held that expert testimony is necessary to establish negligent practice in any profession.").  Plaintiff cannot do so.

a. <u>Plaintiff cannot establish the applicable standard of care or that Counselor Gallagher deviated from acceptable standards.</u>

Plaintiff's only expert neither sets forth the standard of care applicable to Counselor Gallagher nor opines that Counselor Gallagher deviated from that standard.  To the contrary, the single occasion Dr. Patterson mentioned Counselor Gallagher's name was in the context of addressing Counselor Gallagher's compliance with "applicable policies":

Patrick Gallagher, LPC, the Mental Health Coordinator/Treatment Supervisor, who reported his role as putting inmates on suicide watch, as well as reducing their suicide watch status and discontinuing suicide watches, and **clearly not following the applicable policies for suicide prevention and management including follow-up with inmates released from suicide watch**.

(<u>Patterson Report</u>, Sept. 30, 2016, p. 3 of 4.)

The Third Circuit has explicitly held that a failure to comply with a policy does not equate to a breach of a standard of care:

**Mere failure to act in accordance with one's own internal procedures, however, will not automatically render a [provider] negligent**.

25

*Titchnell*, 681 F.2d at 173 (emphasis supplied); *accord Hower v. Rogers*, 53 Pa. D. & C. 4th 353 (Pa. Com. Pl. Berks Cnty. 2001) (holding violation of internal policy is insufficient to show the standard of care or a breach thereof), *aff'd in part, reversed in part on other grounds* 2002 Pa. Super. LEXIS 3103 (Pa. Super. 2002).   Dr. Patterson's criticism of Counselor Gallagher's alleged failure to comply with "applicable policies for suicide prevention and management" neither establishes the standard of care nor supports that Counselor Gallagher deviated from it.

In fact, Dr. Patterson never opines that Counselor Gallagher breached any standard of care at all.  The only time Dr. Patterson mentions a standard of care is in criticizing **PrimeCare and York County Prison's provision of Mental Health services**.  Addressing "mental health staff" as an aggregate unit does not establish that Counselor Gallagher was responsible for Ms. Carlos' overall mental health care or for the same conduct as the psychiatrist or mental health nurses.[10] Thus, Dr. Patterson's opinion is inadequate as a matter of law.

Further, the undisputed facts still cannot establish Counselor Gallagher breached the applicable standard of care.  Plaintiff can point to no evidence that Ms. Carlos was acutely suicidal on October 2, 2013, the time at which Counselor Gallagher evaluated Ms. Carlos and removed her from Psychiatric Observation Status.  It is undisputed that, preceding this decision, Ms. Carlos had been compliant with her treatment plan, which consisted of receiving her scheduled Haldol injections and participating in examinations and counseling.  It is also undisputed that Dr. Rollings-Mazza saw Ms. Carlos two days before Counselor Gallagher's recommendation and concluded that Ms. Carlos was stable.  It is also undisputed that, in the three weeks following discontinuation of psychiatric observations, Ms. Carlos appeared happy, future oriented, and continued to be compliant with her treatment plan.  Discontinuing Psychiatric Observations Status when she was

---

[10] Notably, the other members of the mental health unit, *i.e.*, mental health nurses and psychiatrists, **can** be subject to professional negligence claims under Pennsylvania law.  Pa.R.C.P. 1042.1(c); 40 P.S. § 1303.503.

stable on October 2, 2013, was not a breach of Counselor Gallagher's responsibility to step an inmate down from Psychiatric Observation when she is no longer acutely suicidal.

### b.   Plaintiff cannot establish Counselor Gallagher caused any harm.

Even if the Court somehow concludes that Dr. Patterson's report includes sufficient standard of care opinions against Counselor Gallagher, Plaintiff still has the burden to demonstrate that Counselor Gallagher's breach of the standard of care was the cause of the suicide. *Mitzelfelt v. Kamrin*, 584 A.2d 888, 892 (Pa. 1990).  To establish causation, Plaintiff "must demonstrate that the breach was both the proximate cause and the actual cause" of the suicide. *Reilly v. Tiergarten*, 633 A.2d 208, 210 (Pa. Super. 1993).

