## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANGELA CARLOS, as** | : | |
| **ADMINISTRATRIX of the ESTATE OF** | : | |
| **TIOMBE KIMANA CARLOS,** | : | |
| | : | **No. 1:15-CV-1994-WWC-JFS** |
| **Plaintiff,** | : | |
| | : | **(Judge Caldwell)** |
| **v.** | : | |
| | : | **(Magistrate Judge Saporito)** |
| **YORK COUNTY et al.,** | : | |
| | : | |
| **Defendants.** | : | |

### PLAINTIFF'S CONSOLIDATED STATEMENT OF FACTS
### IN SUPPORT OF OPPOSITION TO DEFENDANTS'
### MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   DEFENDANTS' OBLIGATIONS TO RECOGNIZE AND
     RESPOND TO RISKS OF INMATE SUICIDE ............................................2

II.  TIOMBE CARLOS'S MENTAL HEALTH AND
     INCARCERATION HISTORY.......................................................................4

III. MS. CARLOS'S DIFFICULT ADJUSTMENT AT YCP,
     CONSISTENT DISCIPLINARY PROBLEMS, AND REPEATED
     PLACEMENT IN SEGREGATED HOUSING ............................................6

IV.  DEFENDANTS' FAILURE TO ENGAGE IN REQUIRED
     TREATMENT PLANNING, ENSURE MEDICATION
     COMPLIANCE, AND CONDUCT NECESSARY SUICIDE RISK
     ASSESSMENTS .......................................................................................11

     A.   Treatment Planning..........................................................................11

     B.   Medication Compliance ...................................................................13

     C.   Suicide Risk Assessment .................................................................14

V.   MS. CARLOS'S AUGUST 13, 2013 ATTEMPTED SUICIDE..................16

VI.  DEFENDANTS' FAILURES TO ADDRESS MS. CARLOS'S
     PARTICULAR VULNERABILITIES TO SUICIDE FOLLOWING
     HER SUICIDE ATTEMPT .........................................................................22

VII. MS. CARLOS'S OCTOBER 23, 2013 SUICIDE .......................................34

VIII. REVIEWS OF THE DEFENDANTS' ACTIONS .......................................39

Plaintiff Angela Carlos, through the undersigned counsel, submits this Statement of Facts in support of her opposition to the three motions for summary judgment filed by the defendants in this matter.  Because the legal arguments raised in the three motions arise out of the same factual history, plaintiff provides this single consolidated statement to form the basis of the narrative factual accounts provided in plaintiff's separately filed briefs in opposition to each motion and to further supplement plaintiff's responses to the defendants' statements of undisputed material facts.

All referenced exhibits cited in support of the below factual assertions are described in the attached Declaration of Counsel and are filed as attachments to this Statement.  For the convenience of the parties and the Court, this Statement refers to exhibits by the same numbers used during depositions.  Because not all exhibits marked during depositions are necessary to the issues presented on summary judgment, some exhibit numbers will not be referenced below – e.g., Exhibits 3 and 7 are cited but not Exhibits 4, 5, and 6.  For any exhibit that is not a deposition transcript, page cites refer to the relevant Bates number ("Carlos" for documents produced by plaintiff; "YC" for documents produced by defendant York County; and "PCM" for documents produced by defendant PrimeCare Medical, Inc.).

Plaintiff respectfully submits that, when viewing the record and all reasonable inferences drawn therefrom in the light most favorable to plaintiff as the non-moving party, the material facts established in this case are as follows:

## I.   DEFENDANTS' OBLIGATIONS TO RECOGNIZE AND RESPOND TO RISKS OF INMATE SUICIDE

1.     Defendant York County operated the York County Prison ("YCP") for the incarceration of pretrial detainees, sentenced inmates and, through a contract with the U.S. Department of Homeland Security, immigrants ordered detained by U.S. Immigration and Customs Enforcement ("ICE").  Employees of defendant York County include defendant Deputy Warden for Treatment Clair Doll, defendant Correctional Counselor Janet Jackson, and defendant Correctional Officer Erika Collins.  Collins Dep., Ex. 16 at 21:3-25:18; Doll Dep., Ex. 17 at 29-30, 65:25-66:6; Jackson Dep., Ex. 19 at 14:21-15:6; ICE Rep., Ex. 12 at Carlos 695.

2.     Defendant PrimeCare Medical, Inc. ("PrimeCare"), held a contract with York County to provide all medical and mental health care to inmates detained at YCP, including immigration detainees.  Employees of PrimeCare include defendant Dr. Pamela Rollings-Mazza, the only psychiatrist working at YCP, and defendant Nurse Aimee Leiphart.  Rollings-Mazza Dep., Ex. 22 at 22:13-17; Leiphart Dep., Ex. 20 at 11:6-14.

3.     Defendant Patrick Gallagher, a licensed professional counselor,
though an employee of a private entity, WellSpan Health System, worked full-time
as a mental health counselor at YCP, with the title "Mental Health Coordinator."
Gallagher Dep., Ex. 18 at 16:16-19:16.

4.     In recognition of the fact that inmate suicide is always a risk in a
prison setting, defendant York County and defendant PrimeCare had written
policies regarding suicide prevention.  Both policies outlined provisions to screen
for risks of suicide and methods aimed at preventing inmates from committing
suicide.  *See* York County Suicide Prevention Policy, Ex. 1; PrimeCare Suicide
Prevention Policy, Ex. 3; *see also* Doll Dep., Ex. 17 at 40:17-41:18, 44:10-15;
Rollings-Mazza Dep., Ex. 22 at 38:2-15.

5.     Factors recognized as increasing the risk of suicide in an inmate
population include the following: a diagnosed mental health condition,
despondency over the status of a criminal or immigration case, assaultive conduct,
conflicts with other inmates, inconsistent compliance with psychiatric medication
regimens, housing in segregated areas, and a prior suicide attempt.  Doll Dep., Ex.
17 at 61:16-63:7, 102:17-103:4.

6.     Employees in a correctional facility have a duty to understand suicide
risks and are specially trained to recognize those risks and act to prevent an inmate
from committing suicide.  Doll Dep., Ex. 17 at 40:17-25; *see also* Rollings-Mazza

Dep., Ex. 22 at 36:6-11; Leiphart Dep., Ex. 20 at 24:17-21; Jackson Dep., Ex. 19 at 34:19-25; Gallagher Dep., Ex. 18 at 36:3-18.

## II.   TIOMBE CARLOS'S MENTAL HEALTH AND INCARCERATION HISTORY

7.      Tiombe Carlos was born in 1978 in Antigua and Barbuda.  Her parents immigrated to the United States when she was approximately four years old.  Her parents became citizens, but Ms. Carlos remained a lawful permanent resident.  Patterson Rep., Ex. 25 at 2-3.

8.      As of her early teens, Ms. Carlos suffered from serious mental illness. She was hospitalized at the age of 14 following an episode of hallucinations.  She began receiving antipsychotic medications.  Throughout her teens, she was hospitalized multiple times.  She also reported that she had been raped at least twice, once at the age of 12 and once at the age of 18.  Patterson Rep., Ex. 25 at 3 (citing Noble Rep., Ex. 7 at Carlos 131-32).

9.      Ms. Carlos did not complete school and lived with her mother, plaintiff Angela Carlos, into her early 20s.  According to plaintiff, Ms. Carlos would be "fine" if she took her medications and stayed at home, but, when she did not take her medications, she would act "strangely" and get into trouble.  Noble Rep., Ex. 7 at Carlos 134.

10.      When in good health and compliant with her medications, Ms. Carlos was described by her mother and her father, Hueth Carlos, as a loving family

member.  She liked to listen to and make music, dance, and shop.  She had a daughter, Natalla, with whom she maintained a close relationship and who, at the time of her deposition, was a rising junior at Bensalem High School. A. Carlos Dep., Ex. 27 at 51:8-15, 86:6-15; H. Carlos Dep., Ex. 28 at 12:8-15, 17:4-11; N. Carlos Dep., Ex. 29 at 6:4-8, 12:8-14.

