## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANGELA CARLOS, as** | : | |
| **ADMINISTRATRIX of the ESTATE OF** | : | |
| **TIOMBE KIMANA CARLOS,** | : | |
| | : | **No. 1:15-CV-1994-WWC-JFS** |
| **Plaintiff,** | : | |
| | : | **(Judge Caldwell)** |
| **v.** | : | |
| | : | **(Magistrate Judge Saporito)** |
| **YORK COUNTY et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO PRIMECARE MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................1

II.   FACTS ....................................................................................3

      A.    The Defendants And Their Knowledge Of Suicide Risks...................3

      B.    Tiombe Carlos's Mental Health And Incarceration History................4

      C.    Ms. Carlos's Adjustment Difficulties, Prolonged Segregation,
            And Growing Frustration........................................................4

      D.    Defendants' Failure To Address Ms. Carlos's Mental Health
            Needs ...............................................................................5

      E.    Ms. Carlos's Suicide Attempt..................................................6

      F.    Defendants' Failures To Address Ms. Carlos's Vulnerability to
            Suicide .............................................................................8

      G.    Ms. Carlos's Suicide............................................................10

      H.    Critical Reviews.................................................................11

III.  QUESTIONS INVOLVED.........................................................12

IV.   STANDARD OF REVIEW ........................................................12

V.    ARGUMENT ........................................................................13

      A.    The Facts, In The Light Most Favorable To Plaintiff,
            Demonstrate The PrimeCare Defendants' Deliberate
            Indifference To Ms. Carlos's Vulnerability To Suicide. ...................13

            1.    Defendants Knew Ms. Carlos Was Particularly
                  Vulnerable To Suicide............................................................14

2.     The PrimeCare Defendants Were Deliberately Indifferent To Ms. Carlos's Vulnerability. ................................................. 16

B.     Plaintiff's Negligence Claim Against Nurse Leiphart Must Proceed. ............................................................................. 20

C.     Plaintiff's Punitive Damages Claims Should Be Presented To A Jury. ................................................................................. 21

D.     The Court Should Exercise Discretion To Retain Jurisdiction. .......... 22

VI.    CONCLUSION ............................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ...................................12

*Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524 (3d Cir. 2007)...............13

*Brandt v. PrimeCare Medical, Inc.*, 11-cv-1692, 2013 WL 3863936
   (M.D. Pa. July 24, 2013) ...................................................................14, 16

*Carlos v. York Cnty.*, 15-cv-1994, 2016 WL 5024232
   (M.D. Pa. Aug. 19, 2016)...................................................................21

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. Aug. 15, 2016) ...............14

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)...........................................................12

*Colburn v. Upper Darby Tp.*, 946 F.2d 1017 (3d Cir. 1991) ...................................14

*Edwards v. Johnson*, 209 F.3d 772 (5th Cir. 2000) .................................................14

*Estelle v. Gamble*, 429 U.S. 97 (1976)....................................................................13

*Hasty v. Montgomery Cnty.*, 12-cv-4335, 2014 WL 830282
   (E.D. Pa. March 4, 2014) ...................................................................19

*Keohane v. Lancaster Cnty*, 07-cv-3175, 2010 WL 3221861
   (E.D. Pa. Aug. 13, 2010) ...................................................................16

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)....................................................14

*McKissick v. Cnty. of York*, 09-cv-1840, 2011 WL 5117621
   (M.D. Pa. Oct. 25, 2011) ...................................................................19

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ............................19

*Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir. 1987) ..17

*Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575 (3d Cir. 2003) ...................14

*Robey v. Chester Cty.*, 946 F. Supp. 333 (E.D. Pa. 1996).......................................16

*Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. 2014)................................13

*Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir. 1989)......................14

*Wilson v. Taylor*, 597 F. Supp. 2d 451 (D. Del. 2009)...........................................15

*Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314 (3d Cir. 2005) ...............................16

**Statutes**

28 U.S.C. § 1367(c)................................................................................................22

## I.    INTRODUCTION

Defendant PrimeCare Medical, Inc. ("PrimeCare"), and its employees,

defendants Dr. Pamela Rollings-Mazza and Nurse Aimee Leiphart, were

responsible for providing mental health care to inmates at York County Prison

("YCP").[1]  They were aware of inmates' vulnerability to suicidal actions, and they

knew how to identify an inmate's particularized risks for self-harm.  This was

particularly true with Tiombe Carlos, an immigrant detainee at YCP with a long

history of mental illness.

Dr. Rollings-Mazza and Nurse Leiphart were responsible for Ms. Carlos's

care for nearly all of Ms. Carlos's two-plus year detention at YCP.  They knew,

consistent with a schizophrenia diagnosis, she was prone to acting out impulsively.

They knew she was repeatedly detained in segregated housing.  They knew she

was frustrated by segregation and her ongoing immigration proceedings. And they

knew that this mix of stressors caused Ms. Carlos in August 2013 to tie a sheet

around her neck and attempt to hang herself from a bar in her cell.

These actions by Ms. Carlos—impulsive as they may have been—were a

serious concern and foretold future self-harm.  Notwithstanding these worrying

factors, the defendants failed to act.  Despite its policy calling for a review of

circumstances leading to suicide attempts, PrimeCare conducted no review

---

[1] As noted in the attached proposed Order, plaintiff agrees to dismissal of
defendant Nurse Holly Snyder.

following the August incident.  Despite her knowledge that a multidisciplinary

treatment plan and detailed suicide risk assessments were required for mentally ill

immigration detainees at YCP, Dr. Rollings-Mazza made no effort to fulfill these

requirements.  Further, even though she viewed her sole responsibility as

"medication management," Dr. Rollings-Mazza engaged in no such "management"

even upon learning Ms. Carlos had refused to take medications following her

suicide attempt.  And, Nurse Leiphart, despite knowing her responsibility to report

significant observations to fellow clinicians, failed to tell anyone of her concern

that Ms. Carlos was growing more agitated in October 2013.

On October 23, 2013, Ms. Carlos, still frustrated by her housing status and

immigration proceedings, and having gone two-plus months since her suicide

attempt without any clinical reconsideration of her treatment plan or a suicide risk

assessment, tied a sheet around her neck and hanged herself from a bar in her cell.

This time, no correctional officer was present to intervene.  At 9:17 p.m., an officer

found her dead.

In their motion, defendants PrimeCare, Rollings-Mazza and Leiphart

(collectively "PrimeCare defendants" or "defendants") seek dismissal of all claims

against them.  They argue they were not deliberately indifferent to Ms. Carlos's

vulnerability to suicide, that Nurse Leiphart can't be found liable for negligence,

and that no defendant should be subject to punitive damages.  As demonstrated,

however, these arguments are, when viewing the facts in the light most favorable to plaintiff, baseless.  The motion should be denied.

## II.    FACTS

Plaintiff has set forth a comprehensive outline of the facts relevant to all pending summary judgment motions in the separately filed Plaintiff's Consolidated Statement Of Facts In Support Of Opposition To Defendants' Motions For Summary Judgment (hereinafter "PS"), which is cited throughout this brief.[2]  A summary of the facts relevant to this motion is as follows:

### A.    The Defendants And Their Knowledge Of Suicide Risks

York County Prison ("YCP") holds a contract to incarcerate immigrants detained by U.S. Immigration and Customs Enforcement ("ICE").  PS 1. PrimeCare, in turn, holds a contract to provide all medical and mental health care to persons detained at YCP.  PS 2.  Dr. Rollings-Mazza, a psychiatrist, and Nurse Leiphart were employed by PrimeCare to handle the mental health caseload at YCP.  PS 2.  Based on their experience working in a prison environment, these defendants were aware of the risks of inmate suicide and the factors which increase those risks.  *See* PS 5 (outlining suicide risk factors).

---

[2] Plaintiff has also filed with this brief a response to the PrimeCare defendants' Statement of Undisputed Material Facts.

3

### B.   Tiombe Carlos's Mental Health And Incarceration History

Tiombe Carlos was born in 1978 in Antigua and Barbuda; her parents

immigrated to the United States when Ms. Carlos was young, and, although her

parents became citizens, she remained a lawful permanent resident.  PS 7.  From

her early teen years, Ms. Carlos suffered from serious mental illness.  PS 8.  She

was hospitalized at 14 and began taking antipsychotic medications.  *Id.*  She did

not complete high school and lived with her mother into her early 20s.  PS 9.

Although medications allowed her to maintain good relationships with her family,

including her daughter, she often would go off her medications and act out.  PS 9-

10.

Through a series of incidents with law enforcement officers, Ms. Carlos was

convicted of crimes and, as of 2007, imprisoned in Connecticut.  PS 11-12.  As a

result of her convictions and her noncitizen status, ICE began removal

proceedings, and, in April 2011, she was transferred to YCP.  PS 13.

### C.   Ms. Carlos's Adjustment Difficulties, Prolonged Segregation, And Growing Frustration

Soon after arriving at YCP, Ms. Carlos was evaluated by Dr. Rollings-

Mazza; Ms. Carlos reported she had a diagnosis of paranoid schizophrenia and had

been receiving an injectable anti-psychotic medication, Haldol, every two weeks.

Dr. Rollings-Mazza noted the diagnosis and maintained the same medication

regimen.  PS 15; *see also* PS 14 (independent evaluation confirming diagnosis).

Due to repeated altercations with staff and other inmates, Ms. Carlos spent most of her incarceration in the women's maximum security section, which was divided into five pods, identified as pods A, B, C, D and BAU (Behavioral Adjustment Unit).  PS 16.  Frequently, she was housed in the BAU, a location for inmates guilty of disciplinary violations.  PS 17.  When not assigned to BAU, Ms. Carlos was often in ICU (Intensive Custody Unit) status based on administrative determinations concerning her "history of violence" and "threat to General Population."  PS 17.  BAU and ICU were segregated housing; while in BAU, Ms. Carlos would be allowed out one hour per day, and while on ICU, she would be allowed out two hours per day.  PS 17.

Nurse Leiphart knew Ms. Carlos's disciplinary issues were frequent.  PS 19-21.  Dr. Rollings-Mazza, though, despite more than two years consistently seeing Ms. Carlos, claimed not to be aware of disciplinary problems.  PS 19.  Ms. Carlos also was placed on suicide precautions at least four times.  PS 23.

### D.  Defendants' Failure To Address Ms. Carlos's Mental Health Needs

Though Dr. Rollings-Mazza claimed Ms. Carlos's mental health status was "remarkably stable," her disciplinary issues clearly resulted from her psychotic condition.  PS 22.  Practices were in place to address Ms. Carlos's mental health needs—policies issued by PrimeCare and standards outlined by ICE, PS 24—but, throughout her incarceration, these practices were ignored in at least three areas.

First, ICE detention standards required mental health professionals to develop a treatment plan to address Ms. Carlos's mental health needs.  PS 25.  Dr. Rollings-Mazza claimed to prepare a plan every time she wrote a note about Ms. Carlos, but findings in three separate reports confirmed this was not proper.  PS 26, 29-30.[3]

Second, any "treatment" in the form of medication was provided unevenly, as Ms. Carlos sometimes refused medication, resulting in delays. PS 31.  This was significant given that injectable medications are provided to inmates who cannot be trusted to comply with a daily regimen, and delays would lead to decompensation and increased psychotic symptoms.  PS 32-33.

Third, PrimeCare policies required clinicians to conduct formal suicide risk assessments.  PS 34.  Dr. Rollings-Mazza claimed she performed an assessment on Ms. Carlos at every encounter.  PS 34.  But, such ad hoc and limited encounters were insufficient and violated PrimeCare policies. PS 37.

### E.    Ms. Carlos's Suicide Attempt

In early August 2013, Ms. Carlos was released from a BAU housing assignment.  On August 13, Deputy Warden Clair Doll assigned Ms. Carlos to ICU status in the A Pod.  That afternoon, Ms. Carlos yelled to Dr. Rollings-Mazza, asking whether she knew anything about her immigration status; Dr. Rollings-

---

[3] The three sources are a report issued by ICE's Office of Detention Oversight, PS 110, a report authored by suicide prevention expert Lindsay M. Hayes, PS 113, and the report and addendum prepared by plaintiff's expert, Dr. Raymond F. Patterson, PS 116.

Mazza replied she did not know but Ms. Carlos could find out from the Program Review Committee ("PRC").[4] PS 40. Moments later, Ms. Carlos tied a sheet around her neck and started to hang herself from a bar in her cell. PS 41-42. A correctional officer intervened and stopped her; a cut-down tool was used, and Ms. Carlos was taken to the floor. *Id.* Dr. Rollings-Mazza and Nurse Leiphart heard a commotion coming from the area, and Nurse Leiphart went to the scene. PS 41. Later that afternoon, Nurse Leiphart wrote a note stating Ms. Carlos had been found "hanging by her sheet in her cell by the window." PS 42. Another nurse noted Ms. Carlos was "crying and saying 'it's not fair, I don't wanna live.'" PS 43; *see also* PS 44 (detailing hospital treatment).

Despite notes confirming Ms. Carlos was "hanging by her sheet" and reporting Ms. Carlos's declaration that she did not want to live, Dr. Rollings-Mazza thought Ms. Carlos was only seeking attention. PS 45. Whatever her intentions, Dr. Rollings-Mazza knew Ms. Carlos was concerned about her immigration matter, PS 40; other YCP personnel acknowledged Ms. Carlos was frustrated by repeated segregation placements and that her actions required serious attention. PS 46-47, 56.

---

[4] The PRC consisted of YCP staff members who toured segregated areas weekly. PS 81.

### F.      Defendants' Failures To Address Ms. Carlos's Vulnerability to Suicide

PrimeCare requires that "in 100% of situations involving suicide attempts and completed suicides," clinicians must conduct a "comprehensive clinical review."  PS 49(b).  After Ms. Carlos's suicide attempt, PrimeCare conducted no review.  PS 51.

This omission was consistent with the manner in which Ms. Carlos's care was handled.  Ms. Carlos was placed on "constant watch" on return to YCP.  PS 55.  Dr. Rollings-Mazza saw her the next day and noted she was upset about her housing, was refusing an evaluation, and that she stated she would not take anti-psychotic medications.  PS 56.  Dr. Rollings-Mazza noted she could not conduct an evaluation as Ms. Carlos was uncooperative, stated Ms. Carlos should remain on suicide precautions with her "meds as is," and ordered a follow up one week later. *Id.*  Thus, although Dr. Rollings-Mazza viewed her role as "exclusively managing medication," she made no changes to Ms. Carlos's medication management.  PS 57.

For the follow-up on August 20, Dr. Rollings-Mazza was away, and Ms. Carlos was seen by Dr. Robert Davis.  He reported Ms. Carlos was angry at the system for not releasing or deporting her and stated Ms. Carlos minimized her psychiatric history; he concluded she was paranoid and diagnosed her with

Schizophrenia, Paranoid type and ordered a psychiatric follow up in eight weeks.
PS 63.

That same day, Ms. Carlos was removed from suicide precautions and
placed on "psychiatric observations," a status which could *not* be used for suicide
prevention. PS 61.  She also remained on ICU status—the same status which
caused her to attempt suicide one week earlier.  PS 64.  That status continued to
frustrate her.  On September 19, Ms. Carlos told Mental Health Counselor Patrick
Gallagher she could not handle ICU; she was upset, depressed and anxious.  PS 67.
Still, she remained on ICU status.  PS 68.

During this time, Ms. Carlos—consistent with her August 14 promise—
rejected her medications.  PS 69.  On September 4, a nurse attempted to administer
an injection, but Ms. Carlos refused it; she continued to reject it for two weeks
until September 18.  PS 69-70.

Dr. Rollings-Mazza saw Ms. Carlos on September 30 and was aware of all
that occurred with Ms. Carlos since August 14.  PS 72.  She knew Ms. Carlos had
been frustrated with segregated housing to the point she attempted suicide, she
knew Ms. Carlos said she would not take medication, she knew Ms. Carlos refused
medications for two weeks, and she knew Ms. Carlos continued to complain about
ICU status.  *Id.* Despite that knowledge, Dr. Rollings-Mazza made no treatment

changes, ordered her to continue taking her medications, and said she would see her in six weeks.  PS 73.

On October 2, Ms. Carlos was removed from psychiatric observations, while remaining in ICU status.  PS 74, 76.  Ms. Carlos therefore remained in the same status that had caused her to attempt suicide seven weeks earlier but without mental health clinical encounters.  PS 76-77.  There had been no changes to Ms. Carlos's "treatment plan," nor were there any suicide risk assessments.  PS 78-79.

Following Ms. Carlos's removal from psychiatric observations, her agitation grew.  On October 2, Nurse Leiphart noted Ms. Carlos was "very argumentative" and "very upset."  PS 87.  Nurse Leiphart stated in an interview following Ms. Carlos's death that Ms. Carlos was "more agitated than usual" and "was frustrated that she remained in the Intensive Custody Unit."  *Id.*  This observation is one that should be reported in a note or brought to a mental health clinician.  PS 88-89. Nurse Leiphart, however, made no note, nor did she inform mental health personnel.  PS 90-91.

### G.    Ms. Carlos's Suicide

On October 21, Ms. Carlos was moved to a new cell in A Pod; the last time Ms. Carlos had been housed there was August 13, when she attempted suicide.  PS 99-101.  The cell to which Ms. Carlos was assigned was not suicide resistant.  It had multiple tie-off points, and Ms. Carlos was given clothing and sheets.  PS 103.

On the evening of October 23, 2013, Ms. Carlos got into an argument with another inmate who yelled at her: "why don't you go kill yourself." PS 104. This argument "set [Ms. Carlos] off." PS 104. At 9:15 p.m., Correctional Officer Erika Collins started a tour of A Pod, and, at 9:17 p.m., she found Ms. Carlos hanging with a sheet around her neck and attached to a bar on the cell window. PS 107. Ms. Carlos was cut down and transported to the hospital. She was pronounced dead at 10:17 p.m., and her death was ruled a suicide. PS 107-08.

## H.    Critical Reviews

Following the suicide, several reviews were conducted. PS 109. Among them was an ICE report which noted that Dr. Rollings-Mazza never implemented a treatment plan as required. PS 111. This conclusion was not shared with Dr. Rollings-Mazza, leaving her to believe she had done nothing wrong. PS 111, 119.

Additionally, plaintiff's expert, Dr. Raymond Patterson issued reports opining that mental health care for Ms. Carlos was deficient and her suicide was preventable. PS 116-19. With regard to Dr. Rollings-Mazza, she acted improperly in viewing her only role as monitoring medications and in failing to conduct treatment planning and suicide risk assessment. PS 118. Dr. Patterson also noted that Nurse Leiphart exhibited little training or education in monitoring Ms. Carlos's mental health. *Id.*

### III.   QUESTIONS INVOLVED

A.   Whether the facts, viewed in the light most favorable to plaintiff, demonstrate that the PrimeCare defendants were aware of Ms. Carlos's particular vulnerability to suicide and were deliberately indifferent to that vulnerability.

*Suggested answer: Yes.*

B.   Whether the facts, viewed in the light most favorable to plaintiff, demonstrate that Nurse Leiphart was negligent.

*Suggested answer: Yes.*

C.   Whether the facts, viewed in the light most favorable to plaintiff, support the availability of punitive damages against the PrimeCare defendants.

*Suggested answer: Yes.*

D.   Whether, if the Court were to dismiss the civil rights claims, the Court should maintain jurisdiction over plaintiff's negligence claims.

*Suggested answer: Yes.*

### IV.   STANDARD OF REVIEW

A court may grant summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is material when it "might affect the outcome of the

suit under the governing law." *Id.*  In deciding the motion, the Court must "view

the record in the light most favorable to the non-moving party and draw all

reasonable inferences in that party's favor."  *Thomas v. Cumberland County*, 749

F.3d 217, 222 (3d Cir. 2014) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n,* 475

F.3d 524, 535 (3d Cir. 2007)).

## V.    ARGUMENT

### A.    The Facts, In The Light Most Favorable To Plaintiff, Demonstrate The PrimeCare Defendants' Deliberate Indifference To Ms. Carlos's Vulnerability To Suicide.

The PrimeCare defendants argue the facts do not support plaintiff's claims in

Counts I and II of the Amended Complaint that Dr. Rollings-Mazza, Nurse

Leiphart, and PrimeCare violated Ms. Carlos's constitutional rights.  They are

incorrect.

Under long-established precedent, plaintiff's § 1983 claim for

unconstitutional denial of mental health care in the prison context is satisfied by

facts showing that (1) the plaintiff had a serious medical needs and (2) the

defendants were deliberately indifferent to those needs.  *Estelle v. Gamble*, 429

U.S. 97, 104 (1976).  In a prison suicide case, the Third Circuit holds that the

Constitution is violated when "(1) the detainee had a particular vulnerability to

suicide, (2) the custodial officer or officers knew or should have known of that

vulnerability, and (3) those officers acted with reckless indifference to the

13

detainee's particular vulnerability." *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quotations and citations omitted); *see also id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir. 1989)) (discussing similarities between "reckless indifference" and "deliberate indifference").[5] The PrimeCare defendants assert Ms. Carlos was not particularly vulnerable to suicide and they were not deliberately indifferent. The facts show otherwise.

> **1.   Defendants Knew Ms. Carlos Was Particularly Vulnerable To Suicide.**

Particular vulnerability refers to "the degree of risk inherent in the detainee's condition." *Colburn*, 946 F.2d at 1024. There "must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.* This Court's decision in *Brandt v. PrimeCare Medical, Inc.*, 11-cv-1692, 2013 WL 3863936 (M.D. Pa. July 24, 2013) (Caldwell, J.), provides instructive guidance. In *Brandt*,

---

[5] The case law discussed herein follows the Third Circuit's rulings that claims of unconstitutionally inadequate medical care brought by pretrial detainees and sentenced defendants are subject to the same deliberate indifference analysis. *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 581 (3d Cir. 2003). Plaintiff, however, preserves the claim that, as an immigration detainee, claims concerning deliberate indifference to Ms. Carlos's serious mental health needs should be judged by an objective reasonableness standard. *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. Aug. 15, 2016) (en banc) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)) (ruling that failure-to-protect claim for pretrial detainee required showing that defendant "did not take reasonable available measures to abate…risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved"); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person detained for deportation to be the equivalent of a pretrial detainee").

the decedent hanged himself about a month after his imprisonment.  On summary judgment, the Court found the following facts showed particular vulnerability: on arrival at the prison, correctional staff noted the decedent had been hospitalized for a "302" (involuntary commitment); the decedent had submitted a request stating he "was having 'bad thoughts suicide'"; he met with the defendant social worker and stated "he 'had bad thoughts of suicide and sees and talks to dead people'"; and the defendant social worker assigned the decedent to a stripped cell.  *Id.* at *3.  The Court found the decedent particularly vulnerable to suicide even though, just two days before the suicide, he told a psychiatrist "he had no history of suicide attempts" and "expressed that he had no intent to hurt himself."  *Id.* at *2.[6]

The facts here present a more substantial case of vulnerability.  Far from denying a history of suicide attempts, *Ms. Carlos attempted to kill herself.*  She complained about the unfairness of her segregation and uncertain immigration proceedings; indeed, she complained about these facts to Dr. Rollings-Mazza moments before the attempt.  By October 2013, defendants knew Ms. Carlos had attempted suicide, was frustrated about her segregated status, and was prone to impulsive actions.  These facts provide sufficient circumstantial evidence to cause a jury to find Ms. Carlos particularly vulnerable.

---

[6] Other district court cases illustrate how the record in this case satisfies the particular vulnerability requirement.  *See, e.g.*, *Keohane v. Lancaster Cnty*, 07-cv-3175, 2010 WL 3221861, at *3-4, *9 (E.D. Pa. Aug. 13, 2010); *Wilson v. Taylor*, 597 F. Supp. 2d 451, 454, 460 (D. Del. 2009).

### 2.    The PrimeCare Defendants Were Deliberately Indifferent To Ms. Carlos's Vulnerability.

#### a.    Dr. Rollings-Mazza

Analogous cases decided by this Court and in other courts illustrate that at this stage, there is sufficient evidence that Dr. Rollings-Mazza was deliberately indifferent to Ms. Carlos's vulnerability.  *See Brandt*, 2013 WL 3863936, at *3-4 (defendant psychiatrist deliberately indifferent for removing decedent from "stripped cell"); *Keohane*, 2010 WL 3221861, at *3-4, *9; *Robey v. Chester Cnty.*, 946 F. Supp. 333, 337-38 (E.D. Pa. 1996).  From two-and-a-half years providing mental health care to Ms. Carlos, Dr. Rollings-Mazza was aware of several concerns: Ms. Carlos had repeated disciplinary issues, her mental health condition led to disruptive and assaultive conduct, and she attempted to hang herself following complaints about segregated housing and deportation proceedings.[7] Despite that awareness, Dr. Rollings-Mazza never considered any treatment plan

---

[7] Dr. Rollings-Mazza' self-serving testimony that she did not know these facts is inconsequential, as, at this stage, circumstantial evidence of her knowledge is sufficient. *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005). Thus, for example, Dr. Rollings-Mazza's claim that Ms. Carlos was "stable," PS 22, is belied by the testimony of multiple other YCP personnel.  PS 19-22.  Dr. Rollings-Mazza can say at trial she was not aware of this background, but her credibility is for a jury to assess.

as required by ICE.[8]  And, she never conducted a suicide risk assessment as required by PrimeCare.

Following Ms. Carlos's suicide attempt, failures continued.  Dr. Rollings-Mazza initiated no clinical review as required by PrimeCare—a step critical to determining the reasons for Ms. Carlos's actions.  Further, on her core responsibility, medication management, by September 30, she knew Ms. Carlos had promised not to take medications and had followed through so there was a two-week gap in Haldol injections.  She knew Ms. Carlos continued to complain about the same segregation status which caused her to attempt suicide.  With all this information, there was an obvious need for action.  Yet, Dr. Rollings-Mazza maintained the status quo.[9]

---

[8] That Dr. Rollings-Mazza' responsibilities were purportedly limited to medication management is inconsequential. ICE standards required more, including consideration of alternative placement.  PS 94.  This option was available but never pursued.  PS 96.

[9] The PrimeCare defendants place great emphasis on the number of times Dr. Rollings-Mazza saw Ms. Carlos, PrimeCare Br. at 7-8, with the intent of showing deliberate indifference cannot be proven when some treatment has been provided.  That is not the law.  Even if *some* treatment is provided, deliberate indifference is still found where medical personnel, in the care they choose to provide, "opt for 'an easier and less efficacious treatment' of the inmate's condition."  *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987).

The evidence is sufficient to show her deliberate indifference.[10]

### b.    Nurse Leiphart

The above-cited authorities support a finding of Nurse Leiphart's deliberate indifference.  From multiple encounters, she knew Ms. Carlos was difficult to manage, that this difficulty was tied to her mental condition, and that she would act impulsively.  This was made clear on August 13 when Nurse Leiphart arrived at Ms. Carlos's cell in the midst of a suicide attempt.  Following that attempt and after the termination of psychiatric observations, Nurse Leiphart knew she was one of the few mental health personnel having consistent contact with Ms. Carlos.  Her observations of Ms. Carlos's increased agitation due to continued placement in segregation were significant and the types of findings that, she knew, must be documented or reported.[11]

Despite this knowledge and the need to act, Nurse Leiphart did nothing.  She made no notes in the chart and she informed no one of her observations.  Only after

---

[10] These points are supported further by Dr. Patterson's expert reports.  PS 117-18.  Reliance on PrimeCare's experts' contrary views concerning the impact of medication delays and the foreseeability of suicide, PrimeCare Br. at 9, confirms the existence of material factual disputes which preclude summary judgment.

[11] The PrimeCare defendants are, therefore, incorrect to assert that in October 2013 "Tiombe Carlos did not exhibit behavior that warranted further suicide precautions."  PrimeCare Br. at 9.  In any event, the point is not that *suicide precautions* were required, but that an *evaluation* was required—something that did not happen due to, among other things, Dr. Rollings-Mazza' conclusion on September 30 that there was no need for further review of Ms. Carlos's status.

Ms. Carlos's death did Nurse Leiphart report her observations to ICE investigators. That after-the-fact explanation shows definitively what Nurse Leiphart *could* have done but did not do.  Her inaction, at this stage, supports a finding of deliberate indifference.

### c.      PrimeCare

Plaintiff's claim against PrimeCare is under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which provides that a municipal entity—or private prison medical contractor, *see Hasty v. Montgomery Cnty.*, 12-cv-4335, 2014 WL 830282, at *3 & n.5 (E.D. Pa. March 4, 2014)—is liable for damages under § 1983 when the entity's policy, practice, or custom causes constitutional violations.

In this case, PrimeCare's liability is shown by its failure to follow its policy requiring a review after Ms. Carlos's suicide attempt.  In *McKissick v. Cnty. of York*, 09-cv-1840, 2011 WL 5117621 (M.D. Pa. Oct. 25, 2011), the plaintiff alleged that the prisoner decedent died of a heart attack after medical staff failed to treat numerous health problems.  *Id.* at *2.  The plaintiff pointed to PrimeCare's written policies concerning medical diets and medical professionals' communication responsibilities.  *Id.* at *16.  In denying PrimeCare summary judgment on *Monell* claims, the court stated that "neither [the defendant doctor] nor any other medical professional took any affirmative steps to ensure that…PrimeCare's own written policy was enforced" and that "the record lacks

19

evidence to show that PrimeCare had procedures in place to ensure that these policies were implemented and followed." *Id.* at *16-17.

PrimeCare's policy requiring comprehensive review in "100% of situations involving suicide attempts" makes sense; such reviews allow for full consideration of factors leading to an attempt and allow for treatment plan modifications. Failure to conduct a review has a cascading effect: no treatment plan revisions, no risk assessment, and no alternative placement consideration. That these omissions were present in Ms. Carlos's treatment following the August attempt is attributable to PrimeCare's failure to ensure its policy's implementation, and, as such, summary judgment must be denied on plaintiff's *Monell* claim.

### B. Plaintiff's Negligence Claim Against Nurse Leiphart Must Proceed.

The PrimeCare defendants contend that plaintiff's expert does not identify Nurse Leiphart, and plaintiff's negligence claim against her cannot proceed. That is erroneous. Reading the reports in combination disproves that point. Dr. Patterson's initial report speaks in general terms that YCP and PrimeCare "did not meet the standard of care for mental health care…and…reflected negligence." Patterson Rep., Ex. 25 at 10. The report proceeds to outline specific violations of the standard of care, including the failure to assess and incorporate in her management Ms. Carlos's recent suicide attempt. *Id.* at 10-14.

After discovery, Dr. Patterson reviewed deposition testimony of all relevant providers, including Nurse Leiphart, and, in an addendum, wrote that his review of the deposition testimony was "consistent with [his] opinions" stated previously. Patterson Addendum, Ex. 26 at 1, 3.  He specifically referenced Nurse Leiphart and the fact that she "had very limited knowledge of mental health issues." *Id.* at 3.  He also expressly incorporated the Hayes report's findings, noting his agreement that, among other things, mental health staff did not "identify[] her disruptive behavior that could have been attributed to her serious mental illness, increased anxiety and frustration regarding the continuing uncertainty of her immigration status and frequent housing placement in segregation." *Id.*  This is plaintiff's point concerning Nurse Leiphart's failures to address Ms. Carlos's agitation in October.  Accordingly, plaintiff's negligence claim should proceed.

### C.   Plaintiff's Punitive Damages Claims Should Be Presented To A Jury.

The PrimeCare defendants' punitive damages argument assumes dismissal of plaintiffs' federal claims.  As demonstrated above, however, the civil rights claims must proceed based on a record showing reckless indifference to Ms. Carlos's rights.  As the Court has already decided, such facts support a claim for punitive damages.  *See Carlos v. York Cnty.*, 15-cv-1994, 2016 WL 5024232, at *5 (M.D. Pa. Aug. 19, 2016) ("The facts alleged in the complaint set forth reckless

and willful conduct…the plaintiff's request for punitive damages is sufficient.").

Nothing has changed, and the claim for punitive damages must proceed.[12]

**D.    The Court Should Exercise Discretion To Retain Jurisdiction.**

Plaintiff's federal civil rights claims should proceed, but if the Court were to

rule to the contrary, the PrimeCare defendants' request for remand to a state court

should be rejected.  As the PrimeCare defendants acknowledge, 28 U.S.C. §

1367(c) grants discretion.  At this stage, the Court has expended substantial

resources in this litigation and, accordingly, it would be appropriate for the Court

to exercise jurisdiction over the state law claims.

---

[12] Even if the Court were to allow only negligence claims to proceed, defendants seek to preclude punitive damages only as to PrimeCare.  Punitive damages would still be available against defendants Rollings-Mazza and Leiphart.

## VI.    CONCLUSION

For the foregoing reasons, the PrimeCare defendants' motion for summary

judgment should be denied.

Respectfully submitted,

/s/ Jonathan H. Feinberg
David Rudovsky
Jonathan H. Feinberg
Susan M. Lin
KAIRYS, RUDOVSKY, MESSING & FEINBERG
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
*Counsel for Plaintiff*

DATE: March 10, 2017

## <u>CERTIFICATE OF WORD COUNT</u>

I, Jonathan H. Feinberg, hereby certify that the foregoing brief consists of 4,982 words and, therefore, complies with L.R. 7.8(b)(2).

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg

## CERTIFICATE OF SERVICE

I, Jonathan H. Feinberg, hereby certify that the foregoing Brief In

Opposition To PrimeCare Medical Defendants' Motion For Summary Judgment

and attached Response To PrimeCare Medical Defendants' Statement Of

Undisputed Material Facts In Support Of Summary Judgment were, on March 10,

2017, filed via the Court's CM/ECF system and, therefore, served on the

following:

Brandon R. Conrad
Email: brc@saxtonstump.com
Harlan W. Glasser
Email: hwg@saxtonstump.com
Saxton & Stump, LLC
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
(717) 556-1008

*Counsel for Defendant Gallagher*

Donald L. Reihart
Assistant Solicitor for York County
3015 Eastern Boulevard
York, PA 17402
(717) 755-2799
Email: email@reihartlaw.com

*Counsel for Defendants York County,
Deputy Warden Clair Doll, Counselor
Janet Jackson, and Correctional Officer
Erika Collins*

John R. Ninosky
301 Market Street
P.O. Box 109
Lemoyne, PA 17043
(717) 761-4540
Email: jrn@jdsw.com

*Counsel for Defendants PrimeCare
Medical, Inc., Dr. Pamela Rollings-
Mazza, and Nurse Aimee Leiphart*

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg