## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ANGELA CARLOS, as
ADMINISTRATRIX of the ESTATE
OF TIOMBE KIMANA CARLOS,

        Plaintiff, | CIVIL ACTION NO. 1:15-cv-01994

        v. | (CALDWELL, J.)
| (SAPORITO, M.J.)

YORK COUNTY, et al.,

        Defendants.

## REPORT AND RECOMMENDATION

This is a federal civil rights survival and wrongful death action brought under 42 U.S.C. § 1983, which also asserts supplemental state law claims arising out of the same operative facts. It arises out of the death of Tiombe Kimana Carlos, an immigration detainee, while incarcerated at York County Prison, which is located in York County, Pennsylvania. The plaintiff is Angela Carlos, mother of the decedent and administratrix of her daughter's estate.

## I.  BACKGROUND

In February 2011, upon completion of a state prison sentence, the decedent, Tiombe Carlos, was transferred into the custody of U.S. Immigrations and Customs Enforcement ("ICE"). Although she had

resided within the United States since her childhood, Carlos had been born abroad, and when her parents had become naturalized citizens she had remained a lawful permanent resident. As a non-citizen, the decedent's conviction of an aggravated felony had rendered her removable from the United States. On April 14, 2011, Carlos was transferred to York County Prison for detention pending completion of removal proceedings, and she remained there until she committed suicide by hanging on October 23, 2013.

Prior to her arrival at York County Prison, Carlos had a history of serious mental illness, going back to her teenage years, including multiple hospitalizations. On the day of her arrival at the prison, April 14, 2011, Carlos was seen by mental health professionals, including defendants Pamela Rollings-Mazza, MD, and Patrick Gallagher, LPC.[1] Carlos

---

[1] Dr. Rollings-Mazza is a psychiatrist employed by defendant PrimeCare Medical, Inc. ("PrimeCare"), which had contracted with York County to provide medical and mental health care to inmates at York County Prison, including immigration detainees. Dr. Rollings-Mazza's duties include medication management, evaluations for medication, and referrals from mental health coordinators.

Mr. Gallagher is a mental health coordinator at York County Prison, employed by WellSpan Health System, a private contractor—he appears to be a holdover from an earlier period in which WellSpan held the contract to provide medical and mental health services to the prison's inmates. Mr.

*(continued on next page)*

reported that she had been diagnosed in the past with chronic paranoid schizophrenia, and Dr. Rollings-Mazza saw no reason to change that diagnosis. Dr. Rollings-Mazza continued Carlos on the same medication she had received before her arrival—injections of Haldol Decanoate every two weeks—based on Dr. Rollings-Mazza's impression that the medication was effective for her and that she had remained stable on the medication.[2]

Following her intake mental health screening, Carlos was placed on "Level III – Psychiatric Observation" status.[3] Because she had been

---

Gallagher provides direct mental health treatment to inmates, evaluates them for suicide risks, and initiates step-down procedures.

[2] Dr. Rollings-Mazza testified to this at her deposition. In their answer to the plaintiff's statement of facts, however, the PrimeCare defendants suggest that "Carlos continued to exhibit irrational, agitated, and violent behavior." (Doc. 89 ¶ 14). But the evidence cited in support of this statement does not support it—the citation to "Doc. 69-1 at Exhibit G" points to a hospital discharge order from 1997. (Doc. 69-a, at 34). Thus, in the absence of evidence to support it, we have disregarded this statement by the defendants.

[3] Under PrimeCare's suicide prevention policy, Level III psychiatric observation "is not used for suicide prevention, but [is] reserved for the inmate whose behavior warrants closer observation. *It does not meet the criteria for suicide precaution.*" (Doc. 85-4, at 8–9 (emphasis in original)). Correctional staff are required to make checks by direct visual observation at staggered intervals of 15 to 30 minutes, and to document the checks in writing. (*Id.*). The inmate has all rights and privileges he or she would otherwise have in general population. (*Id.*). Inmates under psychiatric observation are to be seen by medical staff daily and reviewed daily by mental health staff, Monday through Friday. (*Id.*).

disruptive during transport to York County Prison, she was also placed in the Behavioral Adjustment Unit ("BAU") for female detainees.[4]

On April 19, 2011, Carlos was seen by Gallagher at her cell door. She was reportedly "agitated and uncooperative" and she refused to take her Haldol shot.

On April 20, 2011, Carlos acquiesced and received her Haldol Decanoate shot. She was seen again by defendant Gallagher at her cell door. He reported that her mood was euthymic and her affect was appropriate to mood, she denied any suicidal/homicidal ideation, she was cooperative and oriented to person, place, and situation, her insight and judgment were limited, and she was future oriented. Gallagher directed that psychiatric observation be discontinued and cleared Carlos for

---

[4] Over the course of the next thirty months, Carlos was housed in the female maximum-security block of York County Prison. That block was divided into smaller "pods" of cells, including pods A, B, C, and D, and the BAU. Carlos was often housed in segregated conditions, including the BAU and the Intensive Custody Unit ("ICU"). A BAU placement was typically based on a specific disciplinary violation, and inmates in the BAU were permitted only one hour outside of their cells each day, five days per week, and they were limited in the type and amount of personal property they could possess. ICU status was based on an administrative determination that an inmate had a "history of violence" and was a "threat to the general population"—ICU inmates were usually placed in A or D pods, they were not limited in the personal property they could possess, but they were only permitted two hours outside of their cells each day.

transfer out of the BAU and into the general population.

On April 25, 2011, Carlos was seen by defendant Dr. Rollings-Mazza for an evaluation. Based on Carlos's self-reported mental health history, Dr. Rollings-Mazza noted a likely diagnosis of schizoaffective disorder, stable on medications, with no overt psychosis. She continued Carlos's medication regimen and planned to reevaluate in six weeks.

On May 25, 2011, Carlos was evaluated by a non-party clinical psychologist, Ronald Noble, Ph.D., at the request of her immigration attorney. Dr. Noble interviewed Carlos for approximately two hours, at the prison. He also reviewed her medical records and spoke with her mother and sister. In a comprehensive psychological evaluation report, dated September 14, 2011, Dr. Noble noted that, upon her arrival in the interview room, Carlos was not well-oriented to time and place, and her affect was restricted. Based on his observations of Carlos, her self-reported mental health history, his own review of her medical and mental health treatment records, and interviews with her mother and sister, Dr. Noble concluded that she suffered from "severe psychotic symptoms," possibly Schizophrenia, Paranoid Type, but most likely Schizoaffective Disorder, Bipolar Type. He noted that Carlos was "likely to suffer from her psychotic

disorder permanently, and to need psychotropic medication and supportive care for the rest of her life." (Doc. 85-5, at 3). His prognosis for Carlos was for a "[r]isk of future hospitalization and danger to self and others." (*Id.* at 12). Dr. Noble recommended that Carlos be placed "under the care of a psychiatrist who can prescribe appropriate psychotropic medications and monitor her symptoms," and he suggested that, due to her need for "a supportive and structured living environment," she would be best placed in "[a] group home setting for individuals suffering from chronic mental illness." (*Id.* at 13).

On June 6, 2011, defendant Dr. Rollings-Mazza reevaluated Carlos as planned. The doctor noted that Carlos complained of headaches, that she denied any hallucinations or suicidal ideation, that she presented with no agitation or psychosis, and that she appeared to be stable on medications. Dr. Rollings-Mazza continued Carlos on the same medication regimen, and she planned to return for a follow-up evaluation in eight weeks.

On June 8, 2011, Carlos received a misconduct report for disruption and was placed in the BAU, where she was placed on suicide watch. The next day, June 9, 2011, Carlos was seen by defendant Gallagher. In his

treatment notes, Gallagher observed that Carlos presented with a euthymic mood and an affect appropriate to mood, intact thought process, and no overt psychosis. Gallagher reported that Carlos denied any suicidal/homicidal ideation, that she was oriented to time, place, person, and situation, that her insight and judgment appeared to be intact, and that she remained future oriented. Gallagher concluded that Carlos was not suicidal and he directed that she be removed from suicide watch but continued on psychological observation status. She remained in the BAU.

On June 13, 2011, Carlos requested and was seen by Gallagher. In his treatment notes, Gallagher observed that Carlos presented with an anxious mood, with affect congruous to mood. He noted that she presented with thought process intact and no overt psychosis. Gallagher reported that Carlos denied any suicidal/homicidal ideation, that she was cooperative and oriented to time, place, person, and situation, that her insight and judgment were intact, and that she remained future oriented.

On June 22, 2011, Carlos was seen by defendant Gallagher to review her psychiatric observation status. In his treatment notes, Gallagher observed that Carlos presented with euthymic mood and affect appropriate to mood. He noted that she presented with thought process intact and no

overt psychosis. Gallagher reported that Carlos denied any suicidal/homicidal ideation, that she was cooperative and oriented to time, place, person, and situation, that her insight and judgment appeared to be intact, and that she remained future oriented. Gallagher indicated that Carlos was to remain on psychiatric observation for the remainder of her stay in the BAU, but that she was now approved for outdoor recreation.

On June 23, 2011, Carlos was seen by non-party Bette Ann Becker, LPN, for her weekly mental health check while confined in segregation. She reported that she was okay and had no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On July 5, 2011, Carlos was seen by defendant Gallagher at her request. In his treatment notes, Gallagher observed that Carlos presented with a euthymic mood and an affect appropriate to mood, intact thought process, and no overt psychosis. Gallagher reported that Carlos denied any suicidal/homicidal ideation, that she was cooperative and oriented to time, place, person, and situation, that her insight and judgment appeared to be intact, and that she remained future oriented. Gallagher concluded that Carlos was stable on medication and not suicidal. He directed that

psychiatric observation be discontinued and cleared Carlos to return to general population.

On July 7, 2011, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and had no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On July 8, 2011, Carlos was transferred out of the BAU and back into general population.

On February 20, 2012, Carlos was placed in segregation following a report that she stole someone else's iced tea. On February 23, 2012, Carlos was seen by non-party Tracy Luiz, LPN, for her weekly mental health check while confined in segregation. She reported that she was doing well and having no problems, denied any suicidal/homicidal thoughts or hallucinations, and appeared oriented to time, place, person, and situation.

On February 28, 2012, Carlos was released from segregation.

On March 16, 2012, Carlos received a misconduct report for refusing an order and she was transferred to the BAU.

On March 21, 2012 Carlos received her biweekly Haldol Decanoate

shot after initially refusing it.

On March 29, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 5, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 12, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 19, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal

thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 26, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 30, 2012, Carlos was transferred out of the BAU and back into general population.

On October 7, 2012, Carlos was placed in segregation for reasons that are not clear from the record before the Court.

On October 10, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. Carlos was uncooperative and communicated with Nurse Leiphart from underneath her blanket. She denied any suicidal/homicidal thoughts or hallucinations, appeared to have an angry mood, and appeared oriented to time, place, person, and situation.

On October 18, 2012, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported

that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On October 19, 2012, Carlos was removed from segregation and returned to B pod.

On November 11, 2012, Carlos was placed in the BAU after receiving a misconduct report for fighting with another inmate and an attempted assault on staff. On November 12, 2012, she was removed from suicide watch and placed under psychiatric observation by defendant Gallagher.

On December 13, 2012, Carlos received another misconduct report for assault on another inmate while on BAU status. As a result, she was placed on suicide watch. On December 14, 2012, she was removed from suicide watch and placed under psychiatric observation by defendant Gallagher.

On December 20, 2012, Carlos was seen by defendant Leiphart. She denied any suicidal/homicidal thoughts or hallucinations, she appeared to be calm, cooperative, and non-violent, and she appeared oriented to time, place, person, and situation.

On January 18, 2013, Carlos was seen at her cell by defendant

Gallagher for review of her psychiatric observation status. In his treatment notes, Gallagher observed that Carlos presented normal mood, affect congruent to mood, and intact thought process. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher directed that Carlos be taken off psychiatric observation and cleared to return to general population when her disciplinary assignment to the BAU expired.

On January 20, 2013, Carlos was removed from psychiatric observation and transferred back to general population.

On January 23, 2013, on the recommendation of non-party correctional counselors, defendant Deputy Warden Clair Doll directed that Carlos be placed on ICU status due to her poor adjustment and violent behavior. Carlos was transferred to the ICU on A pod.

On January 31, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On February 7, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On February 19, 2013, Carlos was seen by defendant Gallagher. She had been referred by a correctional officer because she had been crying and upset after learning from a phone call home that her parents were having relationship problems. Gallagher spoke with her about that situation. In his treatment notes, Gallagher observed that Carlos presented with a depressed mood and anxious affect congruent to mood. He noted that her thought process was intact but concrete. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, and person.

On February 26, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On March 6, 2013, Carlos was seen by defendant Gallagher to follow up on a report from podmates concerned about her "explosiveness." In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect appropriate to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation.

On March 6, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On March 14, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On March 20, 2013, Carlos refused her biweekly Haldol Decanoate shot.

On March 21, 2013, Carlos received her biweekly Haldol Decanoate shot without incident, and she was seen by defendant Holly Snyder, LPN, for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On March 28, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 5, 2013, Carlos was seen by defendant Snyder for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 10, 2013, Carlos was seen by defendant Dr. Rollings-Mazza. In her treatment notes, Dr. Rollings-Mazza observed that Carlos presented with a euthymic mood, and no agitation or overt psychosis. She reported

that Carlos denied any suicidal ideation. She directed that medications continue as is and planned to reevaluate Carlos in eight weeks.

On April 11, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 18, 2013, Carlos was seen by defendant Gallagher at her request. In his treatment notes, Gallagher observed that Carlos presented with anxious affect congruous to mood and with her thought process intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation.

On April 19, 2013, Carlos was seen by defendant Snyder for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On April 25, 2013, Carlos was seen by defendant Leiphart for her

weekly mental health check while confined in segregation. She reported
that she was okay and having no problems, denied any suicidal/homicidal
thoughts or hallucinations, appeared to have stable mood, and appeared
oriented to time, place, person, and situation.

On May 2, 2013, Carlos was seen by defendant Snyder for her weekly
mental health check while confined in segregation. She reported that she
was okay and having no problems, denied any suicidal/homicidal thoughts
or hallucinations, appeared to have stable mood, and appeared oriented to
time, place, person, and situation. There is no mention in Carlos's
treatment notes regarding her Haldol injection.

On May 9, 2013, Carlos was seen by defendant Leiphart for her
weekly mental health check while confined in segregation. She reported
that she was okay and having no issues, denied any suicidal/homicidal
thoughts or hallucinations, appeared to have stable mood, and appeared
oriented to time, place, person, and situation.

On May 13, 2013, Carlos was seen by defendant Gallagher at her
request. In his treatment notes, Gallagher observed that Carlos presented
with anxious affect congruous to mood and with her thought process
intact. Gallagher reported that Carlos denied any suicidal/homicidal

ideation, and that she was cooperative and oriented to time, place, person, and situation.

On May 16, 2013, Carlos was seen by defendant Snyder for her weekly mental health check while confined in segregation. She reported that she was okay and having no issues, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On May 24, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no issues, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On May 31, 2013, Carlos was seen by defendant Snyder for her weekly mental health check while confined in segregation. She reported that she was okay and having no issues, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On June 5, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported

that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On June 6, 2013, Carlos was seen at her cell by defendant Dr. Rollings-Mazza. In her treatment notes, Dr. Rollings-Mazza observed that Carlos presented with no agitation or overt psychosis. She reported that Carlos denied any suicidal ideation. She directed that medications continue as is and planned to reevaluate Carlos in eight weeks.

On June 7, 2013, Carlos was removed from ICU status and returned to general population on B pod.

On July 11, 2013, Carlos was placed in the BAU after receiving a misconduct report for assaulting another inmate. As a result, she was placed on suicide watch.

On July 12, 2013, Carlos was seen at her cell door by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect appropriate to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher concluded that Carlos was

not suicidal and he directed that she be removed from suicide watch and placed on psychological observation status.

On July 18, 2013, Carlos was seen at her cell by defendant Gallagher for review of her psychiatric observation status. In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect appropriate to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that Carlos continue on psychiatric observation so long as she remained in the BAU.

On July 25, 2013, Carlos was seen at her cell by defendant Gallagher for review of her psychiatric observation status. In his treatment notes, Gallagher observed that Carlos presented with anxious affect appropriate to her mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that Carlos continue on psychiatric observation so long as she remained in the BAU.

On July 29, 2013, Carlos was seen at her cell by defendant Dr.

Rollings-Mazza. In her treatment notes, Dr. Rollings-Mazza observed that Carlos presented as stable with no agitation or overt psychosis. She reported that Carlos denied any suicidal ideation. She directed that medications continue as is and she planned to reevaluate Carlos in eight weeks.

On August 7, 2013, Carlos was seen at her cell by defendant Gallagher for review of her psychiatric observation status. In his treatment notes, Gallagher observed that Carlos presented with anxious affect appropriate to her mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that Carlos continue on psychiatric observation so long as she remained in the BAU.

On August 10, 2013, Carlos was removed from BAU status, but remained in her current housing under psychiatric observation.

On August 12, 2013, Carlos was seen by defendant Gallagher for review of her psychiatric observation status. In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect congruent to mood. He noted that her thought process was intact.

Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher concluded that Carlos was not suicidal, and he recommended that she be taken off psychiatric observation and cleared to return to general population.

On August 13, 2013, Carlos was placed on ICU status at the direction of defendant Doll due to her continued assaultive behavior. Later that day, defendant Leiphart and non-party Angela Schmuck, LPN, reported that Carlos was found hanging by her sheet in her cell by the window. She was cut down by security and lowered to the floor to be medically assessed and provided with emergency medical care. Carlos was reportedly crying and said, "It's not fair, I don't wanna live." (Doc. 76-12, at 2). She was taken to the medical department for further assessment and treatment, and she was taken out of the prison to a hospital.

On August 14, 2013, Carlos was seen by defendant Dr. Rollings-Mazza and defendant Galagher following her attempted hanging. In her treatment notes, Dr. Rollings-Mazza noted that Carlos had been doing well until the previous morning when she learned that she had been transferred from the BAU to the ICU, rather than to general population.

She noted that the decision to place her in the ICU was made by security, not mental health—she had been medically cleared to return to general population. The doctor further noted that Carlos had been observed in her cell by security preparing to hang herself, but that she waited until security entered the cell to make the attempt. Dr. Rollings-Mazza reported that Carlos now refused to cooperate with a mental health evaluation, and that the inmate refused to take her medications. The doctor noted that Carlos was on suicide watch with constant observation.

On August 15, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher noted that Carlos was uncooperative and refused to take her medication. Gallagher concluded that Carlos remained a suicide risk and directed that she continue on suicide watch with constant observation.

On August 16, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect congruent to mood. He noted that Carlos's thought process was impaired, her insight and judgment were limited, and that she was unable to commit to safety. Gallagher concluded that Carlos remained a suicide risk and directed that she continue on

suicide watch with constant observation.

On August 17, 2013, Carlos was seen at her cell door by non-party Shannon M. Taylor, LPC. In her treatment notes, Taylor observed that Carlos provided limited cooperation—she refused to sit up and speak with the counselor—and that she was unable to commit to safety. Taylor concluded that Carlos remained a suicide risk and directed that she continue on suicide watch with constant observation.

On August 18, 2013, Carlos was seen at her cell by non-party Jeff Leer. In his treatment notes, Leer observed that Carlos did not come to the cell door but stated that she was doing okay. Leer concluded that Carlos remained a suicide risk and directed that she continue on suicide watch with constant observation.

On August 19, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos was now appropriate and cooperative. He reported that Carlos had contracted for safety and agreed to cooperate with treatment. Gallagher directed that constant observation be discontinued, but that suicide watch continue.

On August 20, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos

presented with normal mood and affect congruent to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher concluded that Carlos was not suicidal, and he recommended that Carlos be removed from suicide watch, that she be placed on psychiatric observation, and that she be permitted to possess any items allowed for inmates in the ICU.

That same day, Carlos was seen by former defendant Robert Davis, MD.[5] In his treatment notes, Dr. Davis noted that Carlos presented as animated and angry, with good eye contact, and that her speech was goal oriented. He reported that Carlos admitted to hearing voices at times. Dr. Davis concluded that Carlos was paranoid but not delusional. He directed no change in treatment plan, with a follow-up evaluation to take place in eight weeks.

On August 30, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect appropriate to mood. He noted that

---

[5] Dr. Davis was named as a defendant in the amended complaint. But all claims against him were voluntarily dismissed by the plaintiff on July 8, 2016. (Doc. 59).

her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that psychiatric observation continue while Carlos remained in the ICU.

On September 4, 2013, Carlos refused her biweekly Haldol Decanoate shot. The nurse, non-party Bette Ann Becker, LPN, reported that Carlos was "argumentative when approached." She was referred to the mental health nurse for further action. Records indicate that she received the shot later that same day from Nurse Leiphart. (Doc. 76-14, at 5).

On September 19, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos presented with depressed mood and anxious affect congruent to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that psychiatric observation continue while Carlos remained in the ICU.

On September 26, 2013, Carlos was seen at her cell by defendant Gallagher. In his treatment notes, Gallagher observed that Carlos

presented with normal mood and affect congruent to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that psychiatric observation continue while Carlos remained in the ICU.

On September 30, 2013, Carlos was seen at her cell by defendant Dr. Rollings-Mazza. In her treatment notes, Dr. Rollings-Mazza observed that Carlos presented as stable with no agitation or overt psychosis. She reported that Carlos denied any suicidal ideation. She directed that medications continue as is and she planned to reevaluate Carlos in six weeks.

On October 2, 2013, Carlos received her biweekly Haldol Decanoate shot, but according to defendant Leiphart, who administered the shot, Carlos was "very argumentative" this morning, and she was upset that Leiphart had woken her up at 9:30 a.m. for the shot rather than letting her sleep and returning at 11:30 a.m. Leiphart was able to persuade Carlos to receive her Haldol shot, and she noted that Carlos denied any suicidal/homicidal thoughts or hallucinations.

Later that same day, Carlos was seen at her cell by defendant

Gallagher. In his treatment notes, Gallagher observed that Carlos presented with normal mood and affect congruent to mood. He noted that her thought process was intact. Gallagher reported that Carlos denied any suicidal/homicidal ideation, and that she was cooperative and oriented to time, place, person, and situation. Gallagher recommended that, although her assignment to the ICU would continue, psychiatric observation be discontinued.

On October 3, 2013, Carlos was seen by defendant Snyder for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On October 10, 2013, Carlos was seen by defendant Leiphart for her weekly mental health check while confined in segregation. She reported that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On October 17, 2013, Carlos was seen by defendant Snyder for her weekly mental health check while confined in segregation. She reported

that she was okay and having no problems, denied any suicidal/homicidal thoughts or hallucinations, appeared to have stable mood, and appeared oriented to time, place, person, and situation.

On October 23, 2013, prison officials found Carlos hanging in her cell. She was transported to a local hospital, where she was pronounced dead. Prior to her suicide, defendant Correctional Officer Erika Collins had overheard an argument between Carlos and another inmate, in which the other inmate told Carlos, "Why don't you go kill yourself." Officer Collins testified at her deposition that she spoke with Carlos after this comment was made, at which time Carlos had appeared to be calm. After this incident, defendant Correctional Officer Grissell Santos-Heredia had conducted a security check at 9:00 p.m., finding Carlos sitting on her bed. At 9:17 p.m., during the next security check,[6] Officer Collins found Carlos with a bed sheet tied to the window and around her neck.

Following Carlos's death, two federal investigations were conducted. The first, a review of suicide prevention practices within the York County Prison, was conducted by the Office for Civil Rights and Civil Liberties of

---

[6] Although Carlos's status only required security checks every thirty minutes, other inmates on the pod required checks every fifteen minutes.

the U.S. Department of Homeland Security. (Doc. 85-11). This first report found a number of deficiencies in the implementation of suicide prevention programs by York County Prison and PrimeCare, including inadequate guidance with respect to training, problematic housing of inmates in cells that were not suicide-resistant, and failure of mental health personnel to comply with suicide prevention requirements set out in the written policies.[7] (*Id.*). The report also noted an ICE policy requirement that a mortality review be conducted following any detainee suicide attempt, but it deferred making any findings due to lack of documentation.[8] (*Id.*). The second investigation, into Carlos's death in particular, was conducted by the ICE Office of Detention Oversight. (Doc. 85-9). This second report found York County Prison to be deficient in following various ICE standards, including inadequate documentation of administrative

---

[7] In particular, mental health staff were found to have developed informal practices that fell far short of the requirements described in the written policies, including evaluation of inmates on psychiatric observation status on a *weekly* basis rather than the daily basis called for by the written policies, a failure to adequately document suicide risk assessments to justify imposition of or discharge from a particular level of observation, and a failure to develop mental health treatment plans as required for inmates held on suicide precautions for longer than 24 hours.

[8] This report was prepared prior to completion of the ICE investigative report.

segregation orders, untimely segregation reviews, a failure to collect incident reports from all staff who responded to Carlos's October 2013 suicide and her August 2013 suicide attempt, a failure by medical staff to document any treatment plan for Carlos during her thirty months of detention, and a failure to prepare a psychiatric alert report following Carlos's August 2013 suicide attempt. (*Id.*).

The original complaint in this action was filed on October 14, 2015. (Doc. 1). An amended complaint was filed with leave of court on April 27, 2016. (Doc. 36). The amended complaint alleges that the named defendants (York County; Deputy Warden Doll; Correctional Counselor J. Jackson; Correctional Officer Collins; PrimeCare; Dr. Rollings-Mazza; Nurse Leiphart; and Mental Health Coordinator Gallagher)[9] were deliberately indifferent and negligent in failing to treat the serious and chronic mental health needs of the decedent while incarcerated as an immigration detainee at York County Prison, which led to the decedent's death by suicide on October 23, 2013.

---

[9] The amended complaint named another doctor, who was previously voluntarily dismissed, and another nurse and several other correctional staff members against whom the plaintiff has abandoned her claims, as discussed below.

The defendants have moved for summary judgment. (Doc. 65; Doc. 68; Doc. 74). These motions are now fully briefed and ripe for disposition.

## II.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes

such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is

inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III. DISCUSSION

The plaintiff has asserted § 1983 claims against the individual defendants, alleging that all were deliberately indifferent to the decedent's serious medical needs, in violation of her Eighth and Fourteenth Amendment rights (Count I of the amended complaint), and *Monell* claims against York County and PrimeCare, alleging that the unconstitutional conduct of the individual defendants was caused by unconstitutional municipal/corporate policies or customs (Count II of the amended complaint). She has also asserted state-law medical negligence claims against PrimeCare and the individual medical defendants (Count III of the amended complaint). The plaintiff seeks an award of compensatory and punitive damages, plus reasonable attorney fees and costs.[10]

---

[10] The plaintiff has requested punitive damages from the individual defendants only.

The defendants have sorted themselves into three separately represented groups and moved for summary judgment. One group, the municipality of York County and its correctional staff (Deputy Warden Doll, Captain Neeper, Officer Collins, Officer Santos-Heredia, and Correctional Counselors Jackson, McNicholas, Crist, Nadeau, and Trig), have moved for summary judgment on qualified immunity grounds and, in the alternative, on the merits of the plaintiff's federal civil rights claims. The second group, PrimeCare and its medical professional employees (Dr. Rollings-Mazza, Nurse Leiphart, and Nurse Snyder), have moved for summary judgment on the merits of the plaintiff's federal civil rights claims, her state-law medical malpractice claims against the two nurses, and her state-law claim for punitive damages, and they request that we decline to exercise jurisdiction over the remainder of the plaintiff's state-law claims, dismissing them without prejudice for litigation in the state courts. Finally, defendant Gallagher has moved for summary judgment on the merits of all claims against him.

## A. Abandoned Claims Against Defendants Snyder, Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig

First, we note that the amended complaint named PrimeCare employee Holly Snyder, LPN, as a defendant to Counts I and III of the

amended complaint, and defendants Captain Carl Neeper, Correctional Officer Grissell Santos-Heredia, Correctional Counselor McNicholas, Correctional Counselor Crist, Correctional Counselor Nadeau, and Correctional Counselor Trig as defendants to Count I. In her briefs in opposition to the PrimeCare and County motions for summary judgment, the plaintiff has explicitly stated that she "agrees to dismissal" of each of these seven individual defendants. (Doc. 87, at 6 n.1; Doc. 88, at 5 n.1). The plaintiff has not filed a Rule 41(a) notice or stipulation voluntarily dismissing these defendants, merely conceding her abandonment of claims against them in the margins of her opposition briefs. Under these circumstances, we find that the plaintiff has waived her claims against these seven defendants, entitling them to summary judgment. *See Rife v. Borough of Dauphin*, 647 F. Supp. 2d 431, 442 & n.6 (M.D. Pa. 2009).

Accordingly, it is recommended that summary judgment be granted in favor of defendants Snyder, Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig.

### B. Section 1983 Civil Rights Claims

In Counts I and II, the plaintiff has asserted federal civil rights claims against each of the remaining defendants under 42 U.S.C. § 1983.

Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

### 1. Eighth Amendment Claims

The amended complaint references the decedent's rights under the Eighth Amendment. But because Carlos was a civil immigration detainee awaiting removal, not a convicted prisoner, her federal civil rights claims

are governed by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment's proscription against cruel and unusual punishment, which applies only to those who have been convicted and sentenced for criminal offenses. *See Rhodes v. Chapman*, 452 U.S. 337, 344–46 (1981); *Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005); *Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000). Accordingly, it is recommended that all claims under the Eighth Amendment be dismissed with prejudice.

### 2. Fourteenth Amendment Claims

The plaintiff has brought her federal civil rights claims against these defendants under the Due Process Clause of the Fourteenth Amendment.

Civil immigration detainees are entitled to the same due process protections as criminal pretrial detainees. *See Adekoya v. Chertoff*, 431 Fed. App'x 85, 88 (3d Cir. 2011) (per curiam); *Contant v. Sabol*, 431 Fed. App'x 177, 178–79 (3d Cir. 2011) (per curiam); *Foreman v. Lowe*, 261 Fed. App'x 401, 403 (3d Cir. 2008) (per curiam). Criminal pretrial detainees retain liberty interests firmly grounded in the Due Process Clause of the Fourteenth Amendment. *See Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005); *Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000).

As this Court has previously explained:

Pretrial detainees do not stand on the same footing as convicted inmates. For the latter, punishment—both for purposes of deterrence and retribution—and rehabilitation are appropriate adjuncts of imprisonment, and the courts will not interfere with reasonable means adopted to achieve these goals. In contrast, the pretrial detainee is presumed innocent until proven guilty and is not to be punished or subjected to rehabilitation before he is tried and convicted of a crime. Hence, the only constitutional purpose of incarceration for the pretrial detainee is the detention itself; the pretrial detainee should not be subject to punitive conditions nor forced to participate in rehabilitative programs.

However, even if a sanction, restriction, or condition can be viewed as having a punitive effect on the pretrial detainee, it is constitutional if it also furthers the alternative governmental purpose of maintaining custody, maintaining prison security, or maintaining internal order and discipline within the institution. A pretrial detainee constitutionally need not and, as a practical matter, cannot be provided with a normal civilian life while incarcerated awaiting trial. Before being held as a pretrial detainee, the individual has been arrested on probable cause and the judiciary has determined that there exists a prima facie case against him. Moreover, since the detainee was not released on his own recognizance, the requirement of bail indicates a concern for whether the pretrial detainee will appear at his trial and/or his probable dangerousness to the community. Hence, the pretrial detainee is lawfully imprisoned. Thus, while there are differences in the rights enjoyed by pretrial detainees as opposed to convicted prisoners, lawful imprisonment by its nature requires a dilution of the rights and privileges enjoyed by the general public outside the prison walls.

*Padgett v. Stein*, 406 F. Supp. 287, 295 (M.D. Pa. 1975) (citations omitted).

> The test is whether the challenged conditions amount to punishment under the Due Process Clause. Absent a showing of express intent to punish, the determination will normally turn on whether the conditions have an alternative purpose and wehther the conditions appear excessive in relation to that purpose. The inquiry into whether given prison conditions constitute punishment under the Due Process Clause considers the totality of the circumstances within a given institution.

*Dahlan v. Dep't of Homeland Sec.*, 215 Fed. App'x 97, 100 (3d Cir. 2007)

(per curiam).

With respect to medical claims, we analyze an immigration detainee's "claims of inadequate medical care under the familiar deliberate indifference standard." *Harvey v. Chertoff*, 263 Fed. App'x 188, 191 (3d Cir. 2008) (per curiam) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003)).

> To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm. Because the standard is recklessness, "prison officials who actually know of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."

*Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)) (citations omitted).

As the Third Circuit has recognized, "[a] particular vulnerability to

suicide represents a serious medical need." *Woloszyn v. Cty. of Lawrence*,

396 F.3d 314, 320 (3d Cir. 2005) (citing *Colburn v. Upper Darby Twp.*, 946

F.2d 1017, 1023 (3d Cir. 1991)).

> To be liable on a deliberate indifference claim, a
> defendant prison official must both "know[ ] of and
> disregard[ ] an excessive risk to inmate health or safety."
> The knowledge element of deliberate indifference is
> subjective, not objective knowledge, meaning that the
> official must actually be aware of the existence of the
> excessive risk; it is not sufficient that the official should
> have been aware. However, subjective knowledge on the
> part of the official can be proved by circumstantial
> evidence to the effect that the excessive risk was so
> obvious that the official must have known of the risk.
> Finally, a defendant can rebut a prima facie
> demonstration of deliberate indifference either by
> establishing that he did not have the requisite level of
> knowledge or awareness of the risk, or that, although he
> did know of the risk, he took reasonable steps to prevent
> the harm from occurring.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quoting and

citing *Farmer v. Brennan*, 511 U.S. 825, 837–38, 842, 844 (1994)) (citations

omitted) (alterations in original). Thus, the Third Circuit instructs that:

> a plaintiff in a prison suicide case has the burden of
> establishing three elements: (1) the decedent had a
> 'particular vulnerability to suicide,' (2) the [defendants]
> knew . . . of that vulnerability, and (3) those [defendants]
> 'acted with reckless indifference' to the [prisoner's]
> particular vulnerability.

*Herman v. Cty. of York*, 482 F. Supp. 2d 554, 563 (M.D. Pa. 2007) (quoting

*Colburn*, 946 F.2d at 1023).[11]

We further note that, with respect to the medical defendants, "[w]hile the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *see also Herman*, 482 F. Supp. 2d at 564 (citing *Brown*). Thus, prison medical authorities are afforded "considerable latitude . . . in the diagnosis and treatment of the medical problems of inmate patients." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). "Mere medical malpractice cannot give rise to a violation of the Eighth Amendment." *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990). The key

---

[11] In *Colburn*, the second element was originally formulated to inquire whether the defendant "knew or *should have known*" of the inmate's particular vulnerability to suicide, but the Supreme Court's subsequent decision in *Farmer v. Brennan*, 511 U.S. 825 (1994), clarified that the culpability required to support liability under the Eighth Amendment was *subjective* rather than objective—the defendant must actually know of and disregard an excessive risk to inmate health. *See Serafin v. City of Johnstown*, 53 Fed. App'x 211, 213–14 (3d Cir. 2002); *Herman*, 482 F. Supp. 2d at 564. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*." *Woloszyn*, 396 F.3d at 321 (emphasis added).

question is whether the defendants provided the decedent with some type of treatment, regardless of whether it is what the plaintiff desires. *Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).

Meanwhile, non-medical prison officials typically cannot be found deliberately indifferent if they fail to respond to the medical needs of an inmate already being treated by prison medical authorities, or if, as non-physicians, they defer to the medical judgment of the inmate's treating medical staff. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). "[A]bsent reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

### a. Defendant Gallagher

The plaintiff claims that Mental Health Coordinator Gallagher was deliberately indifferent to the decedent's particular vulnerability to suicide based on his failure to institute a treatment plan for Carlos, to conduct a

full suicide-risk assessment, or to consider and recommend alternative placement for Carlos over the duration of her incarceration, as well as his removal of Carlos from psychiatric observation on October 2, 2013, and his failure to schedule any clinical mental health evaluations in the following three weeks that lead up to her suicide on October 23, 2013.

As the Third Circuit has explained: "A particular vulnerability to suicide represents a serious medical need. The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition. There must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Woloszyn*, 396 F.3d at 320 (citations and brackets omitted). To prevail and recover damages under § 1983 under a deliberate indifference theory, a plaintiff must prove that the defendant's actions were both the actual and the *proximate* cause of injury. *Dupree v. Doe*, 646 Fed. App'x 166, 170 (3d Cir. 2016) (per curiam). Over the course of her thirty-month detention, Gallagher met with and evaluated Carlos on numerous occasions. In the several weeks leading up to his October 2, 2013, termination of psychiatric observation, Gallagher had met with and evaluated Carlos multiple times. On each occasion since she was terminated from suicide watch on August 20, 2013, Gallagher

reported that Carlos generally presented with normal mood and appropriate affect. On each occasion, Carlos's thought process was intact, she was cooperative and oriented to time, place, person, and situation, and her thought process was intact. On each occasion, Carlos denied any suicidal ideation.

Following several weeks of apparent stability, Gallagher directed that psychiatric observation be terminated on October 2, 2013. Because she continued in segregation status, Carlos continued to be seen regularly by a nurse for a weekly mental health check. On each of these occasions, Carlos reported to the nurse that she was okay and had no problems or issues. Each time, she denied any suicidal ideation. Each time, the nurse observed that Carlos appeared to be oriented to time, place, person, and situation, and that she appeared to have stable mood. The last of these weekly mental health checks occurred on October 17, 2013, six days before her suicide. During this entire period, treatment records document nothing unusual that would alert mental health staff to any increased suicide risk. During this time period, Carlos continued to receive her regular biweekly Haldol Decanoate shot.

On October 23, 2013, Carlos was involved in a verbal altercation with

another inmate, who told her to "go kill yourself." There is nothing in the record to suggest that this incident was brought to the attention of Gallagher or any other mental health staff. Within an hour, Carlos had committed suicide in her cell.

Viewing the evidence in the light most favorable to the plaintiff, it is clear that the plaintiff has failed to adduce evidence to establish a causal link between Gallagher's treatment decisions on and before October 2, 2013, and Carlos's death by suicide on October 23, 2013. Moreover, the plaintiff has failed to identify any evidence to demonstrate that Gallagher had actual knowledge of any events of special significance—such as the October 23, 2013, verbal altercation between Carlos and another inmate— or any deterioration in Carlos's mental state that might support a claim based on Gallagher's failure to spontaneously schedule another mental health evaluation or to reinstate Carlos to suicide watch. The plaintiff argues that Gallagher *should have known* that Carlos had grown more agitated in the weeks following his termination of psychiatric observation, but was not aware of this change in her mental state because "he *chose* not to schedule any clinical evaluations." (Doc. 86, at 37). But this argument is contrary to the Supreme Court's holding in *Farmer v. Brennan*, 511 U.S.

825 (1994), which requires actual, subjective knowledge of an excessive risk to inmate health or safety. Similarly, the plaintiff has suggested that Gallagher's failure to strictly comply with the written suicide prevention policies promulgated by York County Prison and PrimeCare constitutes *per se* reckless indifference, but this argument is contrary to the Supreme Court's holding in *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), which held that existing Supreme Court and Third Circuit precedent does not prescribe any particular suicide prevention procedures. *Id.* at 2044–45. The plaintiff has presented an expert report by a forensic psychiatrist to argue that Gallagher should have taken different or additional steps in treating Carlos, but one medical professional's disagreement with the professional judgment of another is not actionable under the Fourteenth Amendment. *See White*, 897 F.2d at 110 ("There may, for example, be several acceptable ways to treat an illness."). Ultimately, there is no evidence in the record before this Court to demonstrate that Gallagher had actual knowledge of Carlos's allegedly deteriorating mental state after the termination of psychiatric observation, nor of the verbal altercation that appears to have triggered her suicide.

Accordingly, we recommend that summary judgment be granted in

favor of Mental Health Coordinator Gallagher with respect to Count I.

### b. Defendant Dr. Rollings-Mazza

The plaintiff similarly claims that Dr. Rollings-Mazza was deliberately indifferent to the decedent's particular vulnerability to suicide based on her failure to institute a treatment plan for Carlos, to conduct a full suicide-risk assessment, or to consider and recommend alternative placement for Carlos over the duration of her incarceration, as well as her failure to initiate a full clinical review following the August 2013 suicide attempt as required by PrimeCare policies, and her failure to modify Carlos's medication regimen following her initial refusal of her biweekly Haldol Decanoate shot on September 4, 2013, or in light of her ongoing dissatisfaction with her segregation status and her long-running deportation proceedings.

As noted above, to prevail and recover damages under § 1983 under a deliberate indifference theory, a plaintiff must prove that the defendant's actions were both the actual and the *proximate* cause of injury. *Dupree*, 646 Fed. App'x at 170. Over the course of her thirty-month detention, Dr. Rollings-Mazza met with and evaluated Carlos on numerous occasions. In the several weeks leading up to the October 23, 2013, suicide, Dr.

Rolllings-Mazza met with and evaluated Carlos only once, on September 30, 2013.[12] At that visit, she found Carlos stable, with no agitation or overt psychosis. She reported that Carlos had explicitly denied any suicidal ideation, and she directed that Carlos's medications continue as is, with a follow-up evaluation to be conducted in six weeks.

Because she continued in segregation status, Carlos continued to be seen regularly by a nurse for a weekly mental health check. On each of these occasions, Carlos reported to the nurse that she was okay and had no problems or issues. Each time, she denied any suicidal ideation. Each time, the nurse observed that Carlos appeared to be oriented to time, place, person, and situation, and that she appeared to have stable mood. The last of these weekly mental health checks occurred on October 17, 2013, six days before her suicide. During this entire period, treatment records document nothing unusual that would alert mental health staff to any increased suicide risk. During this time period, Carlos continued to receive her regular biweekly Haldol Decanoate shot. On October 23, 2013, following a verbal altercation with another inmate, Carlos committed

---

[12] Carlos was seen by another psychiatrist, Dr. Davis, on August 20, 2013, because Dr. Rollings-Mazza was away. The plaintiff has voluntarily dismissed her claims against Dr. Davis.

suicide.

Viewing the evidence in the light most favorable to the plaintiff, it is clear that the plaintiff has failed to adduce evidence to establish a causal link between Dr. Rollings-Mazza's treatment decisions on and before September 30, 2013, and Carlos's death by suicide on October 23, 2013. In particular, we note that despite Carlos's initial refusal of her medication on September 4, 2013, she accepted an injection of Haldol Decanoate from Nurse Leiphart later that same day, and she continued to receive it on a biweekly basis until her death, with the last injection administered on October 16, 2013. Moreover, the plaintiff has failed to identify any evidence to demonstrate that Dr. Rollings-Mazza had actual knowledge of any events of special significance—such as the October 23, 2013, verbal altercation between Carlos and another inmate—or any deterioration in Carlos's mental state that might support a claim based on the doctor's failure to change her medication regimen, to spontaneously schedule another mental health evaluation, or to direct that Carlos be reinstated to suicide watch. The plaintiff has suggested that Dr. Rollings-Mazza's failure to strictly comply with the written suicide prevention policies promulgated by York County Prison and PrimeCare constitutes *per se*

reckless indifference, but this argument is contrary to the Supreme Court's holding in *Taylor v. Barkes*, which held that existing Supreme Court and Third Circuit precedent does not prescribe any particular suicide prevention procedures. 135 S. Ct. at 2044–45. The plaintiff has presented an expert report by a forensic psychiatrist to argue that Dr. Rollings-Mazza should have taken different or additional steps in treating Carlos, but one medical professional's disagreement with the professional judgment of another is not actionable under the Fourteenth Amendment. *See White*, 897 F.2d at 110 ("There may, for example, be several acceptable ways to treat an illness."). Ultimately, there is no evidence in the record before this Court to demonstrate that Dr. Rollings-Mazza had actual knowledge of Carlos's allegedly deteriorating mental state after her September 30, 2013, nor of the verbal altercation that appears to have triggered her suicide.

Accordingly, we recommend that summary judgment be granted in favor of Dr. Rollings-Mazza with respect to Count I.

### c. *Nurse Leiphart*

The plaintiff claims that Nurse Leiphart was deliberately indifferent to the decedent's particular vulnerability to suicide based on her failure to

report Carlos's "increased agitation" and refer her for a mental health evaluation.

On October 2, 2013, Nurse Leiphart wrote in her treatment notes that Carlos had been "very argumentative" and "very upset" that Leiphart woke her up at 9:30 a.m. for her shot instead of waiting until 11:30 a.m. Leiphart was able to convince Carlos to receive the shot, and she made a note in Carlos's medical records to try to give the shot at 11:30 a.m. next time. In subsequent mental health evaluations by defendants Gallagher, Snyder, and Leiphart on October 2, 3, 10, and 17, Carlos was reported as having presented with normal or stable mood. No further agitation was noted.

Nevertheless, Nurse Leiphart admitted to ICE investigators that she remembered Carlos being "more agitated than usual" in the two or three weeks leading up to her death, and that Carlos was "frustrated that she remained in the" ICU. (Doc. 85-9, at 19). At her deposition, Nurse Leiphart explained that she viewed this "agitation" as being about Carlos's housing assignment (i.e., to the ICU), which had "nothing to do with Mental Health or Medical." (Doc. 85-17, at 14). She clarified that the "agitation" did not cause her any concern that Carlos might harm herself. (*Id.*).

Viewing the evidence in the light most favorable to the plaintiff, we find the plaintiff's proffered evidence—Nurse Leiphart's statements regarding the decedent's increased agitation in the weeks prior to her suicide—is insufficient to demonstrate Leiphart's actual, subjective knowledge that Carlos posed a substantial risk of suicide in the days or weeks prior to her death. *See Woloszyn*, 396 F.3d at 321; *Beers-Capitol*, 256 F.3d at 133.

Accordingly, we recommend that summary judgment be granted in favor of Nurse Leiphart with respect to Count I.

### d. Deputy Warden Doll

The plaintiff claims that Deputy Warden Doll was deliberately indifferent to the decedent's particular vulnerability to suicide when he directed that Carlos be placed in ICU status for institutional security reasons rather than released to general population in August 2013.

As noted above, to prevail and recover damages under § 1983 under a deliberate indifference theory, a plaintiff must prove that the defendant's actions were both the actual and the *proximate* cause of injury. *Dupree*, 646 Fed. App'x at 170. Based on Carlos's extensive history of assaultive and disruptive behavior, Deputy Warden Doll determined that she should

be placed in ICU status on August 13, 2013. Later that same day, Carlos

attempted suicide. In the weeks thereafter, she was continued in ICU

status and placed on suicide. On August 20, 2013—one week after her

suicide attempt—mental health staff determined that Carlos was no

longer suicidal and removed her from suicide watch. She continued on

psychiatric observation status until that too was terminated by mental

health staff on October 2, 2013. Three weeks later, she successfully

committed suicide, shortly after a verbal altercation with another inmate.

In the intervening weeks and months, Carlos had been seen regularly by

mental health staff.

Viewing the evidence in the light most favorable to the plaintiff, it is

clear that the plaintiff has failed to adduce evidence to establish a causal

link between Deputy Warden Doll's decision to place Carlos on ICU status

and her death by suicide two months later.[13] Moreover, the plaintiff has

failed to identify any evidence to demonstrate that Doll had actual

knowledge of any events of special significance—such as the October 23,

---

[13] This stands in contrast to the clear line that may be traced between the housing decision and her suicide attempt that same day, August 13, 2013. But those two events are clearly tied by temporal proximity not present here.

2013, verbal altercation between Carlos and another inmate—or any deterioration in Carlos's mental state that might support a claim based on Doll's failure to spontaneously terminate Carlos's ICU status or direct that she be placed on suicide watch and referred for evaluation by mental health staff. Finally, absent any reason to believe that the prison's mental health staff was mistreating Carlos, Doll was justified in deferring to their expertise with respect to determining whether suicide watch or psychiatric observation status was appropriate. *See Spruill*, 372 F.3d at 236; *Durmer*, 991 F.2d at 69.[14]

Accordingly, we recommend that summary judgment be granted in favor of Deputy Warden Doll with respect to Count I.

### e. Counselor Jackson

The plaintiff similarly claims that Counselor Jackson was deliberately indifferent to the decedent's particular vulnerability to suicide when she transferred Carlos on October 21, 2013, to an ICU cell on A pod—the pod where she had been housed at the time of her August suicide

---

[14] The defendants have also moved for summary judgment on the ground that Deputy Warden Doll is entitled to qualified immunity. Having found no constitutional violation, the Court need not reach the question of qualified immunity.

attempt. Two days after the transfer, following a verbal altercation with another inmate, Carlos committed suicide.

As the Third Circuit has explained, "the requirement of 'reckless or deliberate indifference' implies that there must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" *Colburn*, 946 F.2d at 1025. This claim against Counselor Jackson rests solely on the sheer speculation that Carlos's placement on A pod caused her to commit suicide. The plaintiff has adduced no evidence that Carlos had threatened self-harm if she was returned to A pod, nor any other evidence that she possessed any fear or animus toward the pod or its inmates. Nor has the plaintiff adduced any evidence that Jackson was aware of and disregarded the possibility that Carlos might harm herself if relocated to A pod, much less a "strong likelihood" that self-inflicted harm would occur. Viewing the record in the light most favorable to the non-moving plaintiff, it is clear that no reasonable jury could find that Jackson knew of and recklessly disregarded a strong likelihood that self-inflicted harm would result from Carlos's transfer to A pod.[15]

---

[15] The defendants have also moved for summary judgment on the ground that Counselor Jackson is entitled to qualified immunity. Having
*(continued on next page)*

Accordingly, we recommend that summary judgment be granted in favor of Counselor Jackson with respect to Count I.

### f.  Officer Collins

The plaintiff claims that Officer Collins was deliberately indifferent to the decedent's particular vulnerability to suicide based on her failure to take unspecified action in response to the verbal altercation between Carlos and another inmate. The plaintiff argues that Collins was aware of Carlos's history of attempted suicide and recklessly disregarded that history in failing to take action to prevent her suicide.

"[P]rison administrators 'are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). That said, "a prison custodian is not the guarantor of a prisoner's safety." *Freedman v. City of Allentown, Pa.*, 853 F.2d 1111, 1115 (3d Cir. 1988). On October 23, 2013, Officer Collins overheard a verbal altercation between Carlos and another inmate, in which the other inmate told her to "go kill yourself." At her deposition,

---

found no constitutional violation, the Court need not reach the question of qualified immunity.

Collins testified that she talked with Carlos afterward and Carlos calmed down. (Doc. 85-13, at 17–18). When they were done conversing, Carlos no longer appeared to be upset. (*Id.* at 18). Because she was calm, Collins did think it necessary for Carlos to speak with someone from the mental health staff. (*Id.*; *see also id.* at 20–21). Viewing the record in the light most favorable to the non-moving plaintiff, it is clear that no reasonable jury could find that Collins knew of and recklessly disregarded a strong likelihood that Carlos posed a substantial risk of suicide at the time of their last interaction on the evening of October 23, 2013.[16]

### g. *York County*

The plaintiff claims that York County should be held liable for its failure to follow its own written policy requiring a mortality review committee evaluation of all suicide attempts. The plaintiff appears to suggest that the County's failure to conduct a mortality review after Carlos's unsuccessful suicide attempt in August 2013 contributed to her later, completed suicide in October 2013.

---

[16] The defendants have also moved for summary judgment on the ground that Officer Collins is entitled to qualified immunity. Having found no constitutional violation, the Court need not reach the question of qualified immunity.

"On its face, § 1983 makes liable 'every person' who deprives another of civil rights under color of state law." *Burns v. Reid*, 500 U.S. 478, 497 (1991) (Scalia, J., concurring in part and dissenting in part). In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court of the United States established that municipalities and other local governmental units are included among those "persons" subject to liability under § 1983. *Id.* at 690. York County is such a municipality subject to liability as a "person" under § 1983. *See id.* at 694; *Mulholland v. Gov't County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013).[17]

A municipality can be liable under § 1983 only if the conduct alleged to be unconstitutional either "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by

---

[17] In the alternative, the defendants have moved for summary judgment on the ground that York County is an improper party defendant. The County argues that the proper defendant in this case is the York County Prison Board, an independent board authorized to make policy decisions regarding the prison. The weight of authority, however, holds that the county may be held liable under *Monell* for policies implemented by the county prison board. *See Barry v. Luzerne Cty.*, 447 F. Supp. 2d 438, 451 (M.D. Pa. 2006) ("The County cannot immunize itself from constitutional harm that its policies cause merely be delegating the authority to create the policy to an independent board."); *see also Ponzini v. Monroe Cty.*, No. 3:11-CV-00413, 2015 WL 5123720, at *10–*11 (M.D. Pa. Aug. 31, 2015); *Horne v. Does*, No. 1:13-cv-01214, at *16 (M.D. Pa. July 23, 2013).

that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690–91. "A plaintiff must identify the challenged policy, attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). "Even in the absence of formal policymaking activity, an 'official policy' may be inferred from informal acts or omissions of supervisory municipal officials . . . ." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 671 (3d Cir. 1988) (citations and internal quotation marks omitted). For example, in *Colburn*, the Third Circuit found that "a custom of laxity regarding the supervision and monitoring of their jail cells and in searching individuals taken into police custody," which led to a detainee's suicide using a hidden firearm, constituted an "official policy" under *Monell* and § 1983. *Id.* at 671. In particular, the *Colburn* court noted that the plaintiff was the third inmate to commit suicide in the jail within a three-year span, providing the municipality and its governing officials with actual or constructive knowledge of the alleged custom of inadequate monitoring of jail cells. *See id.* at 672; *see also Oklahoma City v. Tuttle*, 471

U.S. 808, 823–24 (1985) ("[A] single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brown v. City of Pittsburgh*, 586 F.3d 263, 292–93 (3d Cir. 2009) (recognizing that where no explicit policy is identified, "'more proof than the single incident will be necessary' to establish a causal connection between the incident and some municipal policy").

Here, the County has adopted a prison suicide-prevention policy, but the plaintiff contends that, in practice, it has not been followed. In particular, the plaintiff claims that the County has failed to ensure that prison officials comply with the policy's requirement that a mortality review be conducted after all suicide *attempts*. The plaintiff contends that the prison's failure to conduct a mortality review following Carlos's August 2013 suicide attempt led to her completed suicide in October 2013.

First, we note that "a prison custodian is not the guarantor of a prisoner's safety. We cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to

their care." *Freedman*, 853 F.2d at 1115 (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). "The key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances." *Pierce*, 612 F.2d at 763 (footnote omitted). Here, the written policy at issue provided for a mortality review committee to "examine every completed suicide, as well as serious suicide attempt." (Doc. 85-2, at 3).

The plaintiff claims that York County Prison's failure to comply with its own policy's requirement that it conduct a mortality review after any serious suicide attempt contributed to the circumstances that led to Carlos's death by suicide. The plaintiff argues, without any affirmative evidence in support, that a mortality review would have caused staff to consider the factors that led to Carlos's unsuccessful suicide attempt, which in turn would have led to a formal assessment of her future suicide risk, modifications to her treatment plan, and consideration of alternative placement. It is unclear to us, however, how this policy—or the custom of disregarding this policy—*caused* or made it possible for Carlos to commit

suicide just over two months later. *See Losch*, 736 F.2d at 910.

Moreover, to the extent the plaintiff intends by this to argue that implementation of York County Prison's suicide-prevention policy falls short of the ideal, policies are not deficient simply because they are not the best. *See Serafin v. City of Johnstown*, 53 Fed. App'x 211, 215 (3d Cir. 2002) ("The fact that the City's policy was not the most effective policy possible, however, does not, without more, create an unreasonable risk to detainees' safety or demonstrate the City's indifference to such a risk, and there is no 'more' here."). Indeed—as the Supreme Court of the United States itself has recently observed—although Third Circuit precedent provides that prison officials who know of a particular vulnerability to suicide are obligated not to act with reckless indifference to that vulnerability, that circuit precedent *does not* require "formal physical or mental health screening," nor does it "identify any minimum [suicide] screening procedures or prevention protocols that facilities must use." *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (per curiam) (discussing *Colburn v. Upper Darby Twp.*, 838 F.2d 663 (1988), and *Colburn v. Upper Darby Twp.*, 946 F.2d 1017 (1991)).

Finally, we note that the record lacks any evidence of prior incidents

that might permit a reasonable jury to find that the County and its policymakers had actual or constructive knowledge of the purported policy deficiencies upon which the plaintiff's § 1983 *Monell* claim is premised.[18] *See Tuttle*, 471 U.S. at 823–24; *Brown*, 586 F.3d at 292–93; *Colburn*, 838 F.2d at 672.

Accordingly, we recommend that summary judgment be granted to York County with respect to Count II.

### h. PrimeCare

PrimeCare is a private corporation that has contracted with York County Prison Board to provide medical and mental health care to inmates at the York County Prison. PrimeCare is also the employer of defendants Rollings-Mazza and Leiphart, and of the various non-party mental health staff who treated and evaluated Carlos in the thirty months of her detention at York County Prison.

"[A]lthough a private corporation offering medical services cannot be held liable for an alleged § 1983 violation under a theory of *respondeat*

---

[18] The record includes a review of suicide prevention practices within the York County Prison by the Office for Civil Rights and Civil Liberties of the U.S. Department of Homeland Security (Doc. 85-11) which describes deficiencies involving other inmates at York County Prison, but they all post-date Carlos's suicide.

*superior*, it can be held liable for a policy or custom that demonstrates deliberate indifference." *Francis v. Carroll*, 659 F. Supp. 2d 619, 625–26 (D. Del. 2009) (internal quotation marks omitted). *See generally Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978) (subjecting municipalities to liability for policies or customs that cause constitutional deprivations); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (applying *Monell* to a private company providing medical services to inmates). Thus, to prevail on its claim against PrimeCare, the plaintiff must establish that there was a relevant PrimeCare policy or custom, and that this policy or custom caused the constitutional violation for which she seeks relief. *See Natale*, 318 F.3d at 583–84.

Here, PrimeCare has adopted a suicide-prevention policy applicable to the York County Prison. The plaintiff contends not that the written policy was deficient, but that, in practice, it has not been followed. In particular, the plaintiff claims that PrimeCare failed to ensure that its mental health clinicians at York County Prison comply with the policy's requirement that a comprehensive clinical review be conducted "[i]n 100% of situations involving suicide attempts and completed suicides" and remedial action be taken. (*See* Doc. 85-4, at 2). The plaintiff contends that

PrimeCare's failure to conduct a comprehensive clinical review following Carlos's August 2013 suicide attempt led to her completed suicide in October 2013.

Although the expert opinion evidence adduced by the plaintiff suggests that compliance with the PrimeCare suicide-prevention policy was lacking, for the same reasons expressed above with respect to the identical argument concerning the County suicide-prevention policy, we find that the plaintiff has failed to demonstrate that this alleged custom of noncompliance with its suicide-prevention policy created an unreasonable risk to inmate safety, nor that PrimeCare was recklessly indifferent to such a risk in failing to conduct a comprehensive clinical review following Carlos's August 2013 suicide attempt. *See Taylor*, 135 S. Ct. at 2045; *Serafin*, 53 Fed. App'x at 215.

Accordingly, we recommend that summary judgment be granted to PrimeCare with respect to Count II.

### C. State-Law Claims

In Count III of the amended complaint, the plaintiff has asserted state-law medical negligence claims against Mental Health Coordinator Gallagher, Dr. Rollings-Mazza, Nurse Leiphart, and PrimeCare. But

where a district court has dismissed all claims over which it had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the Court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been dismissed and only state-law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. *Cohill*, 484 U.S. at 350. Finding nothing in the record to distinguish this case from the ordinary one, the balance of factors in this case "point[s] toward declining to exercise jurisdiction over the remaining state law claims." *See Cohill*, 484 U.S. at 350 n.7. Therefore, it is recommended that the plaintiff's state-law claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV.   RECOMMENDATION

For the foregoing reasons, it is recommended that:

1.   The defendants' motions for summary judgment (Doc. 65; Doc. 68; Doc. 74) be **GRANTED**;

2.     The Clerk be directed to **ENTER JUDGMENT** in favor of all defendants and against the plaintiff on the federal civil rights claims set forth in **Counts I and II** of the amended complaint (Doc. 36);

3.     The Clerk be directed to **ENTER JUDGMENT** in favor of defendant Snyder and against the plaintiff on the supplemental state-law claims set forth in **Count III** of the amended complaint (Doc. 36);

4.     The supplemental state-law claims against defendants Gallagher, Rollings-Mazza, Leiphart, and PrimeCare set forth in **Count III** of the amended complaint (Doc. 36) be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3); and

5.     The Clerk be directed to **CLOSE** this case.


Dated: September 1, 2017                    *s/ Joseph F. Saporito, Jr.*
                                            JOSEPH F. SAPORITO, JR.
                                            United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANGELA CARLOS, as ADMINISTRATRIX of the ESTATE OF TIOMBE KIMANA CARLOS, | |
| Plaintiff, | CIVIL ACTION NO. 1:15-cv-01994 |
| v. | (CALDWELL, J.) (SAPORITO, M.J.) |
| YORK COUNTY, et al., | |
| Defendants. | |

## NOTICE

NOTICE IS HEREBY GIVEN that the undersigned has entered the foregoing Report and Recommendation dated September 1, 2017. Any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those

portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Dated: September 1, 2017            *s/ Joseph F. Saporito, Jr.*
                                    JOSEPH F. SAPORITO, JR.
                                    United States Magistrate Judge