UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


ANGELA CARLOS, as                     :
ADMINISTRATRIX of the ESTATE OF  :
TIOMBE KIMANA CARLOS,             :
          Plaintiff                              :
                                                      :          CIVIL NO. 1:15-CV-1994
          v.                                        :
                                                      :
YORK COUNTY, *et al.*,                 :
          Defendants                         :


**M E M O R A N D U M**

*I.          Introduction*

        The plaintiff, Angela Carlos ("the plaintiff"), has brought a federal civil rights survival

and wrongful death action under 42 U.S.C. §1983, and also raises supplemental state-law

claims.   The action, proceeding via an amended complaint (Doc. 36), arises out of the

death of the plaintiff's daughter, Tiombe Kimana Carlos ("Carlos"), who committed suicide

in October 2013 at York County Prison ("YCP") where she was being held as an

immigration detainee.   Presently before the court is Magistrate Judge Joseph F. Saporito

Jr.'s report and recommendation (Doc. 94) addressing three motions (Docs. 65, 68, and

74) for summary judgment filed by various defendants.   The plaintiff has filed multiple

objections (Doc. 101) to the report and recommendation, and York County, one of the

defendants moving for summary judgment, has also filed an objection (Doc. 97) to the

report and recommendation.   For the reasons that follow, the court will sustain in part, and

overrule in part, the objections.

## II.     *Factual Background and Procedural History*

### A. <u>Defendants Named in the Instant Action</u>

The plaintiff's amended complaint names a multitude of institutional and individual defendants, each of whom is alleged to have played a role in failing to prevent Carlos's suicide at YCP. Considering the numerosity of named defendants, it may be helpful to list all of the defendants at the outset because many of them will be referenced in the factual recitation below. The defendants are as follows: (1) York County; (2) PrimeCare Medical, Inc. ("PrimeCare"); (3) Pamela Rollings-Mazza, M.D. ("Dr. Rollings-Mazza," "Rollings-Mazza," or "the Doctor"); (4) Patrick Gallagher, Licensed Professional Counselor ("LPC Gallagher" or "Gallagher"); (5) Aimee Leiphart, LPN ("Nurse Leiphart" or "Leiphart"); (6) Medical John Does 1-10; (7) Corrections Officer John Does 1-10; (8) Deputy Warden Clair Doll ("Deputy Warden Doll" or "Doll"); (9) Corrections Officer Erika Collins ("CO Collins" or "Collins"); (10) Corrections Counselor Janet Jackson ("Counselor Jackson" or "Jackson"; (11) Corrections Officer Grissell Santos-Heredia ("Santos-Heredia"); (12) Corrections Counselor McNicholas ("McNicholas"); (13) Corrections Counselor Crist ("Crist"); (14) Corrections Counselor Nadeau ("Nadeau"); (15) Corrections Counselor Trig ("Trig")[1]; (16) Captain Carl Neeper ("Captain Neeper" or "Neeper"); (17) Holly A. Snyder, RN ("Nurse Snyder" or "Snyder"); and (18) Robert Davis, M.D. ("Dr. Davis" or "Davis").[2]

---

[1] Although the plaintiff's amended complaint refers to this defendant as "Corrections Counselor Trig," it appears that his last name is in fact "Trigilio," based on an affidavit (Doc. 67-9) from Trigilio himself. Nonetheless, since he is referred to as "Trig" on the docket and in the plaintiff's amended complaint, we will refer to him as "Trig" throughout this memorandum.

[2] On July 8, 2016, the plaintiff voluntarily dismissed all of her claims against Dr. Davis, (Doc. 59), and on July 12, 2016, Davis was terminated as a defendant.

B.  <u>Events Leading to Carlos's Incarceration at York County Prison</u>

Carlos, who was born in Antigua and Barbuda in 1978, immigrated to the United States with her parents in 1983.  Carlos maintained lawful permanent resident status, but unlike her parents, she never became a naturalized citizen. Since her teenage years, Carlos suffered from mental health problems, including paranoia and hallucinations, for which she was prescribed medication and hospitalized on numerous occasions since 1994.

Around 2003, Carlos was involved in an altercation with police officers in a Connecticut bar for which she was arrested, convicted of an aggravated felony, and sentenced to a term of incarceration in a Connecticut state prison.  Because Carlos was a non-citizen, her conviction of an aggravated felony rendered her removable from the United States.  In 2008, Immigrations and Customs Enforcement ("ICE") took custody of Carlos, however she remained incarcerated in the Connecticut prison while removal proceedings were initiated.  Subsequently, Carlos assaulted a corrections officer in the Connecticut prison, and her custody was turned back over to the Connecticut State authorities.  In 2011, after an additional period of incarceration, Carlos was again released into ICE custody, and in April of 2011, she was transported to York County Prison ("YCP" or "the Prison") in York, Pennsylvania, for detention pending completion of removal proceedings.

C. YCP – An Overview of the Facility's Mental Health Protocol and Policy at the Time of Carlos's Incarceration

   1. *YCP's Official Suicide-Prevention Policy Circa 2011-2013*

According to the YCP suicide prevention policy, (see Doc. 85-2), effective at the time of Carlos's incarceration,[3] each county prison employee and contracted employee was to receive two hours of initial suicide prevention training followed by one hour of annual training to be provided by the Prison's training department in cooperation with the Prison's mental health department. (Id. at 2). All inmates, immediately upon admission to YCP, were to be screened for suicidal tendencies. (Id.) If an inmate was deemed suicidal upon admission or at any time thereafter during incarceration, any staff member could order that the inmate be placed on a designated level of observation[4] in suicide resistant housing quarters.[5] (Id.) Furthermore, pursuant to established YCP practice, inmates on psychotropic medications who became involved in an altercation were automatically to be placed on a suicide watch regardless of whether they otherwise exhibited suicidal tendencies. (Docs. 85-14 at 14; and 85-15 at 8, 12). Any inmate placed on a suicide observation level was to remain on that level of observation until seen by a mental health counselor. (Doc. 85-2 at 2). The mental health counselor would then assess the inmate and determine whether the inmate should remain on that level of observation, be stepped down to a lower level of observation, or be removed from observation altogether. (Doc. 85-15 at 7).

---

[3] YCP's official suicide prevention has been updated at least once since Carlos's death in October of 2013. (See Doc. 85-14 at 17). As for the policy that was in effect throughout the duration of Carlos's incarceration, it is unclear exactly when that policy took effect, although the Prison's Deputy Warden Clair Doll recalled that it had been in effect since at least 2008 when he began his employment with the Prison. (Id. at 14).

4

The policy also provided that in the event of a suicide or suicide attempt, all staff involved in the discovery and intervention must submit reports relaying their full knowledge of the inmate and incident.  (Id. at 3).  Furthermore, the policy dictated that every completed suicide, as well as every "serious suicide attempt," must be examined by a "mortality review"[6] committee.  (Id.)

---

[4] Although defendants in their depositions often referred to the observation levels using the general term "suicide watch," the suicide prevention policy actually set forth two specific levels of observation for suicidal or mentally unstable inmates.  The first level of observation, referred to as *constant observation*, was reserved for inmates who were "actively suicidal and/or . . . engaged in self-destructive behavior and [for whom] chemical and physical restraints with visual checks alone are not sufficient."  (Doc. 85-2 at 2).  Inmates on the constant observation level were continuously observed by an officer.  (Id.)  The second level of observation, referred to as *close observation*, was "reserved for inmates who have expressed suicidal ideation or display symptoms of mental illness.  Within the "close observation" level, there were two types of precautions: 1) *suicide precaution*, reserved for inmates who expressed suicidal ideation; and (2) *psychiatric observation*, reserved for inmates "who appear[ed] mentally ill and need[ed] observation to determine appropriate level of treatment and/or appropriate housing."  (Id. at 2-3).  Inmates on either suicide precaution or psychiatric observation were observed at intervals of no more than fifteen minutes.  (Id. at 2; Doc. 85-14 at 18).  Only the mental health department could place an inmate on psychiatric observation status.  (Doc. 85-2 at 3).  On the other hand, corrections counselors, supervisors, and medical employees were all permitted to place an inmate on suicide precaution.  (Id.)  Inmates on suicide precaution typically only had a suicide resistant paper gown and a mattress in their cell, unless the precaution was modified.  (Id.)  Only the mental health counselor was permitted to discontinue, change, or modify the level of suicide precaution.  (Id.)

[5] The policy provided that "[i]nmates believed to be suicidal and/or mentally unstable can be isolated from general population for their own protection."  (Id. at 2).  Such inmates were to be housed in "suicide resistant" cells that were offered in the following areas of the Prison: Segregation Units B, C, and E, and Cell 5 of the Female Behavioral Adjustment Unit.  (Id.)

[6] According to the policy, a mortality review should include the following:

   a. Review of the circumstances surrounding the incident.
   b. Review of Prison procedures relevant to the incident.
   c. Review of all relevant training received by involved staff.
   d. Pertinent medical and mental health services/reports involving victim.
   e. Recommendations, if any, for change in policy, training, physical plant, medical or mental health services, and operational procedures.

(Id. at 3).

## 2. YCP's Mental Health Department and Protocol

Individuals from YCP's mental health department remain as defendants in the instant action. Also named as a defendant is PrimeCare, the company with which YCP has contracted to provide mental-health services.

YCP's mental health department consists of six individuals who are responsible for providing mental health services at the Prison: one psychiatrist, three mental health counselors, and two mental health nurses. (Doc. 85-19 at 8). YCP's psychiatrist is defendant Dr. Rollings-Mazza,[7] an employee of PrimeCare. As YCP's psychiatrist, Dr. Rollings-Mazza's primary responsibility is "medication management." (Id. at 7, 9). She performs initial evaluations on individuals who are already on mental health medications when they arrive at the Prison, and after the initial evaluation, she then follows up with patients with respect to medication management by conducting periodic medication checks to ensure that an inmate is stable on his or her current medication. (Id. at 8-9). For inmates that appear to be mentally stable on their medication, the Doctor will conduct medication checks every four to eight weeks, and for inmates that appear to be unstable, the Doctor will conduct checks on a weekly basis. (Id. at 9). The Doctor may conduct a medication check sooner than planned if an inmate complains that his or her medication is not working. (Id.) At each medication check, the Doctor conducts a suicide-risk assessment by asking inmates a series of questions to determine whether they would likely hurt themselves. (Id. at 34). While Dr. Rollings-Mazza's primary responsibility is medication management, she may also refer an inmate to a mental health counselor if she believes that psychotherapy may be beneficial. (Id. at 10).

---

[7] Dr. Rollings-Mazza is normally the only psychiatrist at YCP, unless she is on vacation, in which case another psychiatrist will fill in for her. (Doc. 85-19 at 8, 25).

The prison's mental health department also includes three mental health counselors. One of those three counselors is defendant LPC Gallagher, who also serves as the Prison's Mental Health Coordinator. (Doc. 85-15 at 5). Gallagher's first task each workday is to visit inmates who recently have been placed on a suicide observation level and assess whether they should remain on a suicide observation level, be stepped down to psychiatric observation, or be removed from observation altogether. (Id. at 6-7). During the timeframe of Carlos's detention, any segregated inmate on constant observation status or suicide precaution status was seen by Gallagher on a daily basis. (Id. at 28). Once Gallagher stepped a segregated inmate down to psychiatric observation status, he would check that individual on a weekly basis.[8] (Id. at 9). In addition to regularly seeing segregated inmates on observation statuses, Gallagher also may see inmates for counseling on a request or referral basis. (Id. at 19). Gallagher also was part of the Program Review Committee ("PRC") Team, a group of individuals[9] who regularly met with inmates in segregation to evaluate their status and determine whether their placement is still appropriate based on multiple factors. (See Doc. 85-14 at 22).

Finally, the Prison's mental health department employs two mental health nurses. At the time of Carlos detention, they were defendants Nurse Leiphart and Nurse Snyder.

---

[8] PrimeCare's policy in effect at the time of Carlos's detention called for daily checks of all segregated inmates. The PrimeCare policy, however, explicitly provided that it was to be superseded by policies or practices already in place at any given prison. (Id. at 9). Gallagher explained that since he started working at YCP in the 1980s, the Prison had an established and accepted practice that checks on segregated inmates on psychiatric observation status were conducted on a weekly basis. (Id. at 10). Thus, he followed the Prison's established practice and conducted weekly evaluations of segregated inmates on psychiatric observation status, rather than doing so on a daily basis. (Id. at 9-10).

[9] The PRC Team typically consisted of defendants Gallagher and Doll, as well as a classification supervisor, a shift captain, an assistant director of nursing, and a deportation officer from ICE. (Doc. 85-14 at 22).

During this time, some of the primary responsibilities of the mental health nurses were to conduct weekly checks of inmates in segregated housing, check on mental health inmates who put in sick-call slips, assist Dr. Rollings-Mazza on the days that she was at the Prison, and attend ICE meetings to discuss immigration detainees experiencing specific mental health problems. (Doc. 85-17 at 5-6, 8). Mental health nurses also have a general familiarity with suicide risk factors, and they have the authority to place an inmate on constant watch or suicide precaution. (See id. at 7).

### 3. YCP Administrators and Corrections Employees

At all times relevant to the instant action, the Prison's Deputy Warden of Treatment was defendant Doll. Doll's responsibilities include overseeing the Prison's corrections staff, education department, religious services, work release program, and inmate grievance system. (Doc. 85-14 at 11). Doll's daily interaction with inmates is fairly limited, but he may have contact with inmates when taking part in PRC reviews or when dealing with an inmate's appeal through the grievance system. (Id. at 12). Of the contact Doll has with inmates, little pertains to mental health treatment issues unless individuals from the mental health department call him for assistance in formulating some sort of plan or to ensure that they are comporting with a policy. (Id.) Doll has the authority to place inmates in certain segregation units, and if a particular inmate has a mental health concern, he will consult with a mental health counselor before placing that inmate in segregation. (Id. at 13, 25). Doll has frequent interactions with mental health staff, including psychiatrists and mental health counselors. (Id. at 12-13). Doll and LPC Gallagher have occasionally discussed what type of things could be provided to assist segregated inmates in occupying their time. (Id. at 12).

Corrections officers such as defendants Collins and Santos-Heredia are responsible for conducting rounds by performing alternating tours of their assigned housing block and periodically checking on inmates. (Doc. 85-13 at 8). As for segregated inmates on psychiatric observation, suicide precaution, or medical observation, corrections officers are required to check on those inmates every fifteen minutes and sign a sheet explaining what the inmate was doing at the time of the check. (Id. at 10-11). Inmates who were not on any observation status (i.e., they did not have a "sign" on their cell) would only be checked every thirty minutes. (Id. at 10). Additionally, specific corrections officers were assigned to continuously observe each individual on constant watch. (Id. at 9-10). When corrections officers are first hired by the Prison, they are taught risk factors for inmate suicide, and are trained as to what signs they should look for. (Id. at 11).

YCP's corrections counselors are responsible for conducting intake interviews of inmates upon their arrival to the Prison and for performing monthly "contact reviews" with inmates to whom they are assigned. (Doc. 85-16 at 4). Carlos's assigned corrections counselor was defendant Counselor Jackson. According to Counselor Jackson, her responsibilities at monthly contact reviews with regard to Carlos were to check in on her and make sure she was provided with clothing, writing utensils, communication with family, and contact with immigration services. (Id. at 9). If an inmate needs assistance between monthly contact reviews, the inmate can send a request slip to the corrections counselor, which the counselor would answer by writing on the request slip and returning it to the inmate. (Id.) A corrections counselor may authorize that an inmate be moved from one cell to another, unless the inmate is on an observation status, in which case the

corrections counselor would have to consult with mental health staff prior to authorizing a move.  (Id. at 19).

D. Carlos's Detention at YCP

Given the duration of Carlos's detention at YCP and the chain of events underlying the instant action, it is helpful to separate the operative facts into three specific time periods: (1) April 14, 2011, to August 13, 2013; (2) August 13, 2013, to October 23, 2013; and (3) October 23, 2013, and thereafter.

1. *April 14, 2011 to August 13, 2013*

a. Carlos's Arrival at YCP

Carlos arrived at YCP on April 14, 2011, and she was seen by LPC Gallagher upon arrival.  (Doc. 85-15 at 12).  Because of Carlos's agitation, Gallagher placed her on psychiatric observation status.  (Id. at 12-13).  Due to her aggressive behavior and behavior during transport to the Prison, she was placed in segregated housing conditions in the Behavioral Adjustment Unit (BAU) pod of the Prison's female maximum security block.[10]  (Doc. 85-6 at 2-3).  On April 15, 2011, nonparty Corrections Counselor Schneider conducted an intake of Carlos.  According to Counselor Schneider, Carlos did not understand why she was at the Prison, and she did not remember getting into trouble.  (Doc. 85-6 at 3).  Carlos was classified under Security Level III[11] due to her confusion and her mental health status.  (Id.)

---

[10] Carlos was housed in YCP's female maximum security block for most of her detention at the Prison.  At the time of Carlos's incarceration at the Prison, the female maximum security block was divided into the following five pods of cells: A pod, B pod, C pod, D pod, and BAU pod.  (Doc. 85-13 at 8).

[11] YCP's custody security levels are determined by an "objective classification system" developed by the National Institute of Corrections and utilized by the Immigration Service.  (Doc. 85-14 at 12). YCP has five security levels ranging from "zero" to "four," with "four" being the highest level of security and "zero" being the lowest.  (Id.)

On, April 20, 2011, Carlos was removed from psychiatric observation status per LPC Gallagher's recommendation, and she was transferred to a cell in general population. (Id.) On April 25, 2011, Carlos was seen by psychiatrist Dr. Rollings-Mazza for the first time. (See Doc. 85-11 at 5). It was conveyed to the Doctor that Carlos had previously been diagnosed with schizophrenia and that she had been prescribed Haldol Decanoate ("Haldol") injections which she received every two weeks. (Doc. 85-19 at 14, 17). The Doctor diagnosed Carlos with "likely [ ] schizoaffective disorder" and reported that Carlos was stable on her meds, exhibited no overt psychosis, and denied suicidal ideation. (Doc. 85-11 at 5).

### b. Carlos's Disruptive Behavior

Throughout the first twenty-eight months of her detention at YCP, Carlos repeatedly engaged in disruptive behavior.[12] As a result of this behavior, Carlos spent much of her time on either BAU status or Intensive Custody Unit (ICU) status.[13] During the period of April 14, 2011, to early August 2013, she was housed in disciplinary segregation on eight separate occasions, and she was on ICU status for one extended period of time—from

---

[12] More specific information pertaining to Carlos's disruptive behavior can be found in Corrections Counselor Notes, (Doc. 85-6), and in Judge Saporito's report, (Doc. 94 at 6-20).

[13] BAU placement and ICU placement differed in various ways. As explained in Judge Saporito's report:

> A BAU placement was typically based on a specific disciplinary violation, and inmates in the BAU were permitted only one hour outside of their cells each day, five days per week, and they were limited in the type and amount of personal property they could possess. ICU status was based on an administrative determination that an inmate had a "history of violence" and was a "threat to the general population"—ICU inmates were usually placed in A or D pods, they were not limited in the personal property they could possess, but they were only permitted two hours outside of their cells each day.

(Doc. 94 at 4 n.4).

January 23, 2013 to June 7, 2013. (Docs. 85-6 at 6; 85-9 at 13). Moreover, in accordance with YCP's policy of automatically placing mental health inmates on suicide precaution after involvement in an altercation, Carlos was placed on suicide precaution on four specific dates during that time period: June 8, 2011; November 11, 2012; December 13, 2012; and July 11, 2013. (Doc. 85-9 at 11). Each of the four times that she was placed on suicide precaution following an altercation, she was stepped down to psychiatric observation status the very next day by LPC Gallagher. (See Doc. 85-6 at 3, 6-7).

### c. Defendants' Interactions with Carlos

Many of the individual defendants named in the instant action observed Carlos on a regular basis throughout the first twenty-eight months of her detention. Those observers reported varying accounts as to Carlos's mood and behavioral tendencies.

Dr. Rollings-Mazza typically conducted a medication check on Carlos every four to eight weeks. (Doc. 85-19 at 9). Dr. Rollings-Mazza recalled that Carlos was "remarkably stable" on her Haldol shots, and Carlos never exhibited any psychotic symptoms when the Doctor observed her. (Id. at 14). Additionally, the Doctor recalled that on the majority of occasions where she observed Carlos, Carlos was engaged in terms of conversation. (Id.) Dr. Rollings-Mazza also spoke with Carlos frequently on a social, non-evaluative basis because Carlos was often housed in a segregation area that was directly across from Dr. Rollings-Mazza's office. (Id. at 4). The Doctor recalled that Carlos expressed frustration about three things: (1) lack of contact with her family; (2) confusion about her deportation status; and (3) being housed in a segregated environment. (Id. at 4, 11).

Although Dr. Rollings-Mazza was aware that Carlos engaged in disruptive behavior from time to time, she did not believe that the disruptions were caused by her

schizophrenia, and she elected not to make any changes to her medication regimen. (Id. at 32). The Doctor acknowledged that there were some occasions where Carlos refused her Haldol shot, but according to the Doctor's recollection, Carlos usually received the shot within a day thereafter. (Id. at 4, 14). The Doctor did not recall any exacerbation of Carlos's psychiatric symptoms on the occasions that her shot was delayed, and the Doctor testified that a delay of a day or two should not cause any problems. (Id.)[14]

Each time Carlos was housed in segregation due to her behavior, defendant LPC Gallagher saw her at her cell on a weekly basis to review her mental health status until he believed she could be removed from psychiatric observation status. (Doc. 85-15 at 13). Gallagher would also see Carlos intermittently on other occasions when she requested him or simply needed support; on those occasions, when he could, Gallagher would pull Carlos out for counseling sessions (which lasted between twenty and thirty minutes) in the female mental health office. (Id.) When talking with Gallagher, Carlos frequently expressed concerns about deportation, and she often complained about her placement in segregated housing. (Id. at 11-12). On one occasion, Carlos expressed distress over the

---

[14] In addition to her multiple visits with Dr. Rollings-Mazza, Carlos was also evaluated by nonparty clinical psychologist, Ronald Noble, Ph.D., on May 25, 2011. Dr. Noble's prognosis for Carlos appeared to be grimmer than that of Rollings-Mazza. Judge Saporito summarized Dr. Noble's evaluation, in relevant part, as follows:

> [Dr. Noble] noted that Carlos was "likely to suffer from her psychotic disorder permanently, and to need psychotropic medications and supportive care for the rest of her life." His prognosis for Carlos was for a "[r]isk of future hospitalization and danger to self and others." Dr. Noble recommended that Carlos be placed "under the care of a psychiatrist who can prescribe appropriate psychotropic medications and monitor her symptoms," and he suggested that, due to her need for a "supportive and structured living environment," she would be best placed in "[a] group home setting for individuals suffering from chronic mental illness."

(Doc. 94 at 5-6) (internal citations omitted); (see also Doc. 85-5 at 3, 12-13).

fact that her parents were having relationship problems.  (Id. at 12).  Gallagher reported that Carlos's mood fluctuated; Gallagher recalled that sometimes, Carlos could be "very reasonable" and at other times, she would be "difficult to handle."  (Id. at 14).  Gallagher expressed that Carlos was not the "easiest compliant inmate in the [Prison]," but she was generally "workable."  (Id.)  According to Gallagher, there was an attempt at one point to have Carlos participate in an anger-management class, but she was unable to participate because of her illiteracy.  (Id. at 13).

Gallagher testified that in his many personal assessments of Carlos between April 2011 and August 2013, he observed nothing that led him to believe Carlos may be at risk for harming herself, and none of his interactions with her led him to believe that he should talk to Dr. Rollings-Mazza about a possible medication change.  (Id. at 11, 13).  Gallagher recalled that there were occasions where Carlos refused her Haldol injection and her treatment was briefly delayed, but like Dr. Rollings-Mazza, Gallagher did not observe any changes in Carlos's behavior when the treatment was delayed.  (Id. at 13-14).

Any time that Carlos was in segregation, she would also be seen by a mental health nurse on a weekly basis for a mental health check.  The nurse that saw Carlos most frequently was defendant Nurse Leiphart, but Carlos was also seen occasionally by defendant Nurse Snyder.[15]  (See Doc. 85-21 at 8).  According to Nurse Leiphart, Carlos frequently was involved in altercations with other inmates and staff and would easily become agitated at times.  (Doc. 85-17 at 8).  When speaking with Nurse Leiphart, Carlos would often complain about being locked up in segregation, but Leiphart had no authority

---

[15] Nurse Snyder only saw Carlos sporadically for weekly segregation checks, and she did not have much contact with her other than that.  (Doc. 85-21 at 8).  Snyder did not remember much about Carlos's demeanor and behavior.  (Id.)  Snyder recalled hearing from others that Carlos was upset about her housing status and that she was "ready to be out of prison," but she never heard these complaints from Carlos directly.  (Id. at 8-9).

to move Carlos to different housing quarters.  (Id. at 12).  Although Carlos was difficult for many Prison staff members to deal with, Nurse Leiphart believed that she and Carlos had established a rapport, and Carlos was more cooperative with her than with other staff.  (Id. at 6, 9).  On occasions where Carlos refused her Haldol shot from other staff, Nurse Leiphart could usually convince Carlos to receive the shot shortly thereafter.  (Id. at 9-10).

Defendant Deputy Warden Doll did not personally speak with Carlos until he became part of the PRC around June or July of 2013 and began observing Carlos as a part of that Committee.  (Doc. 85-14 at 23).  Although Doll did not actually speak with Carlos until 2013, he had been previously aware that she was involved in altercations and was "difficult to manage."  (Id.)  Doll also recalled that he had placed Carlos on ICU status on at least one occasion and that he had consulted with Gallagher before doing so.  (Id. at 13).  Doll was also aware that Carlos refused her Haldol shot on various occasions, but it was his understanding that she was stable on her medication.  (Id. at 25).  At various times prior to August 2013, Doll spoke with Joe Dunn, Assistant Field Director for ICE, to recommend that Carlos be moved out of YCP and into a different facility because Doll knew that Carlos was concerned about her immigration status, and he believed that she may have benefited from a "change in scenery."  (Id.)  Doll also discussed this matter with Gallagher who similarly "believe[d] [Carlos] would have been better off in some other type of environment" because she was "getting tired of being where she was."  (Doc. 85-15 at 15).  ICE did not accept Doll's recommendations, however, and Carlos remained detained at YCP.  (Doc. 85-14 at 25).

Defendant Jackson was Carlos's assigned corrections counselor at YCP.  (Doc. 85-16 at 4).  As Carlos's assigned corrections counselor, one of Counselor Jackson's primary

responsibilities was to conduct a monthly contact review at which she would check to make sure Carlos had clothing, writing utensils, communication with family, and contact with immigration services. (Id. at 9). Like many other defendants, Jackson recalled that Carlos expressed concern about her immigration case, and that she wanted to stay in the United States because she did not want to be separated from her family. (Id. at 14). Jackson recalled that she usually did not observe Carlos more than once a month, and, therefore, she did not observe Carlos's behavior on a daily basis. (Id.)

The record reflects that many interactions between Jackson and Carlos were unamiable, and contact reviews were often unproductive due to Carlos's behavior. After one contact review, Jackson reported that Carlos refused to listen, was "very frustrating to speak with," and would not let Jackson "get a word in." (Id. at 12). At other contact reviews, Jackson reported that Carlos would "wast[e] time," repeatedly ask questions that had already been answered, argue, and refuse to talk to Jackson in a respectful manner. (Id. at 14-15). Jackson also recalled that Carlos said some "very colorful things" at the contact reviews and that she once accused Jackson of "not lik[ing] black people." (Id. at 7). On another occasion, Jackson reported that Carlos "[was] always needing something or complaining about something." (Id. at 17). Jackson also recalled that Carlos would sometimes engage in interruptive and "attention-grabbing" behavior, but she stated that such behavior is common among inmates. (Id. at 7).

Defendant CO Collins, who began working at YCP in October 2011, often worked in the prison block on which Carlos was housed, and she had frequent contact with Carlos. (Doc. 85-13 at 3-4). Collins was not aware of Carlos's specific mental health diagnosis, but she could tell that something was "a little off" with her. (Id. at 5). According to Collins,

Carlos acted mentally immature in some ways and would sometimes talk in a child-like manner in an attempt to "get what she wanted." (Id. at 4). Collins did not personally have any significant problems with Carlos, as Carlos was very comfortable with her and respectful to her. (Id. at 4, 12). Collins recalled, however, that Carlos was verbally assaultive with and problematic for other corrections officers and inmates. (Id. at 12-13). Collins testified that Carlos would get agitated very easily and that she could "fly off the handle" when she became agitated. (Id. at 12). Collins remembered that the factors which agitated Carlos most were other inmates and frustration surrounding her lengthy stay at the Prison. (Id. at 14). Collins did not recall talking to Carlos about the status of her immigration case, but Carlos had informed her that she was from Antigua. (Id. at 13). When Carlos became agitated, corrections officers, including Collins, would try to talk to her, calm her down, and divert her mind away from whatever was agitating her. (Id. at 14). This would be effective for "certain officers," including Collins. (Id.)

On August 10, 2013, Carlos was removed from BAU status, after having been placed on that status on July 11, 2013. (Doc. 85-6 at 7). On August 13, 2013, however, three days after she was removed from BAU status, Doll placed her on ICU status due to her "continued assaultive behavior." (Id.) Later that same day, Carlos was found in her cell attempting to hang herself from a window by tying a sheet around her neck. (Doc. 76-12 at 2). Security staff members cut her down to the floor to assess her, and according to a medical chart note from nonparty medical nurse Angela Schmuck, Carlos began crying and saying, "It's not fair, I don't wanna live."[16] (Id.) Carlos was taken to the Prison's medical department, and then ultimately to an outside hospital for further treatment. (Id.)

Dr. Rollings-Mazza and Nurse Leiphart were both near Carlos's cell when the August 13, 2013 suicide attempt occurred. Carlos was being housed in the female maximum security area's "A" pod, which is located directly across from Nurse Leiphart's office. (Doc. 85-17 at 10). Nurse Leiphart ran over to Carlos's cell after she heard officers yelling that there was a medical emergency. (Id.) By the time Nurse Leiphart arrived, Carlos had been cut down and was on the ground and "pretty alert." (Id.) Although Dr. Rollings-Mazza was not present on the A pod at the time of the incident, she was working close enough that she could hear a "commotion" in the area of that pod.[17] (Doc. 85-19 at 20). The Doctor recalled Leiphart emerging from the A pod and informing her that Carlos had

---

[16] A review of the record evidence suggests that prior to Carlos's October 2013 suicide, most of the defendants were not aware that Carlos made the statement that was heard by Nurse Schmuck. Gallagher acknowledged reading this statement in Nurse Schmuck's report, but he could not recall whether he had learned of the statement at the time Carlos was still alive. (See Doc. 85-15 at 16).

[17] Additionally, shortly before the suicide attempt, the Doctor had been in A pod visiting with another patient when Carlos called out to the Doctor to see if she had any more information about her deportation status. (Doc. 85-19 at 19). The Doctor told Carlos that she was unsure and told her that she should ask the PRC individuals when they came around for their next weekly meeting. (Id. at 19-20).

attempted suicide.  (Id.)  Leiphart also told the Doctor that Carlos had been very upset, and was yelling and screaming that she wanted to talk to somebody about her deportation status.  (Id.)  According to Nurse Leiphart, Dr. Rollings-Mazza decided to place Carlos on constant observation status and put her in "four-point" restraints upon her return from the hospital.  (Doc. 85-17 at 12).

Gallagher was at the Prison when Carlos attempted suicide, but he was not located in the area in which the attempt occurred.  (Doc. 85-15 at 15).  Doll, Collins, and Santos-Heredia did not recall being at the Prison at the time of the suicide attempt, but they learned of it shortly afterwards.  (Docs. 85-14 at 26; 85-13 at 13; and 85-20 at 10).  Jackson testified that she "vaguely" remembered the suicide attempt, but she did not discuss the attempt with Carlos at subsequent contact reviews because she felt such discussions would be more appropriate for mental health staff.  (Doc. 85-16 at 8-9, 11).  Snyder, McNicholas, Crist, Nadeau, and Trig all assert that they were unaware of Carlos's suicide attempt.  (Docs. 85-21 at 7-8; 76-23 at 3; 67-7 at 3; 67-8 at 3; and 67-9 at 2).

On August 14, 2013, one day after her suicide attempt, Carlos returned from the hospital to YCP, where she was placed on ICU status and on constant observation.  On that day, Carlos was seen by both Dr. Rollings-Mazza and Gallagher.  Dr. Rollings-Mazza observed that Carlos was uncooperative, refused an evaluation, and refused to take her medication.  (Doc. 85-19 at 25; Doc. 76-13 at 48).  The Doctor directed that Carlos's current medication regimen continue and that she be seen again by a psychiatrist in one week.  (Doc. 76-13 at 48).  Carlos also refused an interview with Gallagher, who assessed her to be a suicide risk and kept her on constant observation.  (Id.)  On August 15, 2013,

Carlos was again uncooperative with Gallagher, and he kept her on constant observation. (Id. at 47-48).

When Gallagher saw Carlos on August 16, 2013, Carlos exhibited a "normal" mood, but her insight and judgment were limited, and she was "unable to commit to safety." (Id. at 47). As a result, Gallagher ordered that she remain on constant observation. (Id.)

On August 17, 2013, Carlos was seen by nonparty Shannon M. Taylor, LPC. Taylor noted that Carlos exhibited little cooperation and was unable to commit to safety, and, therefore, she was kept on constant observation. (Id.)

On August 18, 2013, Carlos was again kept on constant observation after being seen by another nonparty, Jeff Leer. (Doc. 76-14 at 4). According to Leer, Carlos stated that she was "OK," but she would not come to her cell door. (Id.)

On August 19, 2013, Carlos was seen by Gallagher, and for the first time since her suicide attempt, Gallagher stepped her down from constant observation to suicide precaution status. (Id. at 3). Gallagher noted that she was "appropriate and cooperative," and that she "contracted for safety"[18] and agreed to cooperate with treatment. (Id.)

On August 20, 2013, Carlos was seen by both Gallagher and former defendant Dr. Davis. When she saw Dr. Davis, Carlos was "animated" and "angry" about her deportation case, but she was goal-oriented and maintained good eye contact. (Id.) Dr. Davis ordered that Carlos maintain her current treatment plan, and that she be seen again by a psychiatrist in eight weeks. (Id.) When Carlos saw Gallagher on the same day, she was "appropriate and cooperative," she denied suicidal ideations, and her mood was normal.

---

[18] Gallagher testified that when he refers to "contracting for safety," this means that he and Carlos discussed how they were going to manage her behavior following the suicide attempt, that she agreed to cooperate and be communicative if she had any problems, and that she would let him know if she was having any difficulties. (Doc. 85-15 at 21).

(Id.)  Gallagher stepped Carlos down from suicide precaution to psychiatric observation, and she remained on ICU status.  (Id.)

After she was stepped down to psychiatric observation on August 20, 2013, Carlos remained on that observation level for more than a month, during which time Gallagher saw her at her cell on an approximately once-per-week basis.  (See id. at 1-3).  On most visits during this time period, Gallagher observed that Carlos's mood was normal, her thought process was intact, and she denied suicidal ideation.  (See id.)  When Gallagher saw Carlos on September 19, 2013, she was cooperative and denied suicidal thoughts, but she exhibited an anxious and depressed mood, expressing that she could no longer handle being on ICU status.  (Id. at 2).  Gallagher explained to her that he did not have the authority to take her off of ICU status, and he suggested some ways that she could mitigate the anger she felt.  (Doc. 85-15 at 21).

On September 30, 2013, Carlos saw Dr. Rollings-Mazza for a follow-up psychiatric evaluation.  Finding that Carlos was stable with no overt psychosis, the Doctor ordered that her medication regimen be continued and that she be seen by a psychiatrist again in six weeks.  (Doc. 76-14 at 1).  This was the last time that Dr. Rollings-Mazza saw Carlos for a clinical evaluation.  (Doc. 85-19 at 26).

On October 2, 2013, Gallagher saw Carlos at her cell.  Carlos's mood was normal, but she told Gallagher that she was tired of being on psychiatric observation because it made other people think that she was "crazy."  (Doc. 85-15 at 21).  Gallagher told Carlos that he would be willing to recommend her removal from psychiatric observation if she would continue to work with him to move forward on her mental health progress; Carlos agreed to do so.  (Id.)  After consulting with various PRC members, including Doll,

Gallagher decided to take Carlos off psychiatric observation;[19] Carlos, however, remained on ICU status. (Id.) Gallagher believed that taking Carlos off psychiatric observation would give him more room to work with her because she would perceive that he was being supportive of her. (Id.) Once Carlos was taken off psychiatric observation, Gallagher made no arrangements for further clinical evaluations, but he did make arrangements to see her for weekly meetings with the PRC Team. (Id.) Gallagher did not recall anything worrisome about Carlos in those PRC meetings. (Id. at 21-22). Doll, who also took part in the PRC meetings with Carlos, perceived that the meetings had been positive, and he believed that Carlos "was actively engaged in moving back to general population." (Doc. 85-14 at 30).

Nurse Leiphart also testified about her interactions with Carlos in the weeks following the August 2013 suicide attempt. Leiphart recalled that during that time, Carlos was more agitated than usual, and on various occasions, Carlos refused her Haldol shot when medical nurses attempted to give it to her. (Doc. 85-17 at 9, 14). Generally, when Carlos refused her Haldol shot initially, Nurse Leiphart could convince her to take it later on the same day. (Id. at 9-10). Leiphart testified that she was not concerned that Carlos's increased agitation would cause her to harm herself, and she did not specifically recall talking to anyone about Carlos's increased agitation. (Id.)

### 3. Carlos's Suicide – October 23, 2013

At around 8:30 p.m. on the night of October 23, 2013, Officer Collins was on a routine shift at the Prison when she heard screaming coming from one of the pods on the female maximum security block. (Doc. 85-13 at 17, 19). Collins entered "A" pod and observed

---

[19] According to Doll, removing Carlos from psychiatric observation meant that she would be checked by corrections staff at staggered 30-minute intervals rather than 15-minute intervals. (Doc. 85-14 at 29).

that Carlos and another inmate two cells over, Janette Cruz-Rivera, were yelling at each other and arguing about the television. (Id. at 16-17). The argument culminated with Cruz-Rivera saying to Carlos, "why don't you kill yourself?" (Id. at 17). In response, Collins said to Cruz-Rivera, "Why would you say that to her?" (Id.) Collins then turned to Carlos and began speaking with her. (Id.) Collins told Carlos to ignore Cruz-Rivera and to sit down and listen to her radio. (Id.) Immediately following the argument, Carlos was very upset, but after Collins talked with her for about five minutes, it appeared that Carlos had calmed down, and Collins departed from "A" pod for the time being. (Id. at 17-18). According to Collins, because Carlos appeared to have calmed down, Collins did not think of having Carlos speak to someone from the mental health department, and she did not suggest that anyone go back to check on Carlos to see if she was okay. (Id. at 18).

At around 9:00 p.m. on the same evening, Officer Santos-Heredia, while conducting her rounds, checked on Carlos. (Doc. 85-20 at 15). Santos-Heredia observed that Carlos was sitting at the end of her bunk, and it appeared as if she was preparing to go to bed. (Id. at 14-15). Then, at 9:17 p.m., while conducting rounds, Officer Collins found Carlos with a bed sheet tied to the window and around her neck, and she was hanging from a bar on her cell window. (Docs. 85-13 at 16, 19; and 85-9 at 22). Carlos was taken to York Hospital where she was pronounced dead. (Doc. 76-12 at 1). None of the defendants other than Collins and Santos-Heredia were in the prison at the time that Carlos's suicide occurred. (See Docs. 85-19 at 28; 85-17 at 14; 85-16 at 10; 85-15 at 22; 85-14 at 30). Rollings-Mazza, Gallagher, Leiphart, Doll, and Jackson all stated that they were surprised when they learned of Carlos's suicide. (Docs. 85-19 at 28; 85-17 at 15; 85-16 at 10; 85-15

at 22; and 85-14 at 30).  Similarly, Collins recalled that nothing stood out to her about her encounters with Carlos in the days leading up to the suicide.  (Doc. 85-13 at 16).

On October 21, 2013, two days prior to the suicide, Counselor Jackson had authorized Carlos's movement from a cell in "D" pod to a cell in "A" pod because the "D" pod cell, which was close to the medical department, was needed for an inmate with a medical appliance.  (Docs. 85-16 at 11; and 85-15 at 23).  Counselor Jackson did not consult with mental health staff before authorizing Carlos's move because Carlos was not on psychiatric observation at the time.  (Doc. 85-16 at 18-19).  Deputy Warden Doll testified that the cell to which Carlos was moved was "an exact copy" of the cell that she had been in previously.  (Doc. 85-14 at 32).  Similarly, Gallagher averred that the two cells were "mirror images," and that Carlos could have committed suicide in the "D" pod cell just as easily as in the "A" pod cell.  (Doc. 85-15 at 23).  Doll acknowledged that Carlos was not in a suicide-resistant cell when she committed suicide, but stated that her placement into such a cell was allowable because she had been removed from psychiatric observation.  (Doc. 85-14 at 41).

### E.  Post-Suicide Investigations and Reports

Two federal investigations were conducted subsequent to Carlos's death.  The first investigation, which was conducted by Lindsay M. Hayes ("Hayes") for the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security, engaged in a review of YCP's suicide prevention practices.  After that investigation, on April 1, 2014, Hayes issued a report (Doc. 85-11) which consisted of a summary of his observations, conclusions, and suggested remedies in regard to suicide prevention practices within YCP.  Judge Saporito summarized Hayes' findings as follows:

> [Hayes'] report found a number of deficiencies in the implementation of suicide prevention programs by York County Prison and PrimeCare, including inadequate guidance with respect to training, problematic housing of inmates in cells that were not suicide-resistant, and failure of mental health personnel to comply with suicide prevention requirements set out in the written policies. The report also noted an ICE policy requirement that a mortality review be conducted following any detainee suicide attempt, but it deferred making any findings due to lack of documentation.

(Doc. 94 at 31) (internal citations omitted). The Hayes report also found that YCP mental health staff "are not developing any treatment plans," as required for all inmates on suicide precautions greater than 24 hours. (Doc. 85-11 at 28). Moreover, Hayes found that "mental health staff continue to utilize 'contracting for safety' when discharging detainees from suicide precautions and/or psychiatric observation." (Id.) Hayes averred that this practice is problematic and should be discontinued because "[w]hile there may be some positive therapeutic aspects to safety contracts, most experts agree that once a patient becomes suicidal, their written or verbal assurances are no longer sufficient to counter suicidal impulses." (Id.)

The second federal investigation pertaining to Carlos's death was conducted by the ICE Office of Professional Responsibility, Office of Detention Oversight ("ODO"). On July 17, 2014, the ODO issued a report (Doc. 85-9) pertaining to its investigation. Judge Saporito summarized the findings of that report as follows:

> This [ODO] report found York County Prison to be deficient in following various ICE standards, including inadequate documentation of administrative segregation orders, untimely segregation reviews, a failure to collect incident reports from all staff who responded to Carlos's October 2013 suicide and her August 2013 suicide attempt, a failure by medical staff [including LPC Gallagher and Dr. Rollings-Mazza] to document any treatment plan for Carlos during her thirty months of detention,

and a failure to prepare a psychiatric alert report following Carlos's August 2013 suicide attempt.

(Id. at 31-32) (internal citations omitted).

In addition to the two federal investigations, Dr. Raymond F. Patterson, a Board certified forensic psychiatrist and retained expert of the plaintiff, issued a forensic psychiatric report (Doc. 85-22) on June 23, 2015, and, thereafter an addendum (Doc. 85-23) dated September 30, 2016. Of particular relevance, Dr. Patterson concluded in his original report (which was issued prior to the initiation of the instant action) that "to a reasonable degree of medical certainty . . . the mental health care, treatment, and management provided by PrimeCare Inc., and the York County Prison did not meet the standard of care for mental health care in similar situations and institutions, and indeed reflected negligence and deliberate indifference." (Doc. 85-22 at 11). Moreover, in the report, Dr. Patterson found "to a reasonable degree of medical certainty that [Carlos's] suicide was foreseeable and preventable" if she had been housed in a better environment, had her mental health treatment increased, and been provided with comprehensive treatment planning and formal suicide risk assessment and management. (Id. at 14-15).

In the September 30, 2016 addendum to his original report, Dr. Patterson concluded that he reviewed the discovery materials and deposition testimony from this case—including the deposition transcripts of LPC Gallagher, Dr. Rollings-Mazza, and Nurse Leiphart—and that those materials supported the opinions he expressed in his initial report. (Doc. 85-23 at 4-5). Moreover, in the addendum, Dr. Patterson expressly endorsed the opinions that Hayes had previously presented in his own report from April 1, 2014. (See id. at 4).

## F. Procedural History of the Instant Action

The original complaint in this wrongful death and survival action was filed on October 14, 2015. Defendant York County responded by filing an answer with affirmative defenses on October 23, 2015. Defendants PrimeCare and Dr. Rollings-Mazza responded by filing a joint answer with affirmative defenses on November 5, 2015. Defendant Gallagher responded by filing a motion dismiss for failure to state a claim on November 6, 2015.[20]

On February 11, 2016, the plaintiff filed a motion for leave to amend her complaint, and included a proposed three-count amended complaint with the motion. On April 27, 2016, the court granted the plaintiff's motion to amend, (see Doc. 35), and the plaintiff's amended complaint (Doc. 36) was filed on the same date. Count I of the amended complaint raises claims under the Eighth and Fourteenth Amendments to the United States Constitution, as well as Fourteenth Amendment due-process claims against defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart, Doll, Neeper, Collins, Santos-Heredia, McNicholas, Crist, Nadeau, Jackson, Trig, Correctional Officer John Does 1-10, and Medical John Does 1-10. Count II of the amended complaint raises Eighth Amendment and Fourteenth Amendment claims against defendants York County and PrimeCare. Finally, Count III of the amended complaint raises state-law medical negligence claims against defendants Rollings-Mazza, Gallagher, Davis, Snyder, Leiphart, Medical John Does 1-10, and PrimeCare. The plaintiff seeks compensatory damages from all defendants, punitive damages from the individual defendants, and reasonable attorney fees and costs.

---

[20] Gallagher's motion to dismiss the plaintiff's original complaint for failure to state a claim was ultimately denied on September 16, 2016. (See Doc. 64).

Eventually, three motions for summary judgment were filed. The first motion for summary judgment (Doc. 65) was collaboratively filed by defendants Collins, Crist, Doll, Jackson, McNicholas, Nadeau, Neeper, Santos-Heredia, Trig, Corrections Officer John Does 1–10, and York County (hereinafter referred to collectively as the "York County defendants"). The York County defendants move for summary judgment on the merits of the plaintiff's federal constitutional claims and, in the alternative, on qualified-immunity grounds.

The second motion for summary judgment (Doc. 68) was collaboratively filed by defendants Leiphart, Dr. Rollings-Mazza, Snyder, and PrimeCare (hereinafter referred to collectively as the "PrimeCare defendants"). The PrimeCare defendants move for summary judgment on the merits of the federal constitutional claims, the state-law medical malpractice claims against Nurses Snyder and Leiphart, and the state-law claims for punitive damages. Additionally, the PrimeCare defendants request that this court decline to exercise jurisdiction over the remainder of the plaintiff's state-law claims and that they be dismissed without prejudice for litigation in state court.

The third motion for summary judgment (Doc. 74) was filed by defendant Gallagher, who moves for judgment on the merits of all claims against him. The plaintiff filed responses in opposition to all of the motions for summary judgment. While she opposes summary judgment as to many of the defendants, the plaintiff has expressly stated that she "agrees to dismissal" of defendants Snyder, (see Doc 87 at 6 n.1), Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig. (See Doc. 88 at 5 n.1).

## G. Judge Saporito's Report and Recommendation

On September 1, 2017, Magistrate Judge Joseph F. Saporito, Jr. issued a report and recommendation (Doc. 94) addressing the three pending summary judgment motions. In analyzing the plaintiff's claims, Judge Saporito found from the outset that the plaintiff abandoned all of her claims against Snyder, Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig because she explicitly stated that she agreed to the dismissal of those defendants. Judge Saporito then went on to analyze the claims against the remaining defendants. He found that the plaintiff's federal constitutional claims against all of the defendants failed on the merits, and that the court should decline to exercise supplemental jurisdiction over the plaintiff's state-law negligence claims because there is nothing exceptional about this case that would justify keeping the state-law claims.

In light of his findings, Judge Saporito recommended that: (1) all of the motions for summary judgment be granted; (2) judgment be entered in favor of all defendants and against the plaintiff on the federal constitutional claims set forth in Counts I and II of the amended complaint; (3) judgment be entered in favor of defendant Snyder and against the plaintiff on the supplemental state-law claims set forth in Count III of the amended complaint; and (4) the supplemental state-law claims against defendants Gallagher, Dr. Rollings-Mazza, Leiphart, and PrimeCare set forth in Count III of the amended complaint be dismissed without prejudice to those claims being raised in state court pursuant to 28 U.S.C. §1367(c)(3).

Two parties have filed objections to Judge Saporito's report and recommendation. On September 11, 2017, defendant York County filed an objection (Doc. 97), objecting only to Judge Saporito's finding that the County could properly be subject to 42 U.S.C.

§1983 liability as a "person" that operated and established policy for the YCP. The County does not object to any other parts of the report and recommendation.

On October 6, 2017, the plaintiff filed objections (Doc. 101) to most of the recommendations contained within the report and recommendation. Specifically, the plaintiff objects to the following: (1) Judge Saporito's recommendation to grant summary judgment in favor of Gallagher as to the plaintiff's federal constitutional claims; (2) Judge Saporito's recommendation to summary judgment in favor of Dr. Rollings-Mazza as to the plaintiff's federal constitutional claims; (3) Judge Saporito's recommendation to grant summary judgment in favor of Nurse Leiphart as to the plaintiff's federal constitutional claims; (4) Judge Saporito's recommendation to grant summary judgment in favor of Deputy Warden Doll as to the plaintiff's federal constitutional claims; (5) Judge Saporito's recommendation that the court grant summary judgment in favor of Counselor Jackson as to the plaintiff's federal constitutional claims; (6) Judge Saporito's recommendation to grant summary judgment in favor of Collins as to the plaintiff's federal constitutional claims; (7) Judge Saporito's recommendation to grant summary judgment in favor of York County as to the plaintiff's federal constitutional claims; (8) Judge Saporito's recommendation to grant summary judgment in favor of PrimeCare as to the plaintiff's federal constitutional claims; and (9) Judge Saporito's recommendation to decline to exercise supplemental jurisdiction over the plaintiff's state-law negligence claims against Gallagher, Rollings-Mazza, Leiphart, and PrimeCare. The plaintiff, however, does not object to Judge Saporito's recommendation that the claims against Snyder, Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig all be dismissed. (See Doc. 101-1 at 11 n.1).

III.        *Legal Standards*

A.  Standard of Review – Report and Recommendation

"Where objections to a magistrate judge's report and recommendation are filed, the court must perform a *de novo* review of the contested portions of the report." Behar v. Pa. Dept. of Transp., 791 F. Supp. 2d 383, 389 (M.D. Pa. 2011); see also 28 U.S.C. §636(b)(1)(C); M.D. Pa. Local Rule 72.3.  In performing that *de novo* review, the court "may accept, [not accept], or modify, in whole or in part, the magistrate judge's findings or recommendations." Owens v. Beard, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing 28 U.S.C. §636(b)(1); M.D. Pa. Local Rule 904.2).

On the other hand, with regard to *uncontested* portions of a report and recommendation, "de novo review of the record and plenary consideration of the parties' contentions are *not* required." Cruz v. Chater, 990 F. Supp. 375, 376 (M.D. Pa. 1998) (emphasis in original).  Rather, "[t]he court will review the uncontested portions of the magistrate judge's report for 'clear error on the face of the record.'" Clouser v. Johnson, 40 F. Supp. 3d 425, 430 (M.D. Pa. 2014) (citing Cruz, 990 F. Supp. at 375-78).

B.  Standard of Review – Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there

be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is material if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, "all facts and inferences are construed in the light most favorable to the non-moving party." Boyle v. County of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. FED. R. CIV. P. 56(c)(1); see also Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." Celotex, 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

IV.      *Discussion*

A. The Uncontested Portions of the Report and Recommendation

Judge Saporito found that the plaintiff has abandoned all of her claims against Snyder, Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig because she explicitly stated that she agreed to the dismissal of those defendants.  No party objects to this finding.  Upon review, we find no error, and, accordingly, we adopt Judge Saporito's discussion of this issue.  (Doc. 94 at 36-37).  Therefore, judgment shall be entered in favor of defendants Snyder, Neeper, Santos-Heredia, McNicholas, Crist, Nadeau, and Trig on all claims in the amended complaint.

B. The Contested Portions of the Report and Recommendation

Judge Saporito concluded that the plaintiff's federal constitutional claims against defendants Gallagher, Rollings-Mazza, Leiphart, Doll, Jackson, Collins, York County, and PrimeCare fail on the merits, and thus recommended that we grant summary judgment in favor of all those defendants.  Moreover, Judge Saporito recommended that we decline to exercise supplemental jurisdiction over the state-law negligence claims against defendants Gallagher, Rollings-Mazza, Leiphart, and PrimeCare because there is nothing exceptional about this case that would justify retaining jurisdiction.  The plaintiff objects to all of these findings, and, therefore, they must be reviewed *de novo*.

Additionally, defendant York County objects to Judge Saporito's finding that the County could properly be subject to 42 U.S.C. §1983 liability as a "person" that operated

and established policy for the YCP. Consequently, we conduct a *de novo* review of that finding as well.

### 1. Section 1983 Claims

#### a. Section 1983 Claims in General

With respect to Counts I and II of the amended complaint, the plaintiff seeks relief pursuant to 42 U.S.C. §1983. Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress. . . .

42 U.S.C. §1983. Thus, "§1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation and internal quotation marks omitted). "A prima facie case under §1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)).

In raising her §1983 claims, the plaintiff references both the Eighth and Fourteenth Amendments to the United States Constitution. As Judge Saporito noted, however, (see Doc. 94 at 38-39), Carlos was an immigration detainee rather than a convicted prisoner. The Third Circuit has recognized that immigration detainees are "entitled to the same protections as a pretrial detainee." Adekoya v. Chertoff, 431 F. App'x 85, 88 (3d Cir. 2011) (per curiam) (citing Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000)). As

34

opposed to convicted prisoners, "[p]retrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process Clause." Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir. 1987) (citing Bell v. Wolfish, 441 U.S. 520 (1979); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976)), *cert. denied*, 485 U.S. 991 (1988). Consequently, any federal civil rights claims in the instant matter are governed solely by the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment's proscription against cruel and unusual punishment.

b. The Framework of *Estelle v. Gamble*

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court of the United States found that a failure to provide adequate medical care to a convicted prisoner amounts to a violation of the Eighth Amendment's Cruel and Unusual Punishment Clause. To succeed on a constitutional claim under the principles of Estelle, evidence must show: (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Although the holding in Estelle specifically pertained to convicted prisoners within the ambit of the Eighth Amendment, the Third Circuit has "found no reason to apply a different standard than that set forth in Estelle . . . when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment." Id. at 581 (citing Boring, 833 F.2d at 472). This is because "the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" Id. (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).

c.  Detainee Suicide Cases in Light of *Estelle*

The Third Circuit has recognized that since "a 'particular vulnerability to suicide' represents a 'serious medical need,'" the Estelle framework can apply to detainee suicide cases.  Colburn v. Upper Darby Township, 946 F.2d 1017, 1023-24 (3d Cir. 1991) ("Colburn II") (citing Colburn v. Upper Darby Township, 838 F.2d 663, 669 (3d Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989) ("Colburn I"); Partridge v. Two Unknown Police Officers of Houston, 791 F.2d 1182, 1187 (5th Cir. 1986)).  Pursuant to that framework, a plaintiff raising a §1983 constitutional claim on the basis of a detainee's suicide must establish the following elements: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference'[21] to the detainee's particular vulnerability." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005) (quoting Colburn II, 946 F.2d at 1023).

*i.  Element 1 - "Vulnerability to Suicide"*

Whether a detainee bears a "particular vulnerability to suicide" depends on the "degree of risk inherent in the detainee's condition."  Id. at 320 (quoting Colburn II, 946 F.2d at 1024).  "[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Id.

---

[21] In analyzing this element of the vulnerability-to-suicide framework, it seems that some courts use the phrase "*deliberate* indifference," whereas others utilize the term "*reckless* indifference."  The Third Circuit has noted that "whichever [of those phrases] is employed, it indicates a level of culpability beyond mere negligence," and, therefore, has "not [found] it necessary to parse these phrases to determine whether there is some distinction between them."  Palakovic v. Wetzel, 854 F.3d 209, 224 n.15 (3d Cir. 2017).

"Even where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood.'"  Colburn II, 946 F.2d at 1024.  In Colburn II, the Third Circuit emphasized that in the context of a pretrial-detainee suicide, a plaintiff need not establish that a defendant had a *subjective* appreciation of a pretrial detainee's particular vulnerability to suicide; rather, it was sufficient for a plaintiff to show that a defendant *should have known* that the pretrial detainee had a particular vulnerability to suicide.  946 F.2d at 1024-25.  The Colburn II court described the phrase "should have known" as follows:

> [The phrase "should have known"] does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence.  It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk.  The strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

Id. (citations and internal quotation marks omitted).

Three years after the Third Circuit's decision in Colburn II, the Supreme Court in Farmer v. Brennan, 511 U.S. 825 (1994), raised the standard when addressing a convicted inmate's deliberate indifference claim under the Eighth Amendment.  Specifically, the Court stated, in relevant part:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of* and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a

> substantial risk of serious harm exists, *and he must also draw the inference.*

511 U.S. at 837 (emphasis added).  Seven years after <u>Farmer</u>, the Third Circuit in <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001), also addressing an inmate's Eighth Amendment deliberate indifference claim, seemingly refined <u>Farmer</u> as follows:

> To be liable on a deliberate indifference claim, a . . . prison official must both know of and disregard an excessive risk to inmate health and safety.  The . . . element of deliberate indifference is subjective, not objective . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware.  However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk.

256 F.3d at 133 (citations, internal quotation marks, and brackets omitted).

Thus, <u>Farmer</u> and <u>Beers-Capitol</u> established that subjective knowledge of a vulnerability to suicide is required for liability in cases involving convicted inmates.  Relying on <u>Farmer</u> and <u>Beers-Capitol</u>, Judge Saporito concluded in his report that subjective knowledge of Carlos's particular vulnerability to suicide must be established for the defendants to be held liable in this case.  (<u>See</u> Doc. 94 at 42-43).

It is noteworthy that the instant matter may be distinguishable from <u>Farmer</u> and <u>Beers-Capitol</u> because those cases involved convicted inmates raising deliberate indifference claims under the Eighth Amendment, whereas this case involves Fourteenth Amendment claims pertaining to an immigration detainee.  The Third Circuit has not held that the subjective knowledge requirement of <u>Farmer</u> and <u>Beers-Capitol</u> applies to cases in which the plaintiff or decedent is a pretrial detainee.  In fact, in <u>Woloszyn</u>, a case

involving a pretrial-detainee suicide, the Third Circuit, after discussing the Supreme Court's holding in Farmer, explained as follows:

> Farmer defined "deliberate indifference" in the context of the claim of a convicted prisoner under the Eighth Amendment. It does not, therefore, directly control our analysis here because, as we have explained, Woloszyn's claim arises under the Due Process Clause of the Fourteenth Amendment.

396 F.3d at 321. Despite this, even applying Farmer and Beers-Capitol it appears that there are material facts in question as to whether some defendants knew of and disregarded an excessive risk to Carlos's health and safety as more particularly outlined below.

### iii. Element 3 – Acting With Reckless or Deliberate Indifference

The third element of the vulnerability-to-suicide analysis requires a plaintiff to show that a defendant who knew of a detainee's particular vulnerability to suicide acted with reckless or deliberate indifference to that vulnerability. In the context of pretrial-detainee suicides, a defendant with the requisite knowledge of a particular vulnerability to suicide can be said to act with deliberate indifference to that vulnerability if he or she "disregarded that [vulnerability] by failing to take reasonable measures to address it." Estate of Puza v. Carbon County, 586 F. Supp. 2d 271, 277 (M.D. Pa. 2007). Similarly, the Third Circuit has held, albeit in the context of a convicted inmate's suicide, that a defendant can be said to exhibit deliberate indifference to a particular vulnerability to suicide if he or she "fail[s] to take necessary and available precautions to protect the prisoner from self-inflicted wounds." Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988); see also Francis ex rel. Estate of Francis v. Northumberland County, 636 F. Supp. 2d 368, 385 (M.D. Pa. 2009) (acknowledging the Freedman holding in the context of a pretrial-detainee

case); <u>Plasko v. City of Pottsville</u>, 852 F. Supp. 1258, 1263 (E.D. Pa. 1994) (same). However, "[a] court 'cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care.'" <u>Estate of Puza</u>, 586 F. Supp. 2d at 276 (quoting <u>Freedman</u>, 853 F.2d at 1115). "Because of the nature of the [vulnerability-to-suicide] analysis," determinations as to whether a plaintiff can establish deliberate indifference or merely negligence in prison suicide cases "are very fact sensitive." <u>Id.</u> at 278.

d. <u>Applying the Vulnerability-to-Suicide Framework to the Instant Matter</u>

Having set forth the vulnerability-to-suicide framework, we now must apply that framework to the facts presented in the instant matter. From the outset, we note that our discussion for the individual defendants will focus on the third element of the framework, i.e., whether each defendant exhibited deliberate indifference to a particular vulnerability to suicide. This is because, upon review of the record, it appears that there are sufficient facts from which a reasonable juror could find that Carlos indeed had a particular vulnerability to suicide and that some of the remaining defendants knew of that vulnerability at the time Carlos took her own life.

Record evidence establishes that throughout her incarceration Carlos was difficult for staff to manage; she suffered mood swings; she was easily agitated and frequently engaged in disruptive and, sometimes, violent, behavior; she was placed on suicide watch on multiple occasions; she repeatedly expressed frustration and despondency about her placement in segregated housing and about the status of her immigration case; and she, at times, refused her mental-health medication. While some of the defendants were

arguably on better terms with Carlos than others, the record evidence suggests that virtually all were aware of her behavioral tendencies and frustrations. Additionally of importance, while each of the defendants had varying levels of interaction with Carlos, all of the defendants had actual knowledge that Carlos attempted suicide approximately ten weeks before her completed attempt. See Cruise v. Marino, 404 F. Supp. 2d 656, 669 (M.D. Pa. 2005) ("Whether the custodial officials 'knew or should have known' can be demonstrated when the officials have 'actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities.'" (quoting Colburn II, 946 F.2d at 1025 n.4)). Moreover, at the time Carlos committed suicide, she was housed in the very environment in which she had been housed when she recently attempted to take her life.

Combining all of these facts, it appears that the plaintiff has presented sufficient facts that would permit a reasonable juror to conclude that (1) Carlos had a particular vulnerability to suicide; and (2) some of the remaining defendants knew of that particular vulnerability to suicide at the time Carlos took her own life. See, e.g., Nealman v. Laughlin, No. 1:15-CV-1579, 2016 WL 4539203, at *8 (M.D. Pa. Aug. 31, 2016) (noting that while psychotic behavior by itself does not signal a particular vulnerability to suicide, such behavior in coalescence with a history of depression, mental health hospitalizations, and a prior suicide may constitute sufficient evidence of a particularized vulnerability to suicide). Thus, the remainder of our discussion will focus on the third element (i.e., deliberate indifference) of the vulnerability-to-suicide analysis as it pertains to each defendant.

e. <u>Section 1983 Claims Against the Individual Defendants</u>

    *i. Medical John Does 1-10 and Corrections Officer John Does 1-10*

To start, we note that the plaintiff has listed various unidentified medical and corrections defendants in her amended complaint. The plaintiff refers to the unidentified medical defendants as "Medical John Does 1-10," and she refers to the unidentified corrections defendants as "Corrections Officer John Does 1-10." The plaintiff's amended complaint raises federal constitutional claims against Medical John Does 1-10 and Corrections Officer John Does 1-10. Moreover, the amended complaint raises state-law claims against Medical John Does 1-10. When the plaintiff filed the amended complaint on April 27, 2016, she averred that she "[did] not . . . know the names of these defendants but [would] seek leave to amend the Complaint so as to name each appropriate defendant after the completion of additional discovery." (Doc. 36 ¶¶ 16, 26). To date, the plaintiff has not sought our leave to amend the complaint to identify the names of either Medical John Does 1-10 or Corrections Officer John Does 1-10.

This court has previously noted that "[t]he use of John Doe defendants is permissible in certain situations until 'reasonable discovery permits the true defendants to be identified.'" <u>King v. Mansfield Univ. of Pa.</u>, 1:11-CV-1112, 2014 WL 3734551, at *1 n.1 (M.D. Pa. July 28, 2014) (quoting <u>Blakeslee v. Clinton County</u>, 336 F. App'x 248, 250 (3d Cir. 2009)). However, district courts within the Third Circuit have held that "if reasonable discovery fails to unveil the true identities" of the John Doe defendants, the John Doe defendants should be dismissed. <u>Id.</u> (dismissing a plaintiff's claims against John Doe defendants at summary judgment stage because the true identities of those individuals were not made known after a "lengthy period of discovery," and they had not been served

by the plaintiff); <u>see also</u> <u>Aponte v. Karnes</u>, No. 08-cv-0183, 2008 WL 360879, at *1 n.1 (M.D. Pa. Feb. 8, 2008) ("Absent compelling reasons, a district court may dismiss [John or Jane Doe] defendants if the plaintiff, after being granted a reasonable period of discovery, fails to identify them."); <u>Scheetz v. Morning Call, Inc.</u>, 130 F.R.D. 34, 37 (E.D. Pa. 1990) ("[Doe defendants] must eventually be dismissed, if discovery yields no identities.").

In the instant matter, more than three years have passed since the filing of the plaintiff's amended complaint, and the parties have been provided ample time for reasonable discovery. Nonetheless, the plaintiff has identified neither the Medical John Does nor the Corrections Officer John Does, nor is there anything in the record to suggest that any of these John Doe parties have been served by the plaintiff. Moreover, the John Doe defendants are discussed nowhere in the parties' summary judgment filings, and the plaintiff has put forth no compelling reason as to why dismissal of those defendants would be inappropriate. Therefore, all of the plaintiff's claims against Medical John Does 1-10 and Corrections Officer John Does 1-10, are dismissed with prejudice.

*ii. Section 1983 Claim Against LPC Gallagher*

Turning to the identified individual defendants, we begin with the plaintiff's §1983 claim against LPC Gallagher. With regard to that claim, Judge Saporito recommended that summary judgment be granted in favor of Gallagher, and the plaintiff objects to Judge Saporito's recommendation. Upon *de novo* review, it appears that viewing the evidence in the light most favorable to the plaintiff, these are issues of material fact and a reasonable juror could find that Gallagher exhibited deliberate indifference to Carlos's particular vulnerability to suicide.

In arguing that Gallagher acted with deliberate indifference, the plaintiff cites to the following facts and evidence: (1) throughout the course of Carlos's incarceration, Gallagher persistently failed to prepare a comprehensive treatment plan for her, even though ICE and PrimeCare policy required him to do so; (2) Gallagher failed to conduct a suicide risk assessment for Carlos, even though relevant policy required him to do so; (3) Gallagher failed to consider alternative placement for Carlos, even though ICE required such consideration for mentally ill detainees; (4) Gallagher relied on "contracting for safety," an allegedly discredited practice argued to be insufficient to address an inmate's suicidal tendencies; (5) Gallagher removed Carlos from any form of psychiatric observation on October 2, 2013, even though she remained on the same ICU status that caused her to attempt suicide in August of 2013; and (6) Gallagher cut off Carlos from further clinical evaluations after she was removed from psychiatric observation on October 2, 2013. (Doc. 86 at 35-37; Doc. 101-1 at 41-43).

The plaintiff further cites to the respective post-suicide reports prepared by ICE and Hayes, as well as the report and addendum prepared by the plaintiff's proffered expert Dr.

Raymond F. Patterson. First, the plaintiff points out that the ICE report notes Gallagher's failure to implement a treatment plan for Carlos as required under ICE standards and PrimeCare policies. (Doc. 101-1 at 29-30). Second, the plaintiff notes that in the Hayes report, Hayes concluded that Gallagher "appeared indifferent to the suicide prevention requirements" in both PrimeCare's policies and ICE's detention standards. (Id. at 30). Third, the plaintiff cites to Dr. Patterson's report and addendum, in which Dr. Patterson concluded that the mental health care provided to Carlos was deficient, that her suicide was preventable, and that Gallagher, in particular, "was responsible for failing to follow suicide prevention policies, which led to his improperly releasing Carlos from observation status on October 2, 2013." (Id.)

In response to the plaintiff's contentions, Gallagher argues that Carlos appeared to be stable at the time she was removed from psychiatric observation, and, therefore, the decision to remove her from that status cannot amount to deliberate indifference. Moreover, Gallagher suggests that it would be unreasonable to expect that a person who has previously attempted suicide be maintained on suicide watch or psychiatric observation perpetually. The court agrees with Gallagher that there is no case law to suggest that a formerly suicidal inmate must be kept on an observation status perpetually, and removal of an individual from an observation status may not constitute deliberate indifference in all circumstances.

However, at the time Gallagher removed Carlos from psychiatric observation on October 2, 2013, Gallagher was aware that Carlos had attempted suicide less than two months earlier, and he was aware that it had been her recent placement onto ICU status that upset her and led her to engage in the attempt. When Carlos returned from the

outside hospital after her suicide attempt, she remained despondent and exhibited behavioral tendencies such that Gallagher deemed it necessary to keep her on suicide watch for a week before stepping her down to psychiatric observation. Moreover, as recent as September 19, 2013, Carlos had exhibited a depressed and anxious mood, and expressed that she "could no longer handle" being on ICU status. Less than two weeks later, Gallagher made the decision to remove Carlos from psychiatric observation, effectively permitting Carlos's placement into non-suicide-resistant cells, and ceasing regular clinical evaluations of Carlos other than brief PRC reviews at her cell. Gallagher made this decision in spite of the fact that Carlos remained on ICU status—the status that arguably contributed to her attempted suicide less than two months earlier, and the status which, less than two weeks earlier, Carlos told Gallagher that she "could no longer handle."

Furthermore, record evidence—including the respective post-suicide reports prepared by ICE and Hayes—suggests that Gallagher violated various PrimeCare and ICE suicide-prevention policies, and the Hayes report specifically found that Gallagher "appeared indifferent" to said policies. Additionally, as pointed out above, the initial report of the plaintiff's expert, Dr. Patterson, explicitly found that "to a reasonable degree of medical certainty," the mental health care provided to Carlos by PrimeCare during her incarceration at YCP reflected "negligence and deliberate indifference." Dr. Patterson issued a later addendum confirming the findings of his initial report, and in so confirming, Dr. Patterson explicitly stated that he relied upon the deposition testimony of Gallagher. Dr. Patterson found that Gallagher was responsible for failing to follow suicide prevention

policies, and that this led to Carlos's improper release from observation status on October 2, 2013.

Viewing all of these facts in the light most favorable to the plaintiff, it appears that a reasonable juror could find that Gallagher's actions amounted to deliberate indifference. See, e.g., Palakovic v. Wetzel, 854 F.3d 209, 231-32 (3d Cir. 2017) (holding that the subjection of a particularly vulnerable prisoner to prolonged periods of isolation and his placement in an environment "characterized by extreme deprivation of social interaction and environmental stimulation" could constitute deliberate indifference to a particular vulnerability to suicide); Brandt v. PrimeCare Med., Inc., 1:11-CV-1692, 2013 WL 3863936, at *4 (M.D. Pa. July 24, 2013) (concluding that expert report which opined that prisoner was prematurely removed from a "stripped cell" constituted "sufficient evidence from which a reasonable trier of facts could determine that Defendants . . . acted with deliberate indifference.").

### iii. Section 1983 Claim Against Dr. Rollings-Mazza

We next address the plaintiff's §1983 claim against Dr. Rollings-Mazza. Judge Saporito recommended that summary judgment be granted in favor of Dr. Rollings-Mazza, and the plaintiff objects to Judge Saporito's recommendation. For the reasons set forth below, upon *de novo* review, it appears that there is sufficient evidence for the plaintiff's deliberate indifference claim against Dr. Rollings-Mazza to survive summary judgment.

In arguing that Dr. Rollings-Mazza acted with deliberate indifference to Carlos's particular vulnerability to suicide, the plaintiff points us to the following facts and evidence: (1) Dr. Rollings-Mazza never considered any treatment plan, as required by ICE and generally accepted standards of practice; (2) Dr. Rollings-Mazza never conducted a

suicide-risk assessment as required by PrimeCare and generally accepted standards of practice; (3) following Carlos's August 2013 suicide attempt, Dr. Rollings-Mazza initiated no clinical review as required by PrimeCare, which was a step critical to determining the reasons for Carlos's actions; (4) Dr. Rollings-Mazza maintained the "status quo" and failed to change Carlos's medication regimen after the August 2013 suicide attempt. (Doc. 101-1 at 47-48).

Additionally, the plaintiff cites to the respective post-suicide report prepared by ICE, as well as the report and addendum prepared by Dr. Patterson. First, the plaintiff notes that the ICE report identifies Dr. Rollings-Mazza's failure to implement a treatment plan for Carlos as required under ICE standards and PrimeCare policies. (Id. at 29-30). Second, the plaintiff refers to Dr. Patterson's report and addendum, in which Dr. Patterson concluded that the mental health care provided to Carlos was deficient, that her suicide was preventable, and that Dr. Rollings-Mazza acted improperly by viewing her role only as monitoring medications and by failing to conduct treatment planning and suicide-risk assessments for Carlos.[22] (Id. at 30).

We first address the plaintiff's argument that Dr. Rollings-Mazza acted deliberately indifferent by maintaining the "status quo" and failing to change Carlos's medication regimen after the August 2013 suicide attempt. Upon a review of pertinent authority, it

---

[22] We note that there appears to be a factual dispute as to precisely what responsibilities Dr. Rollings-Mazza's bore as a psychiatrist in the Prison setting. As alluded to above, Dr. Rollings-Mazza testified at her deposition that her primary responsibility at the Prison was "medication management." (Doc. 85-19 at 7, 9). On the other hand, Dr. Patterson suggested in the addendum to his initial report that Dr. Rollings-Mazza acted improperly by viewing her role only as monitoring medications, and that her role should also have encompassed the preparation of treatment plans and suicide-risk assessments. (Doc. 85-23 at 4). To the extent the factual dispute surrounding Dr. Rollings-Mazza's precise job responsibilities would impact a deliberate indifference determination, such factual dispute is most appropriately resolved by a jury.

appears this alleged omission alone is insufficient to support a finding of deliberate indifference. The instant case does not present a situation where Rollings-Mazza refused to provide Carlos with mental health care, delayed treatment for a non-medical reason, or prevented her from receiving recommended treatment. See Rouse, 182 F.3d at 197 (noting that the Third Circuit has found deliberate indifference in such circumstances). Rollings-Mazza saw Carlos for multiple evaluations before and after her August 2013 suicide attempt, and based on her observations of Carlos, she reached the conclusion that she was stable on her Haldol and that any disruptive or uncooperative behavior she exhibited was prompted by factors other than her mental health issues. Even assuming that Dr. Rollings-Mazza's conclusions about Carlos's medication amounted to bad judgment or were erroneous, the Doctor's failure to change Carlos's medication regimen, at worst, amounts to poor medical judgment or medical malpractice; this is not sufficient to establish deliberate indifference or a constitutional violation. See id. at 197 ("It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference."); White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) ("If the doctor's judgment is ultimately shown to be mistaken, at most what would be prove[n] is medical malpractice."); Estate of Thomas v. Fayette County, 194 F. Supp. 3d 358, 373 (W.D. Pa. 2016) ("[A]n *incorrect* or *negligent* medical judgment . . . does not give rise to deliberate indifference.") (emphasis in original).

While a failure to change Carlos's medication alone could not amount to deliberate indifference, we conclude that the Doctor's other alleged omissions, considered together, are sufficient to present a question for a jury as to whether the Doctor acted with deliberate indifference to Carlos's particular vulnerability to suicide. There is evidence,

including post-suicide investigative reports, suggesting that Dr. Rollings-Mazza, like Gallagher, violated various suicide-prevention policies. Most notably, despite the fact that Carlos attempted suicide in August 2013, Dr. Rollings-Mazza appears to have violated PrimeCare policy by failing to subsequently conduct a clinical review or take any other steps to evaluate what led Carlos to take such a drastic action in the first instance. When all of these facts are viewed in the light most favorable to the plaintiff, a reasonable juror could conclude that Dr. Rollings-Mazza exhibited deliberate indifference to Carlos's particular vulnerability to suicide.

### iv. Section 1983 Claim Against Nurse Leiphart

With regard to the plaintiff's §1983 claim against Nurse Leiphart, Judge Saporito recommended that summary judgment be granted in favor of Nurse Leiphart. The plaintiff objects to that recommendation, and upon *de novo* review of the plaintiff's claim a reasonable juror could conclude that Nurse Leiphart acted with deliberate indifference.

The plaintiff asserts that Leiphart exhibited deliberate indifference to a particular vulnerability to suicide because she observed an increase in Carlos's agitation in the weeks leading up to the suicide and failed to report this observation until after Carlos had committed suicide. As noted above, a defendant can be considered to have acted with deliberate indifference to a particular vulnerability to suicide if he or she disregarded that vulnerability by failing to take reasonable measures to address it.

Nurse Leiphart was aware of Carlos's August 2013 suicide attempt, and in fact, she was present near Carlos's cell right after Carlos had been cut down from her hanging attempt. Leiphart recalled that at the time of the suicide attempt, Carlos was very upset and was yelling and screaming that she wanted to talk to somebody about her

deportation status.  When Carlos returned to the prison from the outside hospital, Nurse Leiphart continued to see Carlos on a regular basis, and Leiphart observed an increase in Carlos's agitation in the weeks leading up to Carlos's completed suicide.  In spite of this, Leiphart appears to have taken no action.  As a result, it appears from the record that no one other than Leiphart was aware of Carlos's increasing agitation, and, therefore, no one was alerted that action may be necessary to address that condition in a suicidal detainee. A reasonable juror could find that given Carlos's recent suicide attempt and her increasing agitation in the immediate aftermath of that attempt, Nurse Leiphart should have taken some action—i.e. reasonable steps—to address Carlos's vulnerability to suicide.  Given that Nurse Leiphart took no action whatsoever, a reasonable juror could find that Nurse Leiphart exhibited deliberate indifference to Carlos's particular vulnerability to suicide. Therefore, we will deny Nurse Leiphart's motion for summary judgment.

*v.  Section 1983 Claim Against Deputy Warden Doll*

We now turn to the plaintiff's §1983 claim against Deputy Warden Doll, for which Judge Saporito recommended granting summary judgment in favor of Doll.  The court agrees with Judge Saporito's recommendation.

In asserting that Doll acted with deliberate indifference, the plaintiff cites to the following facts and evidence: (1) Doll waited for more than two years to seek alternative placement for Carlos; and (2) even though Doll knew that his decision to place Carlos in ICU status in August 2013 led to her suicide attempt, Doll maintained Carlos in that exact same status in October 2013 after Gallagher had removed Carlos from psychiatric observation.  (Doc. 101-1 at 52-53).

First, with regard to Doll's alleged failure to seek alternative placement for Carlos for two years, this alleged omission is insufficient to permit a reasonable juror to find deliberate indifference. Doll testified that when he spoke with ICE Assistant Field Director Joe Dunn to recommend alternative placement for Carlos, ICE ultimately declined Doll's recommendation. Thus, Doll had sought alternative placement for Carlos, but this request was denied by ICE.

Second, no reasonable juror viewing the facts in the light most favorable to the plaintiff and drawing all inferences in her favor could find that Doll acted with deliberate indifference by maintaining Carlos on ICU status in October of 2013 after she was removed from psychiatric observation by Gallagher.

Doll's decision to maintain Carlos on ICU status was justified given her behavioral history and difficulty living among the Prison's general population. Taking all of these facts into consideration, the court finds there is insufficient evidence from which a reasonable juror may find that Doll acted with deliberate indifference to Carlos's particular vulnerability to suicide. Therefore, Doll's motion for summary judgment will be granted.

*vi. Section 1983 Claim Against Collins*

We proceed to the plaintiff's §1983 claim against Officer Collins. In objecting to Judge Saporito's recommendation that summary judgment be granted in favor of Collins, the plaintiff contends that Collins exhibited deliberate indifference by failing to inform mental health professionals or take other action to ensure Carlos's safety after she observed the argument between Carlos and the other inmate on the night of the suicide. The plaintiff contends that Collins should have taken further protective action given that she knew of Carlos's emotional and reactive nature and that she was aware that the

argument with Cruz-Rivera upset Carlos. The court finds that the plaintiff has presented insufficient facts from which a reasonable juror could find that Officer Collins acted with deliberate indifference.

Collins was aware of Carlos's volatile behavior throughout her period of incarceration at the Prison. In her deposition, Collins herself recalled that Carlos became easily agitated and could "fly off the handle" when she became agitated. Having this knowledge, Collins personally witnessed the altercation between Carlos and Cruz-Rivera that occurred on the night of Carlos's completed suicide. During that altercation, Cruz-Rivera allegedly suggested that Carlos kill herself. Collins recalled that Carlos was very upset and therefore Collins appropriately spent time discussing the matter with her, calming her down. She redirected Carlos's attention from the incident toward other activities like relaxing and listening to her radio. Based upon this isolated interaction, a reasonable juror could not conclude that Collins disregarded a particular vulnerability to suicide by failing to take any reasonable measures to address it, and, therefore, exhibited deliberate indifference. Consequently, summary judgment will be granted as to Collins.

*vii. Section 1983 Claim Against Jackson*

Finally, we address the plaintiff's §1983 claim against Counselor Jackson. As with the other individual defendants, Judge Saporito recommended summary judgment be granted in Jackson's favor. Although the plaintiff similarly objects to this recommendation, we have conducted a *de novo* review, and we agree with Judge Saporito's recommendation that summary judgment be granted in favor of Counselor Jackson.

The plaintiff asserts that Counselor Jackson exhibited deliberate indifference to Carlos's vulnerability to suicide because (1) she showed no willingness to constructively

address Carlos's behavior; (2) she failed to discuss the August 2013 suicide attempt with Carlos in her first encounter after that attempt; and (3) in October of 2013, two days prior to the suicide, Jackson moved Carlos into a non-suicide-resistant cell on A pod—where Carlos was housed at the time of her August 2013 suicide attempt—without first consulting with mental health staff. For the reasons set forth below, we find that, as a matter of law, there is insufficient evidence from which a reasonable juror could conclude that Counselor Jackson acted with deliberate indifference.

To the extent that Counselor Jackson failed to show willingness to constructively address Carlos's behavior or failed to discuss Carlos's August 2013 suicide attempt with her, these alleged failures do not constitute deliberate indifference. Jackson testified that she did not discuss the attempt with Carlos at subsequent contact reviews because she believed that such discussions would be more appropriate for mental health staff. Given that Jackson was a corrections counselor and was not trained as a mental health professional, Jackson's decision to refrain from discussing the suicide attempt has little, if any, probative value for the issue at hand. Moreover, the record evidence suggests that Jackson's relationship with Carlos was not particularly cordial. Prior to the suicide attempt, Jackson had previously attempted to conduct multiple contact reviews with Carlos, but most were unproductive to Carlos's failure to cooperate and communicate amicably with Jackson. Given the strained relationship Jackson had with Carlos, it is far from certain that any attempts by Jackson to discuss the sensitive issue of a suicide attempt would have been constructive.

As for Jackson moving Carlos into a non-suicide resistant cell in A pod in October of 2013 without consulting mental health staff, we also find that such evidence is insufficient

to show deliberate indifference. Jackson testified that nothing required her to inform mental health staff of the move because Carlos had been taken off psychiatric observation status. Moreover, there is no evidence to suggest that Carlos was actively threatening to harm herself at the time she was moved. Most importantly, the cell to which Carlos was moved was essentially a carbon copy of her prior cell. Thus, even if Jackson had informed mental health staff of the move, there is no evidence to suggest that mental health staff would have prevented such a move or that the new cell was riskier than the previous cell. Accordingly, when viewing the proffered evidence as a whole, the plaintiff has failed to provide sufficient evidence from which a trier of fact could conclude that Jackson acted with deliberate indifference to Carlos's particular vulnerability to suicide. Therefore, summary judgment will be granted in favor of Jackson.

### viii. *Qualified Immunity*

In addition to arguing that the plaintiff's claims failed on the merits, defendants Doll, Collins, and Jackson also argued that they are entitled to summary judgment on the ground of qualified immunity. Because Judge Saporito determined that none of those defendants' actions or omissions amounted to constitutional violations, he did not address their qualified immunity argument. Since we agree with Judge Saporito's analysis with respect to Doll, Collins and Jackson, we need not address the qualified immunity argument either.

f.  Section 1983 Claims Against York County and PrimeCare

Having addressed the constitutional claims against the individual defendants, we now turn to the plaintiff's constitutional claims against York County and PrimeCare.

*i.  Section 1983 Claim Against York County*

As discussed above, Section 1983 generally imposes liability upon any "person," acting under color of state-law, who violates a plaintiff's constitutional rights.  The courts though have made it clear that the word "person," as used in Section 1983, does not merely encompass natural persons.  For example, in Monell v. New York City Dept. of Social Servs., 436 U.S. 658 (1978), the Supreme Court held that a municipality constitutes a "person" under Section 1983.  Id. at 690.  However, pursuant to the holding in Monell, "a municipality cannot be held liable under §1983 on a *respondeat superior* theory."  Id. at 691.  Rather, a municipality will only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" of which a plaintiff complains.  Id. at 694; see also Estate of Bailey by Oare v. County of York, 768 F.2d 503, 507 (3d Cir. 1985) ("Only if there is a plausible nexus between the policy or established state procedure and the infringement of constitutional rights can a §1983 action be maintained.").

"A government policy or custom can be established in two ways."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).  First, "policy is made when 'a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict.'"  Id. (alteration in original) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).  Second, "[a] course of conduct

is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Id. (second alteration in original) (citing Monell, 436 U.S. at 691).

As a threshold matter, we must address whether York County is an appropriate defendant in the instant matter. The County asserts that pursuant to Pennsylvania statute, the sole responsibility for the government and management of YCP is exclusively vested in an independent body referred to as the York County Prison Board, which is not operated or controlled by the County. The County thus argues that it cannot be held liable for the Prison Board's policies or decision making.

In his report and recommendation, Judge Saporito concluded that the County was an appropriate defendant. In reaching that conclusion, Judge Saporito reasoned that "the weight of authority . . . holds that the county may be held liable under Monell for policies implemented by the county prison board." (Doc. 94 at 60 n.17). Judge Saporito cited to Barry v. Luzerne County, 447 F. Supp. 2d 438, 451 (M.D. Pa. 2006), in which this court held that a county "cannot immunize itself from constitutional harm that its policies cause merely by delegating the authority to create the policy to an independent board."

The County argues that the instant matter is distinguishable from Barry and that, therefore, Judge Saporito's reliance upon that case was misplaced. Specifically, the County avers as follows:

> This is not a question of the County immunizing itself from constitutional harm that its policies caused merely by delegating the authority to create the policy to an independent Board. In this case, the Board was established by the Commonwealth of Pennsylvania. It is the State Legislature that enacted the statue which creates the Prison Board and delegates specific authority to be responsible for the government and management of the prison.

(Doc. 98 at 7).

Having reviewed the County's argument, Judge Saporito's report, and the pertinent law, we agree with Judge Saporito's conclusion that the County is an appropriate defendant in the instant matter. A review of case law reveals that this court previously rejected an argument practically identical to that raised by York County. In Bills v. Monroe County, No. 3:05cv1403, 2007 WL 2907932 (M.D. Pa. Sept. 28, 2007), defendant Monroe County asserted the following argument: "[I]t is the Prison Board that possesses the statutory authority to establish the policies, customs and training in effect at the [Monroe County Correctional Facility]. Therefore, the County cannot be held liable for those policies, customs and training." Id. at *2. The court, however, rejected that argument, and denied Monroe County's motion for summary judgment on the County's liability as a municipality. Id. The court reasoned that "the Prison Board was the authorized decisionmaker possessing authority to establish municipal policy with regard to the prison, and the County can be bound based on the Board's official proclamations, policies, or edicts." Id. Thus, we are unable to conclude that York County is an inappropriate defendant merely because the Prison Board is the entity responsible for government and management of YCP.

Having determined that York County is an appropriate party, we must now determine whether the plaintiff's constitutional claims against the County survive the motion for summary judgment on the merits. Judge Saporito recommended that summary judgment be granted in favor of the County. The plaintiff objects to Judge Saporito's recommendation, claiming that York County should be held liable for its failure to follow its

own written policy requiring a mortality review committee evaluation of all suicide attempts. We disagree with the plaintiff and will overrule her objection.

The plaintiff does not allege that a County policy itself caused a constitutional violation. Rather, the plaintiff contends that the County's failure to *follow* a particular requirement of its own suicide-prevention policy—namely that which requires mortality reviews after suicide attempts—amounted to a constitutional violation. First, plaintiff's claim against the County could be based upon a "custom" theory, i.e., that the County had a "custom" of failing to conduct mortality reviews following suicide attempts at YCP and that this custom led to Carlos's death by suicide.

As noted by Judge Saporito in his report and recommendation, the Third Circuit in Colburn I held that "a custom of laxity regarding the supervision and monitoring of their jail cells and in searching individuals taken into police custody," which led to a detainee's suicide utilizing a concealed firearm, amounted to an "official policy." 838 F.2d at 671. The court reasoned that the detainee had been the third inmate in three years to commit suicide at the subject prison, and, therefore, this was sufficient to provide the municipality and its governing officials with actual or constructive knowledge of the alleged custom of inadequate monitoring of jail cells. Id. at 672.

The instant matter is distinguishable from Colburn I, however. The plaintiff has put forth no facts to suggest that York County or its governing officials should have been aware of a custom of failing to conduct mortality reviews subsequent to suicide attempts. There are also no facts to suggest that failure to conduct such reviews had been a widespread practice prior to Carlos's suicide attempt or that such practice had led to other

prison suicides.  Consequently, we find that York County cannot be subject to municipal liability based on custom or policy.

The plaintiff asserts that even if there were no *prior* incidents giving the County notice of a policy deficiency or problematic custom, this provides no basis for summary judgment.  The plaintiff argues that the instant case is one where "a municipality may be liable [for a single incident] for failure to implement appropriate policies when it is obvious that its failure could lead to constitutional violations."  (Doc. 101-1 at 59).

In raising this assertion, the plaintiff cites Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014), which allowed a Monell claim to proceed based on a single incident of a constitutional violation caused by a County's failure to train correctional officers in de-escalating inmate conflicts.  The Thomas court noted that in order for a municipality to be held liable based on a single incident of a constitutional violation, a plaintiff must show either: (1) the existence of a "pattern of violations [that] puts municipal decisionmakers on notice that a new program is necessary"; or (2) that "the need for training [is] so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations."  Id. at 223 (internal quotations marks omitted) (citing City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989)).

Thomas, however, is distinguishable from the instant matter.  Here, there is no evidence to suggest that the County knew that its policies were being ignored, as there was no "pattern of violations" to put the municipal decisionmakers on notice.  Moreover, this is not a case where the County failed to institute a policy or provide training—the mortality review policy *had* been instituted.  But just because county employees failed to follow that policy in this case does not automatically result in Monell liability for York

County. Rather, the Third Circuit has found that isolated incidents in which county employees fail to follow a facially appropriate municipal policy generally do not impose liability upon the municipality itself. See, e.g., Rago v. City of Pittsburgh, 429 F. App'x 86, 89 (3d Cir. 2011) (nonprecedential) (affirming summary judgment in favor of defendant municipality in §1983 action where plaintiff "produced no evidence that anything other than a one-time failure to follow municipal policy occurred"); Talbert v. Kelly, 799 F.2d 62, 67 (3d Cir. 1986) (noting that in §1983 actions against governmental agencies, "the carelessness of an employee in failing to follow a policy . . . may establish the negligence of the employee but does not fasten liability on the governmental agency." (quoting Kranson v. Valley Crest Nursing Home, 755 F.2d 46, 51 (3d Cir. 1985))). Therefore, the plaintiff has provided insufficient evidence to create a genuine dispute of material fact regarding municipal liability for York County. As such, summary judgment will be entered against plaintiff on the constitutional claims against York County.

*ii. Section 1983 Claim Against PrimeCare*

As is the case with municipalities, under §1983, "a private corporation contracted by a prison to provide healthcare for inmates cannot be held liable on a respondeat superior theory; rather, pursuant to [Monell], a private corporation can be held liable for constitutional violations only if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." Gannaway v. Prime Care Medical, Inc., 150 F. Supp. 3d 511, 530 (E.D. Pa. 2015) (citing Natale, 318 F.3d at 583-84). Thus, since the courts have recognized a particular vulnerability to suicide as a serious medical need, PrimeCare may be held liable in the instant matter if the plaintiff shows that it has a custom or policy exhibiting deliberate indifference to prisoners' particular vulnerabilities to suicide.

Like her claim against York County, the plaintiff's §1983 claim against PrimeCare arises primarily out of PrimeCare's alleged failure to follow its own suicide-prevention policies. Specifically, the plaintiff avers that PrimeCare failed to ensure that its mental health clinicians at YCP were complying with the policy's requirement that a comprehensive clinical review be conducted in all situations involving suicide attempts and completed suicides, and that remedial action be taken. The plaintiff claims that PrimeCare's failure to comply with these requirements after Carlos's August 2013 suicide attempt led to her completed suicide in October 2013.

However, we find that the record is devoid of facts to suggest that PrimeCare could be found liable under §1983 based on the failures of its employees to follow its suicide prevention policies. The plaintiff does not specifically allege a failure to train or implement critical policies, nor does she point to any facts specifically showing that there was a pattern of policy violations that would have made PrimeCare aware of policy-implementation deficiencies. Therefore, we agree with Judge Saporito's recommendation that summary judgment be granted in favor of PrimeCare with respect to the plaintiff's federal constitutional claims.

g. <u>State-Law Claims Against Rollings-Mazza, Gallagher, Leiphart, and PrimeCare</u>

Having determined that the plaintiff's federal constitutional claims were all meritless, Judge Saporito recommended that this Court decline to exercise supplemental jurisdiction[23] over the remaining state-law claims because there is "nothing in the record to distinguish this case from the ordinary one." (Doc. 94 at 68). However, since we have

---

[23] A district court may decline to exercise supplemental jurisdiction over a state-law claim if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §1367(c)(3).

found that there is sufficient evidence to permit at least some of the plaintiff's federal constitutional claims to go to a jury, we will not adopt Judge Saporito's recommendation, and instead continue to exercise supplemental jurisdiction over the plaintiff's state-law claims.

As stated above, Count III of the plaintiff's amended complaint consists of medical negligence claims against defendants Gallagher, Rollings-Mazza, Leiphart, and PrimeCare.[24] Moreover, the plaintiff raises state-law claims for punitive damages against all of the individual defendants. Leiphart and Gallagher have moved for summary judgment on the plaintiff's medical negligence claim. Additionally, Leiphart, Rollings-Mazza, and Gallagher have moved for summary judgment on the plaintiff's claims for punitive damages.

### i. Medical Negligence Claims

Under Pennsylvania law, a plaintiff claiming medical negligence "must establish a duty owed by the physician or medical personnel to the patient, a breach of that duty, that the breach was the proximate cause of the plaintiff's injury, and that the damages suffered were a direct result of the harm." Rodriguez v. United States, Civil Action No. 3:14-1149, 2016 WL 4480761, at *4 (M.D. Pa. Aug. 23, 2016) (citing Toogood v. Owen J. Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003)). "In addition, '[w]ith all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff

---

[24] Count III of the amended complaint also raised state-law medical negligence claims against Davis, Snyder, and Medical John Does 1-10. As explained above, however, Davis was already terminated as a defendant from this action, and all of the plaintiff's claims against Snyder will be dismissed as we deem them to be abandoned. Moreover, the claims against Medical John Does 1-10 will be dismissed because the plaintiff has failed to amend her complaint to identify the Medical John Does despite an ample period of discovery.

must provide a medical expert who will testify as to the elements of duty, breach, and causation.'" Id. (quoting Quinby v. Plumsteadville Family Practice, Inc., 907 A.2d 1061, 1070-71 (Pa. 2006)).

The plaintiff has presented a report and addendum prepared by Dr. Raymond F. Patterson, a Board certified forensic psychiatrist. As discussed above, Dr. Patterson concluded in his original report that "to a reasonable degree of medical certainty . . . . the mental health care, treatment, and management provided by PrimeCare Inc., and the York County Prison did not meet the standard of care for mental health care in similar situations and institutions, and indeed reflected negligence and deliberate indifference." (Doc. 85-22 at 11). Moreover, in the report, Dr. Patterson found "to a reasonable degree of medical certainty that [Carlos's] suicide was foreseeable and preventable." (Id. at 14-15). In Dr. Patterson's subsequent addendum, which was prepared after discovery, he affirmed his previous findings of negligence and deliberate indifference; in doing so, Dr. Patterson specifically referenced the omissions of Rollings-Mazza, Leiphart, and Gallagher, as gleaned from a review of those defendants' depositions. (See Doc. 85-23 at 4-5). Based on Dr. Patterson's opinion, a reasonable juror could conclude that Leiphart and Gallagher breached the pertinent standard of care for mental health patients in prisons, and that this breach was the proximate cause of Carlos's injury.

Considering the foregoing, it appears that the plaintiff has presented sufficient evidence to survive summary judgment on the medical negligence claims against Leiphart and Gallagher. Therefore, to the extent Leiphart and Gallagher move for summary judgment on the plaintiff's state-law medical negligence claims, we will deny summary judgment on those claims.

*ii. Claims for Punitive Damages*

To the extent Leiphart, Rollings-Mazza, and Gallagher move for summary on the plaintiff's claims for punitive damages, those motions will also be denied at this time. Punitive damages may be awarded when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Tenon v. Dreibelbis, 190 F. Supp. 3d 412, 418 (M.D. Pa. 2016) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). Because "the standard to show 'deliberate indifference' is substantially the same as the standard to show 'reckless or callous indifference,'" courts have typically held that a claim for punitive damages should survive provided that a plaintiff sets forth a cognizable deliberate indifference claim. See id. (collecting cases). Thus, since there are sufficient facts from which a reasonable juror could find deliberate indifference on the part of Leiphart, Rollings-Mazza, and Gallagher, it follows that the plaintiff's claims for punitive damages against those defendants likewise survive summary judgment.

*V.*        *Conclusion*

As set forth in further detail above, the plaintiff's objections to Judge Saporito's report and recommendation will be sustained in part and overruled in part, and York County's objection to the report and recommendation will be overruled.  An appropriate order with further details will follow.


*s/Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: December 9, 2019**