To establish actual causation, Plaintiff must submit evidence that, "but for" Counselor Gallagher's allegedly negligent conduct, Ms. Carlos would not have died. *See First v. Zem Zem Temple*, 686 A.2d 18, 21 n.2 (Pa. Super. 1986).  If Ms. Carlos' death would have occurred notwithstanding Counselor Gallagher's allegedly negligent conduct, then Counselor Gallagher cannot, as a matter of law, be held liable for the suicide. *See Geter v. Owens Corning Fiberglass Corp.*, 716 A.2d 633, 637 (Pa. Super. 1998).  It is undisputed that Ms. Carlos killed herself.  It is also undisputed that Counselor Gallagher was not even present in York County Prison on the day Ms. Carlos died and was neither asked nor required to see Ms. Carlos that day.

Moreover, Plaintiff cannot establish that Counselor Gallagher's actions were the proximate cause of Ms. Carlos' suicide.  "A determination of legal causation, essentially regards 'whether the negligence, if any, was so remote that as a matter of law, the actor cannot be held legally responsible for the harm which subsequently occurred.'"  *Reilly*, 633 A.2d at 210.  In other words, "the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of."  *Id.*

Plaintiff cannot establish this element.  None of the "ordinary persons" who encountered Ms. Carlos in the months preceding her suicide – or, in fact, during the years preceding her suicide – believed she would take her own life.  Indeed, the correctional officers, correctional counselors, mental health nurses, psychiatrist, and Ms. Carlos' three family members were unanimously surprised of the suicide.  Ms. Carlos' death was not a reasonably foreseeable result of discontinuing psychiatric observation.

In fact, Plaintiff does not – because she cannot – even attempt to establish that discontinuing psychiatric observation was the proximate cause of Ms. Carlos' suicide.  **There was no difference in discontinuing Ms. Carlos' psychiatric observation.  She had the same housing arrangements and the same level of monitoring that she would have received while on Psychiatric Observation Status.**  The undisputed evidence supports that Corrections Officers were required to perform 15-minute rounds of the A Pod – and therefore, on Ms. Carlos – on October 23, 2013.  Thus, **Ms. Carlos was still monitored on fifteen minutes rounds despite the discontinuation of psychiatric observation**.  Indeed, it was in the course of Officer Collin's 15-minute round of the A Pod that the suicide was discovered.  *See Puza*, 586 F. Supp. 2d at 279 (granting summary judgment and reasoning "[a]lthough the decedent was not placed on suicide watch, he was placed in a cell next to an inmate who was on suicide watch.  When the corrections officers checked on that inmate, they were evidently also able to observe the decedent.").

The indisputable fact is that Counselor Gallagher's decision three weeks before Ms. Carlos' death changed nothing.  The discontinuation of Psychiatric Observation Status for a stable, non-acutely suicidal inmate was a reasonable exercise of Counselor Gallagher's judgment.  Therefore, Counselor Gallagher is entitled to judgment as a matter of law.

**C. Counselor Gallagher is entitled to Judgment as a matter of law on Plaintiff's claim for punitive damages.**

In the unlikely event this Honorable Court finds that this record can support a claim of deliberate indifference or negligence against Counselor Gallagher, this Court must dismiss Plaintiff's claim for punitive damages. In order to warrant punitive damages, Plaintiff must establish that Counselor Gallagher acted with evil motive or with reckless and callous indifference. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."). As discussed above, the record in this case fails to establish Counselor Gallagher acted with negligence, let alone "reckless and callous" indifference or evil motivation, toward Ms. Carlos. To the contrary, the undisputed facts clearly establish that: (1) Counselor Gallagher regularly provided counseling to Ms. Carlos over the course of her 2 ½ year incarceration; (2) Counselor Gallagher discontinued psychiatric observation status only after Ms. Carlos showed sustained stability; and (3) that neither Counselor Gallagher nor any other individual, including corrections counselors, corrections officers, mental health nurses, psychiatrists, and Ms. Carlos' family members, believed Ms. Carlos was suicidal either before or after psychiatric observation was discontinued. Accordingly, Plaintiff cannot establish the requisite degree of culpability to warrant submitting a request for punitive damages against Counselor Gallagher to the jury. Accordingly, Counselor Gallagher is entitled to judgment in his favor on any claim for punitive damages.

**VII.    CONCLUSION**

There is no evidence to support a claim of deliberate indifference against Counselor Gallagher. It is undisputed that Ms. Carlos did not exhibit any particular vulnerability that she would commit suicide at the time Counselor Gallagher discontinued Psychiatric Observation or

any time thereafter, and Counselor Gallagher cannot be deliberately indifferent to something neither he nor anyone else knew.  Moreover, Plaintiff cannot pursue a professional liability claim against Counselor Gallagher as a matter of law and, even if she could, she still cannot establish the applicable standard of care, that Counselor Gallagher deviated from it, or that Counselor Gallagher's deviation caused Ms. Carlos' death.  For the foregoing reasons, Counselor Gallagher is entitled to judgment as a matter of law on all of Plaintiff's claims, including Plaintiff's request for punitive damages.

Respectfully submitted:

**SAXTON & STUMP**

Date:   February 7, 2017                    By:    */s/ Brandon R. Conrad* _____
                                                    Brandon R. Conrad, Esquire
                                                    Harlan W. Glasser, Esquire
                                                    280 Granite Run Drive, Suite 300
                                                    Lancaster, PA 17601
                                                    Phone: (717) 556-1000
                                                    Email: brc@saxtonstump.com
                                                           hwg@saxtonstump.com
                                                    *For Defendant Patrick Gallagher, LPC*

30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA CARLOS, as ADMINISTRATRIX OF THE ESTATE OF TIOMBE KIMANA CARLOS, | : : : | CIVIL ACTION  No. 1:15-cv-01994-WWC |
| Plaintiff | : | |
| | : | [ELECTRONICALLY FILED] |
| v. | : | |
| | : | |
| YORK COUNTY, et al., | : | District Judge William W. Caldwell |
| Defendants | : | Magistrate Judge Joseph F. Saporito |

<u>**CERTIFICATION OF WORD COUNT**</u>
<u>**PURSUANT TO MIDDLE DISTRICT LOCAL RULE 7.8**</u>

The body of Counselor Gallagher's Brief in Support of his Motion for Summary Judgment contains 9082 words, excluding the table of contents, table of authorities, and headings, according to the word count feature of the word-processing system used to prepare the Brief, which is consistent with his Motion to Exceed Length Limitations, granted by Magistrate Judge Saporito.

Respectfully submitted:

**SAXTON & STUMP**

Date:   February 7, 2017

By:     */s/ Brandon R. Conrad* _____
        Brandon R. Conrad, Esquire
        Harlan W. Glasser, Esquire
        280 Granite Run Drive, Suite 300
        Lancaster, PA 17601
        Phone: (717) 556-1000
        Email: brc@saxtonstump.com
                  hwg@saxtonstump.com
        *For Defendant Patrick Gallagher, LPC*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Brief in Support of Defendant Patrick Gallagher's Motion for Summary Judgment was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

David Rudovsky, Esquire
Jonathan H. Feinberg, Esquire
Susan M. Lin, Esquire
Kairys Rudovsky Messing & Feinberg, LLP
The Cast Iron Building, Ste. 501S
718 Arch Street
Philadelphia, PA 19106
drudovsky@krlawphila.com
jfeinberg@krlawphila.com
slin@krlawphila.com


Donald L. Reihart, Esquire
Assistant Solicitor for York County
3015 Eastern Boulevard
York, PA 17402
email@reihartlaw.com


John R. Ninosky, Esquire
Johnson, Duffie, Stewart & Weidner, P.C.
301 Market Street
P.O. Box 109
Lemoyne, PA 17043-0109
jrn@jdsw.com


Date:   February 7, 2017                                    */s/ Brandon R. Conrad* _____
                                                            Brandon R. Conrad, Esquire