11.     In or around 2007, Ms. Carlos, due to her mental health condition, got into a fight with a police officer at a bar in Connecticut.  She was arrested and charged with assault on the officer and, after being convicted, was sentenced to serve three years in prison.  Patterson Rep., Ex. 25 at 6; Noble Rep., Ex. 7 at 4.

12.     Given her noncitizen status, her conviction rendered her removable from the United States, and, following completion of her sentence, she was transferred into ICE custody.  While in a Connecticut prison awaiting completion of her removal proceedings, she had an altercation with a correctional officer, which led to another conviction and another sentence of approximately three years imprisonment.  Patterson Rep., Ex. 25 at 6.

13.     In February 2011, Ms. Carlos was transferred back into ICE custody, and, on April 14, 2011, she was transferred to YCP as an immigration detainee awaiting completion of removal proceedings.  Patterson Rep., Ex. 25 at 6; ICE Rep., Ex. 12 at Carlos 693, 695-97.

14. Shortly after she arrived at YCP, Ms. Carlos's immigration attorney arranged for a comprehensive psychological evaluation to be completed by Dr. Ronald Noble, a clinical psychologist at the University of Pennsylvania. In a report dated September 14, 2011, Dr. Noble stated that Ms. Carlos informed him of her belief that she had been diagnosed with paranoid schizophrenia; she also reported that she had been receiving injections of an antipsychotic medication, Haldol, every two weeks and that this medication generally worked to keep her calm. Dr. Noble concluded that Ms. Carlos suffered from "Schizoaffective Disorder, Bipolar Type." He concluded, further, that she would suffer from a psychotic disorder permanently and that she would need psychotropic medication and supportive care for the remainder of her life. With respect to her continued incarceration, Dr. Noble concluded that Ms. Carlos could successfully minimize her symptoms if living in a structured environment and remaining medication compliant. Noble Rep., Ex. 7 at Carlos 138-39; *see also* Patterson Rep., Ex. 25 at 3-5.

## III. MS. CARLOS'S DIFFICULT ADJUSTMENT AT YCP, CONSISTENT DISCIPLINARY PROBLEMS, AND REPEATED PLACEMENT IN SEGREGATED HOUSING

15. Shortly after her arrival at YCP, Ms. Carlos was seen by mental health professionals, including Counselor Gallagher and Dr. Rollings-Mazza. Ms. Carlos reported that she had been diagnosed in the past with paranoid schizophrenia, and

Dr. Rollings-Mazza saw no reason to change that diagnosis.  Dr. Rollings-Mazza

ordered continuation of Haldol injections every two weeks.  Rollings-Mazza Dep.,

Ex. 22 at 50:15-52:20; Gallagher Dep., Ex. 18 at 40:18-23, 45:23-46:4.

16.     Ms. Carlos spent the majority of her incarceration at YCP in the

female maximum-security block of YCP.  That block was divided into smaller

"pods" of cells, including pods A, B, C, and D and the Behavioral Adjustment

Unit, known as "BAU."  Collins Dep., Ex. 16 at 26:17-30:15; Doll Dep., Ex. 17 at

75:19-76:16; ICE Rep., Ex. 12 at Carlos 708.

17.     Throughout much of her incarceration, Ms. Carlos was housed in

segregated conditions, including, most frequently, the BAU and the Intensive

Custody Unit, known as "ICU."   BAU placements were made as a result of a

specific disciplinary violation; while placed in that unit, inmates were permitted

only one hour out of their cells per day, five days per week, and were limited in the

types of property they could possess.  ICU status was based on administrative

decisions that the inmate had a "history of violence" and was a "threat to General

Population"; ICU inmates, who could be placed on various pods, usually A Pod or

D Pod, were not limited in the property they could possess, but were permitted

only two hours out of their cell per day.  Doll Dep., Ex. 17 at 67:12-68:11.

18.   Shortly after her arrival at YCP, Ms. Carlos was placed in a BAU cell due to conflicts with staff, including a report that she had been disruptive during transportation to the facility.  Hayes Rep., Ex. 14 at YC 827.

19.   Her initial placement in a segregated unit was the start of a pattern that persisted for the next two-plus years.  Because she was difficult to manage and had multiple physical and verbal altercations with correctional staff and other inmates, she was repeatedly required to reside in a segregated setting.  *See* Doll Dep., Ex. 17 at 78:11-78:15 ("She was difficult to manage."); Gallagher Dep., Ex. 18 at 45:8-22 (discussing frequent contact with Ms. Carlos to provide "support" when "she got in trouble" and noting that she had an "attack on staff" and "altercations"); Leiphart Dep., Ex. 20 at 28:9-19 (noting that Ms. Carlos had frequent problems interacting with other inmates and staff, got into fights, and was easily agitated); *see also* ICE Rep., Ex. 12 at Carlos 701 (listing eight disciplinary reports, including for "refusing orders, using abusive or obscene language, disrespect, and assault on staff and other detainees" and noting that at the time of each reported incident Ms. Carlos "was either already on disciplinary segregation, or was assigned to administrative segregation pending a disciplinary hearing"); *but see* Rollings-Mazza Dep., Ex. 22 at 52:21-53:10 (stating that she did not recall Ms. Carlos having any altercations or being required to spend time in the BAU).

20.   To Ms. Carlos's assigned correctional counselor, defendant Janet

Jackson,[1] interactions with Ms. Carlos were frustrating.  *See* Jackson Dep., Ex. 19

at 53:21-54:11 (discussing note of contact review reporting that Ms. Carlos did not

like Jackson's answers as to whether, among other things, she could have an

inmate job and stating that Ms. Carlos "kept going on about it" so that "[f]inally,"

she "had to end the conversation because we were getting nowhere fast"); *see also*

Counselor Notes, Ex. 8 at PCM 1771; ICE Rep., Ex. 12 at Carlos 709 (noting

Counselor Jackson's statement that Ms. Carlos "was a 'different person' every

time she talked to her").

21.   In these interactions, repeated placements in disciplinary segregation

became a foregone conclusion to Counselor Jackson, as she noted several times:

a.   On June 27, 2011, while speaking with Ms. Carlos in BAU

following a disciplinary violation, Counselor Jackson noted that

Ms. Carlos was "talking circles and was not absorbing a word I

said," and that "[s]he is very frustrating to speak with and doesn't

like to listen to others."  Accordingly, defendant Jackson stated she

could "see her being back in BAU at another point while she's

---

[1] As a correctional counselor, Jackson's duties were to serve as the liaison
between Ms. Carlos and outside agencies, such as ICE.  She conducted monthly
"contact reviews" with inmates to "check on them, see how they're doing, ask
them any questions, if they have any problems."  Jackson Dep., Ex. 19 at 17:18-
19:11.

here" at YCP.  Counselor Notes, Ex. 8 at PCM 1769; *see also*

Jackson Dep., Ex. 19 at 41:17-45:15.

b. On December 18, 2012, Counselor Jackson stated that Ms. Carlos

"went on a rant" with complaints about disciplinary issues and her

request for access to a phone call.  She concluded her note by

reporting that "[s]he continues to be a problem and have poor

adjustment. I can see her going onto ICU status once she's off

BAU."  Counselor Notes, Ex. 8 at PCM 1772; *see also* Jackson

Dep., Ex. 19 at 54:19-60:25.

c. On March 14, 2013, Counselor Jackson noted that Ms. Carlos "was

being very disruptive" and "screaming 'the counselor doesn't' like

black people,'" and that "[s]he is always needing something or

complaining about something."  In view of this conduct, defendant

Jackson noted that "[i]f she keeps this up, I can easily see her

getting another write up."  Counselor Notes, Ex. 8 at PCM 1773;

*see also* Jackson Dep., Ex. 19 at 64:14-65:16.

22.    Ms. Carlos's behavior was directly tied to her mental health diagnoses

and showed that her condition resulted in instability, agitation and impulsivity.  *See*

Leiphart Dep., Ex. 20 at 31:10-32:17 (stating that Ms. Carlos's conduct, including

the fact that she "didn't get along with people and was argumentative" and "would

be agitated," was not surprising given her schizophrenia diagnosis); Hayes Rep.,

Ex. 14 at 831 ("[Ms. Carlos] was frequently housed in segregation due to

assaultive and/or disruptive behavior.  Much of this disruptive behavior could be

attributable to her serious mental illness, as well as increased anxiety and

frustration regarding the continued uncertainty of her immigration status."); *but see*

Rollings-Mazza Dep., Ex. 22 at 50:17-21 ("In the time that she—in the time that

she was with us, she was remarkably stable on her medication...I never saw her to

have any psychotic-type symptoms.").

23.     In addition to placement in segregated housing locations, Ms. Carlos

was throughout her incarceration placed on some form of suicide watch at least

four times between June 2011 and July 2013.  *See* ICE Rep., Ex. 12 at Carlos 700;

Gallagher Dep., Ex. 18 at 45:8-22; *see also* York County Suicide Prevention

Policy, Ex. 1 at YC 223-24 (describing four levels of observation to be applied in

the case of an inmate expressing suicidal ideation); PrimeCare Suicide Prevention

Policy, Ex. 3 at PCM 1960-64 (same).

## IV.   DEFENDANTS' FAILURE TO ENGAGE IN REQUIRED TREATMENT PLANNING, ENSURE MEDICATION COMPLIANCE, AND CONDUCT NECESSARY SUICIDE RISK ASSESSMENTS

### A.    Treatment Planning

24.     As part of its agreement to house immigration detainees for ICE, York

County and PrimeCare were required to comply with established rules outlined in

the ICE Performance-Based National Detention Standards ("PBNDS").  ICE Rep.,

Ex. 12 at Carlos 695.

25.    Those standards mandated, among other things, the implementation of

a "treatment plan" for any immigration detainee suffering from mental illness.

Specifically, the standards state: "The provider shall develop an overall

treatment/management plan that may include transfer to a mental health facility if

the detainee's mental illness or developmental disability needs exceed the

treatment capability of the facility."  ICE Rep., Ex. 12 at Carlos 722.

26.    According to Dr. Rollings-Mazza, she prepared a "treatment plan"

every time she wrote a note about Ms. Carlos in which she discussed "medication

management, compliance, side effects and follow-up."  Rollings-Mazza Dep., Ex.

22 at 69:20-70:5.

27.    Counselor Gallagher stated that, although it is "customary" in the

psychiatric/psychological fields to "have a written plan for how mental health

issues will be treated," it is "unrealistic" to do that in the prison environment.

Gallagher Dep., Ex. 18 at 50:1-22.

28.    As a result, the only "treatment" Ms. Carlos received was medication

and counseling, with most "counseling" sessions taking place at Ms. Carlos's cell

in a segregated housing environment.  Gallagher Dep., Ex. 18 at 46:24-48:7.

29.     These actions did not meet ICE's treatment planning standards.  *See* ICE Rep., Ex. 12 at Carlos 722 ("[Ms. Carlos's] medical record does not document any treatment plan for the duration of her detention at YCP."); Hayes Rep., Ex. 14 at YC 832 ("[T]here was *never* a treatment plan completed on the detainee.").

30.     Nor, did the actions taken by mental health staff meet the required standard of care with respect to a treatment plan.  *See* Patterson Rep., Ex. 25 at 11 ("Further, it is my opinion that the mental health care and treatment rendered by PrimeCare, Inc. was substandard and did not include any comprehensive multidisciplinary treatment plans during her entire stay in the YCP.").

### B.     Medication Compliance

31.     Further, to the extent any "treatment" was given to Ms. Carlos in the form of medications, it was provided in an uneven fashion, as "Ms. Carlos had inconsistencies with regard to receiving psychotropic medication injections." Patterson Rep., Ex. 25 at 9; *see also* Gallagher Dep., Ex. 18 at 48:11-49:12 (acknowledging delays in provision of medications).

32.     Injectable medications are intended to ensure proper dosing when the patient may be at risk for noncompliance; they are "are designed for inmates who may have difficulties taking oral medications on a daily basis and to assure that patients receive adequate doses of medication on a regular basis."  Patterson Rep., Ex. 25 at 9.

33.     Failure to ensure proper compliance with Ms. Carlos's medication regimen was dangerous as her "history prior to and subsequent to her incarcerations clearly indicate that without proper medication management, her condition deteriorated and she decompensated and became more psychotic and impulsive." Patterson Rep., Ex. 25 at 12; *but see* Rollings-Mazza Dep., Ex. 22 at 66:8-12 (denying that delays in Ms. Carlos's receipt of medications increased her psychiatric symptoms).

### C.     Suicide Risk Assessment

34.     Consistent with accepted correctional practice, PrimeCare's policies impose specific requirements on mental health practitioners to conduct "suicide risk assessments." The relevant policy states:

> Suicide risk assessments must always provided at [*sic*]
> sufficient description of the current behavior and
> justification for a particular level of observation and/or
> discharge from suicide precautions. The assessment
> should include a brief mental status examination, a listing
> of both static and variable risk factors, a listing of any
> protective factors, a level of suicide risk (i.e. low,
> medium, high), and a treatment plan.

PrimeCare Suicide Prevention Policy, Ex. 3 at PCM 1958.

35.     Dr. Rollings-Mazza claimed that she performs such an assessment "[e]very time [she] see[s] a patient." Rollings-Mazza Dep., Ex. 22 at 128:20-129:2.

36.     Counselor Gallagher also claimed to conduct such assessments "based on [his] own experience and what [he] saw before [him] to make some determination."  Gallagher Dep., Ex. 18 at 23:9-20.

37.     These actions, however, were not suicide risk assessments as required by PrimeCare policy.  As stated in a report authored by noted suicide prevention expert Lindsay M. Hayes,[2] Dr. Rollings-Mazza and Counselor Gallagher only conducted "a brief mental health status each time [Ms. Carlos] was seen," and "*never* completed a suicide risk assessment."  Hayes Rep., Ex. 14 at YC 832; *see also* Patterson Rep., Ex. 25 at 13 ("From my review, I also conclude that there were no formal suicide risk assessments conducted on Ms. Carlos during her entire stay at YCP."); Patterson Addendum, Ex. 26 at 3 (noting that review of, among other materials, Dr. Rollings-Mazza' deposition testimony asserting that she conducted a suicide risk assessment every time she saw a patient, confirmed conclusions in initial report regarding violations of the relevant standard of care).

38.     Since receipt of the Hayes report, YCP and PrimeCare have instituted a new practice whereby mental health practitioners are required to complete a detailed written instrument for suicide risk assessment purposes. Gallagher Dep., Ex. 18 at 22:13-23:12.

---

[2] The genesis of the Hayes report and other findings contained therein are explained below.  *See infra* ¶¶ 113-14.

## V.   MS. CARLOS'S AUGUST 13, 2013 ATTEMPTED SUICIDE

39.   In early August 2013, Ms. Carlos was housed in the BAU as a result

of a disciplinary violation.  She completed her time in BAU and, on August 13,

Deputy Warden Doll, in consultation with Counselor Gallagher, decided that Ms.

Carlos should be placed on ICU status in the A Pod "due to her continued

assaultive behavior."  As noted, *see supra* ¶ 17, this segregated status meant she

would continue to only have limited time out of her cell.  Counselor Notes, Ex. 8 at

PCM 1773; Doll Dep., Ex. 17 at 92:6-94:20.[3]

40.   On August 13, Dr. Rollings-Mazza was seeing a different inmate in

the A Pod area when Ms. Carlos called out to her and asked whether she had any

information about Ms. Carlos's immigration status or her deportation.  Dr.

Rollings-Mazza told Ms. Carlos that she did not have any information on Ms.

Carlos's status and that she should speak to members of the PRC ("Program

Review Committee") when they came to her cell on their weekly rounds.[4]

Rollings-Mazza Dep., Ex. 22 at 71:18-72:25.

---

[3] Deputy Warden Doll's authorization of Ms. Carlos's placement in ICU status was issued verbally and not explained in any document.  This practice violated ICE detention standards, which provided that a "written order shall be completed and approved by a security supervisor before a detainee is placed in Administrative Segregation."  ICE Rep., Ex. 12 at Carlos 719; Doll Dep., Ex. 17 at 94:16-20.

[4] The PRC is discussed at greater length below.  *See infra* ¶¶ 80-82.

41.   Dr. Rollings-Mazza left A Pod, and, a short while later, at approximately 1:20 p.m., heard a commotion coming from the A Pod area.  Nurse Leiphart, who was working with Dr. Rollings-Mazza, went to the area and heard officers yelling that there was a medical emergency and that a "cut-down tool" (a tool designed to cut down a ligature used by an inmate attempting to hang herself) was needed.  When Nurse Leiphart arrived in A Pod, Ms. Carlos was lying on the floor of her cell and an item she had used to hang herself had been cut.  Rollings-Mazza Dep., Ex. 22 at 73:2-6; Leiphart Dep., Ex. 20 at 34:20-36:7.

42.   Less than half an hour later, Nurse Leiphart wrote a note in Ms. Carlos's medical chart documenting the suicide attempt:

> [Patient] found at approx[imately] 1320 hanging by her sheet in her cell by the window.  [Patient] cut down by security and placed on the floor.  [M]edical emergency called.  911 called at approx[imately] 1330.  [Patient] alert.  [M]edical staff took over treatment at this time, [D]r. Rollings-Mazza made aware.

PrimeCare Records, Ex. 13 at PCM 197.

43.   Another nurse who was on the scene, Angela Schmuck, LPN, entered a separate note in Ms. Carlos's medical chart further describing Ms. Carlos's demeanor and actions at the time of the suicide attempt.  As Nurse Schmuck described, when Ms. Carlos was cut down and lowered to the floor, she was "crying and saying 'it's not fair, I don't wanna live.'"  PrimeCare Records, Ex. 13 at PCM 197.

17

44.     Ms. Carlos was taken to York Hospital for an evaluation.  In a note

entered at 2:39 p.m., an emergency department physician stated: "The patient

presents with neck injury and non radiating neck pain."  The note also stated that

Ms. Carlos reported "she did this because 'I don't want to live any more.'"  A

correctional officer informed the physician that Ms. Carlos would be placed on

suicide watch when she was returned to the prison, and she was discharged from

the hospital later that afternoon.  York Hosp. Records, Ex. 30 at Carlos 583-84.

45.     Some involved with Ms. Carlos's care stated that Ms. Carlos's tying a

sheet around her neck was not aimed at actually producing her death. Dr. Rollings-

Mazza stated: "My understanding is that she didn't actually do anything.  There

was a Security Officer sitting constant with another individual in the same

pod…The Security Officer was sitting in the central area.  She saw that Ms. Carlos

was attempting to do something and intervened."  Rollings-Mazza Dep., Ex. 22 at

73:7-14.

46.     Whatever her intentions, all agreed that Ms. Carlos's actions were

motivated by her frustration at her continued detention in a segregated setting and

the status of her deportation proceedings.  *See* Doll Dep., Ex. 17 at 83:7-18, 90:15-

16 (stating that Ms. Carlos "didn't want to kill herself," but "wanted out of

detention" and that her actions were "more of an attention seeking type of

behavior"); Gallagher Dep., Ex. 18 at 77:3-16 (noting that Ms. Carlos was "angry

18

that she thought she was off of BAU," and, after being placed in ICU status, "nothing changed"); *see also supra* ¶ 40 (Dr. Rollings-Mazza' testimony that Ms. Carlos's suicide attempt was immediately preceded by questions concerning the status of her immigration matter).

47.     Regardless of whether Ms. Carlos actually intended to kill herself, her actions—which, if not interrupted, would have led to her death—required serious attention.  *See* Doll Dep., Ex. 17 at 90:24-91:1 ("[T]he problem with suicide attempts is even when people don't want to kill themselves, they can complete the act accidentally."); Gallagher Dep., Ex. 18 at 57:13-58:3 (agreeing that Ms. Carlos's actions should be treated as "a serious issue" because "even if you plan it well, that there's going to be an intervention, you can always make a mistake"); *but see* Rollings-Mazza Dep., Ex. 22 at 73:24-74:12 (rejecting distinction of "serious versus not serious" suicide attempt and stating that "When I say quote attempt, what I mean is my understanding is that she didn't actually do anything. She made a gesture of going to do something").[5]

---

[5] Dr. Rollings-Mazza told ICE investigators that "she did not believe [Ms. Carlos] was truly attempting suicide on August 13, 2013, but was instead trying to get attention because she was upset about her housing decision."  ICE Rep., Ex. 12 at Carlos 706.  At the time she made this statement to investigators she was not aware of the description of the incident provided by Nurse Schmuck, that Ms. Carlos stated she did not want to live any more.  *See supra* ¶ 43.  In her deposition, she testified that this description of the incident did not change her opinion that Ms. Carlos was only seeking attention due to her concerns about housing. Rollings-Mazza Dep., Ex. 22 at 75:14-77:13.

48.     Counselor Gallagher was surprised by Ms. Carlos's actions.  He stated: "I didn't see that coming.  I didn't, you know, didn't see that she was going to do that.  Just didn't."  Gallagher Dep., Ex. 18 at 56:12-15.

49.     In August 2013, both York County and PrimeCare had policies requiring a comprehensive investigation of the circumstances leading to a suicide attempt:

    a.  York County's policy required that "[a] mortality review committee should examine every completed suicide, *as well as attempt*" and should include "[r]eview of the circumstances surrounding the incident," "[r]eview of Prison procedures relevant to the incident," "[r]eview of all relevant training received by involved staff," "[p]ertinent medical and mental health services/reports involving [the] victim," and "[r]ecommendations, if any, for change in policy, training, physical plan, medical or mental health services, and operational procedures."  York County Suicide Prevention Policy, Ex. 1 at YC 234 (emphasis added).

    b.  PrimeCare's policy required that "[i]n 100% of situations involving suicide *attempts* and completed suicides, a comprehensive clinical review is to be conducted."  PrimeCare Suicide Prevention Policy, Ex. 3 at PCM 1956 (emphasis added).

50.     Following Ms. Carlos's August 2013 suicide attempt, York County conducted no review like that described by its suicide prevention policy.  Doll Dep., Ex. 17 at 117:9-12; Gallagher Dep., Ex. 18 at 63:19-64:15.

51.     Following Ms. Carlos's August 2013 suicide attempt, PrimeCare conducted no review like that described by its suicide prevention policy.  Rollings-Mazza Dep., Ex. 22 at 89:22-91:4.

52.     In the event of a suicide attempt, standard practices call for the inmate's family to be notified.  Hayes Rep., Ex. 14 at YC 852; Gallagher Dep., Ex. 18 at 107:4-108:22.

53.     Ms. Carlos's family members were not notified of the attempt.  Ms. Carlos's mother, plaintiff Angela Carlos, learned of the attempt from Ms. Carlos after an approximately two-month period in which she could not get in touch with Ms. Carlos.  When plaintiff finally learned of the attempt, Ms. Carlos "just said she can't take it no more."  A. Carlos Dep., Ex. 27 at 27:22-38:19.

54.     Counselor Gallagher agreed that it would have been appropriate to inform Ms. Carlos's family of her suicide attempt, but he did not expect that it would happen because he did not "know who would be charged with doing that." Gallagher Dep., Ex. 18 at 108:10-109:1.

## VI.   DEFENDANTS' FAILURES TO ADDRESS MS. CARLOS'S PARTICULAR VULNERABILITIES TO SUICIDE FOLLOWING HER SUICIDE ATTEMPT

55.     When Ms. Carlos was returned to YCP following her August 13 suicide attempt, she was placed on a suicide precaution status requiring "constant watch" of her cell.  Rollings-Mazza Dep., Ex. 22 at 85:22-86:6; *see also* Doll Dep., Ex. 17 at 61:9-12 (explaining constant watch procedure); York County Suicide Prevention Policy, Ex. 1 at YC 233 (outlining levels of observation for inmates believed to be at risk of suicide).

56.     Dr. Rollings-Mazza saw Ms. Carlos on August 14, 2013.  She wrote in a note that Ms. Carlos was upset regarding her housing and had attempted to hang herself.  She also noted that Ms. Carlos was refusing an evaluation and that Ms. Carlos stated she would no longer take her prescribed anti-psychotic medications.  Dr. Rollings-Mazza reported that she was unable to conduct an evaluation due to Ms. Carlos being uncooperative.  As her "plan," she ordered that Ms. Carlos should remain on suicide precautions and continue with her "meds as is."  She scheduled a follow up appointment for one week later.  PrimeCare Records, Ex. 13 at PCM 655.

57.     Dr. Rollings-Mazza viewed her role in treating Ms. Carlos as "exclusively managing medication," and, notwithstanding either Ms. Carlos's suicide attempt the day before or Ms. Carlos's statement that she would no longer

take her mental health medications, Dr. Rollings-Mazza claimed not to see on August 14, 2013 any reason to make changes to the management of Ms. Carlos's treatment.  Rollings-Mazza Dep., Ex. 22 at 87:3-89:6.

58.    Following the August 13 suicide attempt and Ms. Carlos's placement on "constant watch" status, Counselor Gallagher saw Ms. Carlos once per day between August 14 and August 20.  On August 14, August 15, August 16, and August 17, Counselor Gallagher noted in Ms. Carlos's medical chart that she was a suicide risk.  PrimeCare Records, Ex. 13 at PCM 654-55.

59.    During that time period, Counselor Gallagher also documented his performance of  "mental status exams" on Ms. Carlos.  That documentation provided inconsistent information about his assessment of Ms. Carlos's suicide risk.  On August 16, 2013, Counselor Gallagher's mental status exam report included a check in the box next to "none" for an assessment of suicide risk.  But, on that same date, he stated in a chart note that Ms. Carlos was a suicide risk. *Compare* Prime Care Records, Ex. 13 at PCM 505 *with* Prime Care Records, Ex. 13 at PCM 654.[6]

---

[6] Counselor Gallagher attempted to explain this inconsistency in his deposition testimony: "Because I didn't believe she was suicidal, but she wouldn't discuss it with me, so she—she's a suicide risk."  Gallagher Dep., Ex. 18 at 71:11-13.

60.     On August 19, 2013, Counselor Gallagher reported in a chart note that he interviewed Ms. Carlos at her cell and that she "contracted for safety." PrimeCare Records, Ex. 13 at PCM 661; Gallagher Dep., Ex. 18 at 76:16-77:13.

61.     On August 20, 2013, Counselor Gallagher again met with Ms. Carlos and noted that she "contracted for safety."  He discontinued suicide precautions and wrote that she would be placed on "psychiatric observations" while housed in ICU status.  PrimeCare Records, Ex. 13 at PCM 660; *see also* PrimeCare Suicide Prevention Policy, Ex. 3 at PCM 1962-63 (describing "psychiatric observations" practices and noting that "[t]his level [of observation] is not used for suicide prevention, but reserved for the inmate whose behavior warrants closer observation"); York County Suicide Prevention Policy, Ex. 1 at YC 234 (describing "psychiatric observations" practices).

62.     "Contracting for safety," as Counselor Gallagher asked Ms. Carlos to do on August 19 and August 20, is a discredited practice, and it was contrary to both PrimeCare policy and ICE standards which York County agreed to follow in housing immigration detainees.  "[M]ost experts agree that once a patient becomes suicidal, their written or verbal assurances are no longer sufficient to counter suicidal impulses."  Hayes Rep., Ex. 14 at YC 851; *see also* Patterson Addendum, Ex. 26 at 3 (concurring with Hayes' findings and noting that failures in treatment

provided to Ms. Carlos included "continuous reliance on 'contracting for safety'").[7]

63.     An hour after Counselor Gallagher removed Ms. Carlos from suicide precautions on August 20, she was seen by Dr. Robert Davis, a contract psychiatrist filling in for Dr. Rollings-Mazza.  Dr. Davis reported that Ms. Carlos was angry at the system for not releasing her or deporting her and noted that Ms. Carlos minimized her psychiatric history.  She also admitted hearing voices, and Dr. Davis concluded that she was paranoid and diagnosed her with Schizophrenia, Paranoid type.  He ordered that she be seen by a psychiatrist again eight weeks later.  PrimeCare Records, Ex. 13 at PCM 660; *see also* Rollings-Mazza Dep., Ex. 22 at 95:11-98:13.

64.     Based on Counselor Gallagher's decision, Ms. Carlos was removed from any suicide precautions just seven days after her suicide attempt, but she remained in ICU status—the same status that was the subject of her complaints prior to her suicide attempt.  *See* Gallagher Dep., Ex. 18 at 77:3-16 (discussing Ms. Carlos's anger on August 13, 2013 at remaining in ICU status); *see also* Counselor

---

[7] York County's revised suicide prevention policy, issued in 2015 after receipt of the Hayes report, *see infra* ¶ 113, stated specifically: "Contracting for safety (inmate promising not to engage in suicidal behavior when risk factors for suicide or self-harm are present) is not an effective suicide prevention method.  It shall not be relied on by the staff."  York County Suicide Prevention Policy and Procedure, Ex. 2 at YC 180.

Notes, Ex. 8 at PCM 1773 (noting that Ms. Carlos remained in ICU status as of August 20, 2013).

65.     On August 28, 2013, Counselor Jackson met with Ms. Carlos for a monthly contact visit.  Counselor Jackson did not discuss the suicide attempt with Ms. Carlos or take any action regarding the issues that gave rise to that attempt. Counselor Notes, Ex. 8 at PCM 1773; Jackson Dep., Ex. 19 at 66:10-67:22.[8]

66.     Throughout late August and September, Counselor Gallagher saw Ms. Carlos periodically.  Ms. Carlos remained in ICU status and remained under psychiatric observations.  *See* PrimeCare Records, Ex. 13 at PCM 658-59.

67.     Ms. Carlos complained about the fact that she continued in these statuses, informing Counselor Gallagher on September 19, 2013 that she "could no[t] handle ICU status."  According to Counselor Gallagher's note of that encounter, Ms. Carlos appeared upset, depressed, and anxious.  PrimeCare Records, Ex. 13 at PCM 659.

68.     Despite Ms. Carlos's continued complaints and despite the fact that Ms. Carlos had attempted suicide following complaints about ICU status on August 13, she remained on ICU status.  Doll Dep., Ex. 17 at 101:7-18.

---

[8] Counselor Jackson testified in her deposition that she only vaguely recalled the details of the suicide attempt.  Jackson Dep., Ex. 19 at 28:10-14.  But, she told ICE investigators that Ms. Carlos's "August 2013 suicide attempt was done for attention."  ICE Rep., Ex. 12 at Carlos 709.

69.     In addition to growing ever more frustrated with her prolonged ICU placement, Ms. Carlos rejected her anti-psychotic medication.  On September 4, 2013, Nurse Bette Ann Becker attempted to administer a Haldol injection, but Ms. Carlos was "argumentative" and refused the injection.  PrimeCare Records, Ex. 13 at PCM 196.

70.     Ms. Carlos did not receive the Haldol injection until two weeks later, on September 18, 2013.  ICE Rep., Ex. 12 at Carlos 707.

71.     Ms. Carlos's history showed that inconsistent medication management increased her psychotic symptoms and made her more impulsive.  *See supra* ¶ 33 (citing Patterson Rep., Ex. 25 at 12).

72.     On September 30, 2013, Dr. Rollings-Mazza saw Ms. Carlos for the first time since August 14, the day after Ms. Carlos's suicide attempt.  Dr. Rollings-Mazza knew from that August 14 encounter that Ms. Carlos had expressed frustration with her ICU placement and had told Dr. Rollings-Mazza that she would no longer take her mental health medications.  *See supra* ¶ 56.  Dr. Rollings-Mazza also knew from her review of Ms. Carlos's medical chart that, since their last encounter, Ms. Carlos had, consistent with her statement on August 14, refused her Haldol injection, resulting in a two-week delay in administration of her medication.  And, Dr. Rollings-Mazza knew that Ms. Carlos had continued to complain about her ICU placement.  *See* Rollings-Mazza Dep., Ex. 22 at 97:8-12

("I always review the notes when I see people."); *id.* at 99:19-25, 103:6-12 (noting awareness that Ms. Carlos had complained about ICU placement).

73.     Despite this knowledge, Dr. Rollings-Mazza made no changes to Ms. Carlos's medication management.  She wrote that Ms. Carlos should continue receiving her medications as directed and ordered that she be seen in six weeks. Rollings-Mazza Dep., Ex. 22 at 98:10-99:18; PrimeCare Records, Ex. 13 at PCM 658.

74.     Two days later, on October 2, 2013, Counselor Gallagher met with Ms. Carlos, who remained on ICU status.  PrimeCare Records, Ex. 13 at PCM 658.

75.     At that point, Counselor Gallagher knew the following about Ms. Carlos:

 a. She had attempted suicide seven weeks earlier because of frustration over prolonged placement in ICU status.  Gallagher Dep., Ex. 18 at 78:3-7, 81:5-13.

 b. Despite her repeated complaints and frustration over that placement, Ms. Carlos's impulsive actions in attempting suicide were still surprising to Counselor Gallagher.  *See supra* ¶ 48.

 c. She continued to express frustrations about her housing status. Gallagher Dep., Ex. 18 at 81:11-13.

d.  There were issues with her medication compliance.  *Id.* at 81:14-
     17.

e.  She continued to express frustration that her immigration
     proceedings were ongoing and that she remained detained.  *Id.* at
     81:22-82:2.

76.    Despite the fact that the same factors which were present before Ms.
Carlos's "surprising" suicide attempt in August were present to an even greater
degree on October 2, Counselor Gallagher removed Ms. Carlos from psychiatric
observations.  Although he could have also unilaterally removed her from ICU
status, based on discussions with Deputy Warden Doll and other members of the
Program Review Committee, he elected not to do so.  As a result, based on
Counselor Gallagher's actions, Ms. Carlos would remain in ICU, the segregated
housing status which had been a source of frustration and despondency for months,
but without any required checks on her mental health status.  Gallagher Dep., Ex.
18 at 78:17-79:16; *see also* Doll Dep., Ex. 17 at 101:7-102:4 (discussing removal
of Ms. Carlos from psychiatric observations while retaining her ICU status).

77.    Counselor Gallagher made no arrangements for any further clinical
evaluations with Ms. Carlos.  Gallagher Dep., Ex. 18 at 79:22-80:2.

78.    At no time between Ms. Carlos's August 13, 2013 suicide attempt and
the October 2, 2013 order removing her from psychiatric observations was

consideration given to modifying Ms. Carlos's treatment plan.  *See* Rollings-

Mazza Dep., Ex. 22 at 87:3-89-6 (stating that her role was "exclusively managing

medication" and that she saw no reason to adjust medication at any time after

August 13); Doll Dep., Ex. 17 at 101:16-22 (agreeing that there was no

"consideration given to changing her mental health treatment plan" other than

"stepping her down and providing more privileges," but noting that she would

remain in ICU status); *see also* Patterson Rep., Ex. 25 at 14 ("She did not receive

appropriate and consistent follow-up when she returned from York County

Hospital after her suicide attempt in August 2013, nor did the staff who did provide

services to her over the course of her incarceration at YCP ever meet together as a

multidisciplinary team, which would include the psychiatrist, counselors, custodial

and nursing staff to provide a comprehensive assessment and treatment of her

severe and persistent mental illness."); Hayes Rep., Ex. 14 at YC 832 ("Despite her

serious mental illness and suicide attempt, there was *never* a treatment plan

completed on the detainee.").

79.     Nor, between the August 13 suicide attempt and Ms. Carlos's removal

from psychiatric observations was there any suicide risk assessment conducted.

*See supra* ¶¶ 34-38.

80.     Following his decision not to conduct any clinical encounters with

Ms. Carlos following her October 2 removal from psychiatric observations,

Counselor Gallagher anticipated he would see Ms. Carlos during Program Review Committee ("PRC") rounds.  Gallagher Dep., Ex. 18 at 79:22-80:2.

81.     The PRC was a group of five YCP staff members who met weekly with inmates held in any form of segregated status to assess their condition and address the need for further segregated placement.   Such meetings would occur at the inmate's cell and would typically take no more than three or four minutes per inmate.  Doll Dep., Ex. 17 at 68:2-75:18, Neeper Dep., Ex. 21 at 7:15-21, 15:13-18:4.

82.     Counselor Gallagher's practice concerning notes of clinical encounters was to put all such notes in the medical chart.  On occasion, he would document clinical encounters with Ms. Carlos when seeing her during PRC review.  Gallagher Dep., Ex. 18 at 10:13-11:7; *see also* PrimeCare Records, Ex. 13 at PCM 659 (stating that September 19, 2013 encounter where Ms. Carlos complained she could not handle ICU status occurred in interview at Ms. Carlos's cell "for PRC review").

83.     Counselor Gallagher made no notes of any encounter with Ms. Carlos at any time after October 2, 2013.  Gallagher Dep., Ex. 18 at 80:20-81:4.

84.     Following the October 2, 2013 removal of Ms. Carlos from psychiatric observations, the PRC reportedly saw Ms. Carlos twice: on October 9, 2013 and October 16, 2013.  ICE Rep., Ex. 12 at Carlos 708.

85.     There is, however, no documentation of any PRC encounter with Ms. Carlos on October 16.  Doll Dep., Ex. 17 at 72:4-11, 137:18-138:4.

86.     In both reported PRC encounters following the October 2 removal of Ms. Carlos from psychiatric observations, the members of the PRC elected to maintain Ms. Carlos in ICU status.  On October 16, the stated reasons for doing so were that the basis for the placement remained valid, Ms. Carlos was unwilling or unable to live in general population, and Ms. Carlos's habitual actions would provoke or instigate stressful or violent situations in general population.  ICE Rep., Ex. 12 at Carlos 708.

87.     Ms. Carlos continued to experience mental health difficulties while housed in ICU status.  In an interview with ICE investigators after Ms. Carlos's death, Nurse Leiphart stated that, following Ms. Carlos's October 2 removal from psychiatric observations, she was "more agitated than usual" and "was frustrated that she remained in the Intensive Custody Unit."  ICE Rep., Ex. 12 at Carlos 708; *see also* Leiphart Dep., Ex. 20 at 50:10-24; PrimeCare Records, Ex. 13 at PCM 196 (Nurse Leiphart's note from October 2, 2013 that Ms. Carlos was "very argumentative," "very upset," and resistant to taking her Haldol injection).

88.     An observation that Ms. Carlos was agitated is a type of finding that should be noted in a medical chart and reported to a mental health counselor or psychiatrist.  Snyder Dep., Ex. 24 at 43:9-19.

89.    Counselor Gallagher would expect to be alerted to the fact that Ms. Carlos appeared agitated.  Gallagher Dep., Ex. 18 at 88:23-90:5, 90:23-91:14.

90.    Counselor Gallagher was not informed at any point of Nurse Leiphart's observations concerning Ms. Carlos's agitation.  Gallagher Dep., Ex. 18 at 88:23-89:2.

91.    Nurse Leiphart made no entry in Ms. Carlos's medical chart concerning such agitation.  Leiphart Dep., Ex. 20 at 52:7-14.

92.    In mid-October 2013, Deputy Warden Doll asked ICE to consider placing Ms. Carlos in a long-term mental health facility.  ICE Rep., Ex. 12 at Carlos 708; Doll Dep., Ex. 17 at 81:16-85:16.

93.    According to Deputy Warden Doll, the mental health staff joined in these efforts.  Doll Dep., Ex. 17 at 82:3-6.

94.    Considering a move to a mental health facility was part of York County's obligation under its agreement with ICE to imprison immigration detainees: it was required to consider "transfer to a mental health facility if the detainee's mental illness or developmental disability needs exceed the treatment capability of the facility."  ICE Rep., Ex. 12 at Carlos 722.

95.    Counselor Gallagher agreed that incarceration was "not helpful" for Ms. Carlos because, as he explained, "I believe she would have been better off in some other type of environment because we're basically – we're basically

33

detention. I think, you know, some Federal and State prisons have other program

options that we don't have. We're fundamentally a detention center." Gallagher

Dep., Ex. 18 at 53:18-25.

96.    Despite these concerns, at no time did Ms. Carlos's medical chart

contain "documentation [that] YCP mental health staff pursued alternative

placement" with ICE.  ICE Rep., Ex. 12 at Carlos 721.

97.    ICE informed Deputy Warden Doll on October 22, 2013 that the

request for transfer had been reviewed "but an appropriate facility was not

available at that time."  ICE Rep., Ex. 12 at Carlos 708; *see also id.* at Carlos 700

(noting that records did not show "communication with ICE concerning [Ms.

Carlos's treatment, or exploration of alternative placement until shortly before her

death").

## VII.  MS. CARLOS'S OCTOBER 23, 2013 SUICIDE

98.    As of October 21, 2013, the following had occurred with Ms. Carlos:

    a.  She had been detained at YCP for two-and-a-half years, spending

        most of that time frustrated by prolonged placement in segregated

        housing and the uncertain status of her immigration proceedings,

        *see supra* ¶¶ 19, 46;

b.  Her mental health condition caused her to act out in an agitated fashion, subjecting her to frequent punishments and segregation placements, *see supra* ¶¶ 19-22;

c.  She had attempted to hang herself just two months earlier, telling medical professionals who responded that she did not want to live, *see supra* ¶¶ 42-44;

d.  Following the suicide attempt, she refused to take her anti-psychotic medications, leading to further psychotic symptoms and impulsivity, *see supra* ¶¶ 33, 56, 69-71;

e.  Following the suicide attempt, mental health staff failed to consider any changes to the treatment provided to Ms. Carlos (which was consistent with their failure to ever produce a comprehensive multidisciplinary treatment plan as required by general standards of care and institutional policies), *see supra* ¶¶ 24-30, 78;

f.  Following the suicide attempt, mental health staff failed to conduct a comprehensive suicide risk assessment (which was consistent with their failure to ever conduct such an assessment as required by general standards of care and institutional policies), *see supra* ¶ 34-38, 79;

g.  Notwithstanding these facts, mental health staff removed Ms.
Carlos from psychiatric observations and did not schedule any
further clinical encounters, *see supra* ¶¶ 76-77, 82-83;

h.  After the termination of psychiatric observations, Ms. Carlos's
agitation grew, and Nurse Leiphart, who knew of that agitation,
failed to advise any other mental health staff of that concerning
fact, *see supra* ¶¶ 76-77; and

i.  Despite recognition that Ms. Carlos would be better served by
placement in a long-term mental health care facility, medical and
mental health staff failed to conduct any efforts to pursue such
placement, and, when Deputy Warden Doll inquired about such a
placement, it proved too late, *see supra* ¶¶ 92-97.

99.   On October 21, 2013, Counselor Jackson authorized a move of Ms.
Carlos to a cell in A Pod where she would remain in ICU status.  The move was
made to accommodate another inmate with medical needs, as Ms. Carlos's cell in
D Pod was closer to the medical unit.  Counselor Notes, Ex. 8 at PCM 1774;
Jackson Dep., Ex. 19 at 68:8-23.

100.   Counselor Jackson did not consult with any mental health personnel
before approving the cell move because Ms. Carlos was no longer on psychiatric
observations.  Jackson Dep., Ex. 19 at 68:24-69:8; Doll Dep., Ex. 17 at 112:7-12.

101.   The last time Ms. Carlos had been housed on A Pod was on August

13, 2013, when she attempted to hang herself in her cell.  Gallagher Dep., Ex. 18 at

84:3-85:3; *see also* Inmate Transfer History, Ex. 15 at YC 636.

102.   Given this history, Deputy Warden Doll noted that "it would have

been nice if she would have been able to stay in that unit, the original unit," D Pod.

Doll Dep., Ex. 17 at 113:22-25; *see also* Doll Dep., Ex. 17 at 112:7-12.

103.   The cell that Ms. Carlos was placed in at the time of the move was not

suicide resistant.   The cell had multiple tie-off points that could be used to secure a

noose, including four metal clothes hooks, a mesh vent, and two horizontal safety

bars over a window.  Ms. Carlos was given regular-issue clothing and sheets.  Doll

Dep., Ex. 17 at 143:22-146:22; ICE Rep., Ex. 12 at Carlos 708-09; Patterson Rep.,

Ex. 25 at 12.

104.   On the evening of October 23, 2013, Correctional Officer Erika

Collins was assigned to the female maximum area.  At some time after 8:00 p.m.,

she heard yelling coming from A Pod.  She entered the pod and heard an argument;

as best she could tell, Ms. Carlos and another inmate were arguing over what

channel to watch on the TV.  As the argument ended, the other inmate said to Ms.

Carlos: "why don't you kill yourself."  This statement noticeably upset Ms. Carlos.

Collins Dep., Ex. 16 at 59:4-62:4; *see also* ICE Rep., Ex. 12 at Carlos 710 (noting

that Officer Collins told ICE investigators that Ms. Carlos "was a very emotional

37

and reactive individual," and that what was said to her during the argument "set [Ms. Carlos] off").

105.    It was clear that the other inmate was referring to Ms. Carlos's suicide attempt in August 2013, which was known among the prison population.  Collins Dep., Ex. 16 at 65:1-19.

106.    After Officer Collins left A Pod, at approximately 9:00 p.m., Officer Grissell Santos-Heredia entered the pod and observed Ms. Carlos sitting on her bed.  Santos Dep., Ex. 23 at 49:8-50:18; ICE Rep., Ex. 12 at Carlos 711.

107.    At 9:15 p.m., Officer Collins started another tour of the area.  She entered A Pod at 9:17 p.m. and found Ms. Carlos hanging with a sheet around her neck and attached to the horizontal bars on the cell's window.  A medical emergency was called and Ms. Carlos was cut down.  Collins Dep., Ex. 16 at 75:7-14; Santos Dep., Ex. 23 at 50:20-52:13; ICE Rep., Ex. 12 at Carlos 711-13; Officer Daily Reports, Ex. 9 at YC 36-38.

108.    Emergency medical services arrived at YCP and transported Ms. Carlos to York Hospital.  She was pronounced dead at 10:13 p.m.  An autopsy concluded that Ms. Carlos's cause of death was hanging and that the manner of death was suicide.  ICE Rep., Ex. 12 at Carlos 713-15; York Hosp. Records, Ex. 30 at Carlos 609.

## VIII.  REVIEWS OF THE DEFENDANTS' ACTIONS

109.   Following Ms. Carlos's death, multiple investigations concerning the circumstances leading to the suicide were conducted.  *See* Doll Dep., Ex. 17 at 16:11-18:4.

110.   One such investigation was conducted by the ICE Office of Professional Responsibility, Office of Detention Oversight.  The investigation resulted in a report issued on July 17, 2014.  The report, cited throughout this Statement, cited several areas in which YCP, PrimeCare, and each entity's respective employees failed to comply with standards for immigration detention facilities.  ICE Rep., Ex. 12 at 718-22.

111.   In particular, the ICE report noted, as discussed above, that mental health staff, including Dr. Rollings-Mazza and Counselor Gallagher, never implemented a treatment plan for Ms. Carlos.  Those critiques, however, were never communicated to Dr. Rollings-Mazza or Counselor Gallagher by York County or PrimeCare.  *See* Rollings-Mazza Dep., Ex. 22 at 68:20-69:3 (stating that she had never seen the report before her deposition); Gallagher Dep., Ex. 18 at 65:7-14 (stating that he only reviewed the report in preparation for his deposition).

112.   The ICE report also noted that, following Ms. Carlos's suicide, YCP placed Plexiglas over all exposed horizontal bars in the cells on A Pod like the one from which Ms. Carlos hanged herself.  ICE Rep., Ex. 12 at Carlos 709.

113.   An additional investigation was conducted by Lindsay M. Hayes on behalf of the U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties, which resulted in the issuance of a report on April 1, 2014.  Hayes Rep., Ex. 14.[9]

114.   Mr. Hayes conducted an interview with Counselor Gallagher—which Counselor Gallagher did not recall, Gallagher Dep., Ex. 18 at 106:10-12—and found several deficiencies in his practices.  In general, he concluded that Counselor Gallagher "appeared indifferent to the suicide prevention requirements" embodied in both PrimeCare's policies and ICE's detention standards.  Counselor Gallagher "admitted that treatment planning does not occur at the facility."  But, under the relevant standards, such treatment plans are required for all inmates held on suicide precautions and must "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur."  Further, Counselor Gallagher's practice of "contracting for safety" is not "sufficient to counter suicidal impulses" and "should be immediately discontinued."  Hayes Rep, Ex. 14 at YC 843.

---

[9] Mr. Hayes is a Project Director of the National Center on Institutions and Alternatives and is a nationally recognized expert in the field of suicide prevention in jails and prisons.  *See* http://www.ncianet.org/criminal-justice-services/suicide-prevention-in-custody/staff/

115.   The conclusions reached in Mr. Hayes' report were not shared with Counselor Gallagher, despite the fact that the report was in the possession of York County.  Gallagher Dep., Ex. 18 at 106:13-107:3.

116.   Additionally, during the course of this litigation, plaintiff's expert, Dr. Raymond Patterson has issued two reports: a report dated June 23, 2015 issued prior to the filing of plaintiff's complaint, Ex. 25, and an addendum dated September 30, 2016 briefly summarizing Dr. Patterson's opinions that the documents produced in discovery and deposition testimony confirmed his original views as to the deficiencies which led to Ms. Carlos's suicide, Ex. 26.[10]

117.   As noted throughout the above factual assertions, Dr. Patterson found several deficiencies in care.  Before discovery, he found, in summary, that "to a reasonable degree of medical certainty…the mental health care, treatment, and management provided by PrimeCare Inc., and the York County Prison did not meet the standard of care for mental health care in similar situations and institutions, and indeed reflected negligence and deliberate indifference."  He found, further, "to a reasonable degree of medical certainty that Ms. Carlos' suicide was foreseeable and preventable."  Her death would have been prevented "had she been placed in a proper mental health unit environment, her mental health

---

[10] Dr. Patterson is one of the most widely respected forensic psychiatrists in the nation with extensive experience in correctional psychiatry.  He has testified in many notable cases, including in the prosecutions of John Hinckley, Jr., and Zacarias Moussaoui.

treatment increased, and she had been provided assessments and treatment via comprehensive and multidisciplinary treatment planning and formal suicide risk assessment and management (which were never done), and she had been placed on a minimum of every 15 minute checks to observe her behavior and changes in condition." Patterson Rep., Ex. 25 at 10, 13, 14.

118.   In his addendum, Dr. Patterson stated that his review of discovery materials and deposition testimony supported his opinions as expressed in his initial report.  He also expressly endorsed the opinions stated by Mr. Hayes, *see supra* ¶ 114.  In particular, he noted that his review of the following deposition testimony confirmed his views that the care provided by mental health practitioners was negligent and deliberately indifferent to Ms. Carlos's serious mental health needs: Dr. Rollings-Mazza, given her testimony that her sole role in Ms. Carlos's mental health care was to prescribe medications, that she conducted suicide risk assessments every time she saw a patient, and that she did not participate in multidisciplinary treatment planning; Nurse Leiphart, given that she was charged with supervision of Ms. Carlos's mental health care and had little training, education or supervision on mental health issues; and Counselor Gallagher given his failure to follow policies for suicide prevention and management, including follow-up with inmates released from suicide precautions.  Patterson Addendum, Ex. 26 at 3.

119.   Despite these critiques of their performance, the professionals charged

with caring for Ms. Carlos and preventing her from suffering harm saw no

deficiencies in their actions and maintained there was nothing they could have

done to prevent Ms. Carlos's death.  For example, Counselor Gallagher testified:

> Q.  Did you ever believe that she was at risk for suicide?
>
> A.  No.
>
> Q.  In light of her suicide, have you revisited that conclusion?
>
> A. Well, she's dead, but no.

Gallagher Dep., Ex. 18 at 54:15-20; *see also* Rollings-Mazza Dep., Ex. 22 at 16:3-

7; Doll Dep., Ex. 17 at 11:24-12:23.

Respectfully submitted,


/s/ Jonathan H. Feinberg
David Rudovsky
Jonathan H. Feinberg
Susan M. Lin
KAIRYS, RUDOVSKY, MESSING & FEINBERG
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
*Counsel for Plaintiff*


DATE: March 10, 2017

# CERTIFICATE OF SERVICE

I, Jonathan H. Feinberg, hereby certify that the foregoing Consolidated

Statement Of Facts In Support Of Opposition To Defendants' Motions For

Summary Judgment with attached Declaration of Counsel and Exhibits was, on

March 10, 2017, filed via the Court's ECF system and served on the following:

Brandon R. Conrad
Email: brc@saxtonstump.com
Harlan W. Glasser
Email: hwg@saxtonstump.com
Saxton & Stump, LLC
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
(717) 556-1008

*Counsel for Defendant Gallagher*

Donald L. Reihart
Assistant Solicitor for York County
3015 Eastern Boulevard
York, PA 17402
(717) 755-2799
Email: email@reihartlaw.com

*Counsel for Defendants York County,
Deputy Warden Clair Doll, Counselor
Janet Jackson, and Correctional Officer
Erika Collins*

John R. Ninosky
301 Market Street
P.O. Box 109
Lemoyne, PA 17043
(717) 761-4540
Email: jrn@jdsw.com

*Counsel for Defendants PrimeCare
Medical, Inc., Dr. Pamela Rollings-
Mazza, and Nurse Aimee Leiphart*

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg